ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Superseding Indictment |
| | : | Crim. No. S1 1:14-cr-00272-JSR |
| | : | |
| v. | : | VIOLATIONS: 18 U.S.C. Sections 1349 |
| | : | (Conspiracy), 1343 (Wire Fraud) & 2 |
| | : | (Aiding and Abetting), and Forfeiture. |
| ANTHONY ALLEN, | : | : |
| PAUL THOMPSON, | : | |
| TETSUYA MOTOMURA, and | : | |
| ANTHONY CONTI, | : | |
| | : | |
| Defendants. | : | |
| | : | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: OCT 16 2014

INDICTMENT

The grand jury charges that, at all times relevant to this Indictment:

COUNT ONE
(Conspiracy)

General Allegations

1. The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate overseen by the British Bankers' Association ("BBA"), a trade association based in London, United Kingdom representing approximately 200 banks from more than 60 countries.

2. LIBOR was calculated every London business day by averaging the interest rates at which designated banks ("Contributor Panel" banks) perceived that they could borrow unsecured funds from other banks across ten currencies, including U.S. Dollar ("USD") and the Japanese Yen ("Yen"). Contributor Panel banks for each currency submitted their perceived borrowing rates for fifteen different borrowing periods ("maturities" or "tenors"), ranging in length from overnight to one year, including maturities of one month, three months, and six months

1

(commonly referred to on paper as "1m," "3m," and "6m"). Thomson Reuters, acting as an agent for the BBA, received electronically the Contributor Panel banks' interest rate submissions at or before approximately 11:10 a.m. in London. Among other currencies, Thomson Reuters received the interest rate submissions for the USD and Yen LIBOR from sixteen designated Contributor Panel banks, specifically from bank employees referred to as "submitters" or "setters." Upon receipt of the sixteen Contributor Panel banks' Yen LIBOR submissions, Thomson Reuters: (a) ranked the submissions from highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions to determine the official USD and Yen LIBOR setting (also referred to as the "fix") used to settle trades and as a reference rate for various financial products. This process was repeated for each different maturity or tenor. Contributor Panel banks' USD and Yen LIBOR submissions were between two and five decimal places, and the published USD and Yen LIBOR fix was rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") was one-hundredth of one percent (0.01 percent).

3. By approximately 12:00 p.m. in the United Kingdom, Thomson Reuters published the averaged rates – or LIBORs – to, among others, Bloomberg LP network equipment which thereafter transmitted the LIBORs to servers located in New York, New York and elsewhere. Thomson Reuters as a general matter, pursuant to service agreements with various clients, transmitted the rates to servers and traders of LIBOR-based financial products around the world, including to those located in New York, New York and elsewhere.

4. The published LIBOR rates were used as the basis for the pricing of fixed-income futures, options, swaps, forward rate agreements, and other derivative instruments. Interest rate swaps involved an agreement between counterparties to exchange payments in the future:  one

counterparty paid a fixed rate while the other paid a variable rate. Generally, the fixed rate was agreed upon at the outset by the counterparties and the variable rate was set at some point in the future. Often times, the variable rate was based on a reference rate such as USD or Yen LIBOR. The actual value of the contract could not be determined until the date on which the variable rate was set. At that point, payment amounts were determined, and, depending on the value of the variable rate, one party made money and the other lost money.

5. Traders made predictions on where LIBORs would set in the future. Traders, on behalf of their respective financial institutions, often entered into multiple derivatives contracts containing LIBORs as a price component based on those views. Therefore, the profit and loss that flowed from those contracts was directly affected by the relevant LIBORs on certain dates. If the relevant LIBORs moved in the direction favorable to the trader's position, the financial institution and the trader benefitted at the expense of their counterparties. When the traders' predictions were wrong and LIBOR moved in an unfavorable direction, the traders and the financial institutions stood to lose money to their counterparties.

6. Because traders often took large derivative positions, even small moves in the LIBOR fix could result in large swings in profits or losses from trades.

7. USD and Yen LIBOR globally impacted transactions and financial products tied to USD and Yen LIBOR. In addition to being used to price derivative products, financial institutions and other lenders in the United States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products, which included mortgages, credit cards, and student loans, among others.

3

8. A Contributor Panel bank's submission was to be an independent assessment of that bank's perceived borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBOR rates.

9. Because LIBOR was calculated as an average of banks' submissions, if a bank coordinated its submission with another Contributor Panel bank, it could affect the fix more significantly than if it manipulated only its own submission.

10. One of the USD and Yen LIBOR Contributor Panel banks was Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), a financial institution and global financial services company headquartered in Utrecht, the Netherlands with branches in the United States that were insured by the Federal Deposit Insurance Corporation (FDIC).

11. From at least in or about May 2006 through at least in or about early 2012, Takayuki Yagami ("Yagami") was a Senior Trader on Rabobank's Money Market/FX Forwards desks in Tokyo, Japan and elsewhere in Asia. Yagami traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of Yagami's trading positions depended on the direction in which Yen LIBORs moved.

12. From at least May 2006 through at least November 2008, Paul Robson a/k/a "Pookie," a/k/a "Pooks" ("Robson") worked as a Senior Trader at Rabobank's Money Markets and Short Term Forwards desk in London. From in or about January 2006 until at least November 2008, he served as Rabobank's primary submitter of Yen LIBOR to the BBA. At times during this period, Robson acted as a back-up USD LIBOR submitter. Starting sometime in 2009, Robson worked at a brokerage firm in the United Kingdom and thereafter moved to a London-based office of a Japanese bank. At times during his tenure at Rabobank, Robson traded

4

derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of Robson's trading positions depended on the direction in which Yen LIBORs moved.

13. From at least in or about September 2002 through at least in or about December 2005, Trader-R1 was a trader at Rabobank in London, England. From at least April 2006 through in or about August 2008, Trader-R1 was a trader at Rabobank at Rabobank's New York office, which was located at 245 Park Avenue in New York, New York. Trader-R1 traded derivative products that referenced USD LIBOR. Because these trades were settled based on the published USD LIBOR, the profitability of Trader-R1's trading positions depended on the direction in which USD LIBORs moved. As set forth below, Trader-R1 sought to manipulate USD LIBOR from New York, New York.

14. From at least in or about January 2005 through about January 2009, Trader-R2 was a senior trader on the Short Dated Forwards and Overnight Index Swap Desk in London. In January 2009 Trader-R2 moved to the Short Dated Forwards and Overnight Index Swap Desk in Utrecht, Netherlands and remained there through at least in or about December 2010. From at least in or about January 2006 through about June 2009, Trader-R2 was a backup submitter for Yen LIBOR.

15. From at least in or about 1993 through about 2009, Trader-R3 was a senior trader at Rabobank's London desk. At times during that period, Trader-R3 supervised Trader-R1. Also during that period, Trader-R3 traded derivative products that referenced USD LIBOR. Because such trades were settled based on the published USD LIBOR, the profitability of Trader-R3's trading positions depended on the direction in which USD LIBORs moved.

16. From at least 1998 through 2000, Submitter-R1 worked in Rabobank's Utrecht, Netherlands office where he traded Repurchase Agreements. From at least 2000 to at least 2008, Submitter-R1 worked at Rabobank's Money Markets and Short Term Forwards Desk in London, U.K. where he traded Repurchase Agreements, Overnight Index Swaps, and derivative products that referenced USD LIBOR. While working in London, Submitter-R1 was a backup submitter for USD LIBOR.

17. From at least 2006 through about December 2010, Submitter-R2 was a senior Money Markets dealer based in Utrecht. During this time Submitter-R2 had primary responsibility for making Rabobank's EURIBOR submission. At times during this period Submitter-R2 was the primary or backup submitter for USD LIBOR.

18. Another of the Yen LIBOR Contributor Panel banks was Lloyds Banking Group plc ("Lloyds"), a global financial services company headquartered in London, United Kingdom.

19. Submitter-A worked for Lloyds TSB as a trader from at least May 2006 to at least October 2008. At times while employed at Lloyds TSB, Submitter-A was responsible for making the bank's Yen LIBOR submissions.

20. Another of the Yen LIBOR Contributor Panel banks was UBS AG, a financial institution located in Zurich, Switzerland. Tom Hayes worked for UBS AG as a trader from at least July 2006 to at least September 2009.

21. Bank-B was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in Charlotte, North Carolina.

22. Bank-C was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in New York, New York.

The Defendants

23. From at least in or about January 2005 through about October 2008, defendant ANTHONY ALLEN ("ALLEN") was the Global Head of Liquidity and Finance at Rabobank's London desk. During that time, ALLEN supervised, among other things, the LIBOR submission process and the money market and derivative trading at Rabobank's London desk. These responsibilities included, at times, supervising ANTHONY CONTI, Paul Robson, Traders-R1 and R2, and Submitter-R1. At times during this period, ALLEN acted as a back-up USD and Yen LIBOR submitter. ALLEN traded derivative products that referenced USD LIBOR. Because these trades were settled based on the published USD LIBOR, the profitability of ALLEN's trading positions depended on the direction in which USD LIBORs moved. ALLEN was a member of the BBA Steering Committee, a group of financial professionals who provided the BBA with advice on the calculation of the LIBOR rate as well as recommendations concerning which financial institutions should sit on the LIBOR panel.

24. From at least in or about June 2006 through at least in or about October 2007, defendant PAUL THOMPSON ("THOMPSON") was Rabobank's Head of Money Market and Derivatives Trading for Northeast Asia. In or about October 2007, he was promoted to Executive Director of local currency trading for Asia, and from in or about November 2010 to at least in or about January 2011 he was a Managing Director and head of liquidity and finance for Rabobank Asia. At times during that period, THOMPSON traded derivative products that referenced USD and Yen LIBOR. Because these trades were settled based on the published

7

USD and Yen LIBOR, the profitability of THOMPSON's trading positions depended on the direction in which USD and Yen LIBORs moved.

25. From at least in or about May 2006 through at least late 2010, defendant TETSUYA MOTOMURA a/k/a "Moto man" ("MOTOMURA") was a Senior Trader and Head of Global Financial Markets Trading-Tokyo at Rabobank's Tokyo desk. During that time, MOTOMURA supervised money market and derivative traders employed at Rabobank's Tokyo desk, including, at times, Yagami. MOTOMURA traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of MOTOMURA's trading positions depended on the direction in which Yen LIBORs moved.

26. From at least in or about January 2005 through about December 2008, ANTHONY CONTI ("CONTI") was a senior trader on Rabobank's Money Markets Trading Desk in London. In about late 2008 to early 2009, CONTI moved to the Money Markets Trading Desk in Utrecht, Netherlands and remained there through at least in or about April 2009. Also during those periods, CONTI traded derivative products that referenced USD LIBOR. Because such trades were settled based on the published USD LIBOR, the profitability of CONTI's trading positions depended on the direction in which USD LIBORs moved. From about May 2006 through about April 2009 CONTI was the primary submitter for USD LIBOR. At times, CONTI acted as a back-up Yen LIBOR submitter.

The Conspiracy

27. From at least in or about May 2006 through at least in or about early 2011, in the Southern District of New York and elsewhere, ANTHONY ALLEN, PAUL THOMPSON, TETSUYA MOTOMURA, and ANTHONY CONTI, the defendants, together with Paul Robson, Takayuki Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, and Submitter-A, and others

8

known and unknown, did knowingly combine, conspire, confederate, and agree to commit certain offenses against the United States, that is:

    (A) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme, all affecting a financial institution; to wit, the defendants engaged in a scheme to manipulate and attempt to manipulate to their advantage the benchmark interest rates referenced by derivative products throughout the financial industry, by the dissemination, and submission, of false and fraudulent statements intended to influence and manipulate the benchmark interest rates to which the profitability of interest rate derivative trades was tied, in violation of Title 18, United States Code, Section 1343; and

    (B) to execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits for which were at the time insured by the Federal Deposit Insurance Corporation; and to obtain and attempt to obtain moneys, funds, credits, assets, and other properties owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, as well as by omission of material facts in violation of Title 18, United States Code, Section 1344.

## The Scheme

28. From at least in or about May 2006 through at least in or about early 2011, ANTHONY ALLEN, PAUL THOMPSON, TETSUYA MOTOMURA, ANTHONY CONTI,

the defendants, together with Paul Robson, Takayuki Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, Submitter- R2, and Submitter-A, at times located in Tokyo, Japan; London, England; New York, New York; Utrecht, the Netherlands; and elsewhere, and others known and unknown to the grand jury, intending to manipulate and attempt to manipulate to their advantage the benchmark interest rates referenced by derivative products throughout the financial industry, engaged in a scheme to obtain money and property by making false and fraudulent USD and Yen LIBOR submissions to the BBA for inclusion in the calculation of USD and Yen LIBOR.  The scheme had an effect on one or more financial institutions, within the meaning of Title 18, United States Code, Sections 20 and 3293(2). The conduct of the conspirators caused financial institutions to be susceptible to substantial risk of loss and to suffer actual loss. At all times material to this Indictment, ALLEN, THOMPSON, MOTOMURA, and CONTI knew and foresaw that Rabobank had counterparties in the United States which had taken financial positions that would be negatively affected by their scheme to manipulate the LIBOR benchmark interest rate. At all times material to this Indictment, ALLEN, THOMPSON, MOTOMURA, and CONTI knew and foresaw that entities in the United States were trading derivative swaps the profitability of which was linked to Yen and USD LIBOR.

### Manner and Means

29. In order to further the objects and goals of the conspiracy, ANTHONY ALLEN, PAUL THOMPSON, and TETSUYA MOTOMURA, and ANTHONY CONTI, the defendants, together with Robson, Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, Submitter-R2, Submitter-A, and others known and unknown to the grand jury used the following manners and means, among others:

a. ALLEN, who supervised Rabobank's submission process for LIBOR, directed Rabobank traders to advise Rabobank's LIBOR setters of any financial interest they had in LIBOR on a particular day and also directed Rabobank's LIBOR setters to seek out that information and make LIBOR submissions that favored the traders' positions.

b. Rabobank traders who entered into derivative swap agreements the profitability of which was tied to the LIBOR benchmark – including ALLEN, THOMPSON, MOTOMURA, Yagami, Trader-R1, Trader-R2, and Trader-R3 – asked Rabobank LIBOR setters to make USD and Yen LIBOR submissions that favored the traders' derivative positions and Rabobank LIBOR submitters – including ALLEN, CONTI, Robson, Submitter-R1, and Submitter-R2 – accommodated those requests by making USD and Yen LIBOR submissions that were intended to benefit Rabobank's traders rather than making submissions that reflected the perceived rate at which Rabobank could borrow unsecured funds. At times, the Rabobank LIBOR submitters submitted rates that benefitted their own trading positions.

c. From at least May 2006 through at least November 2008, Robson had primary responsibility for making Rabobank's Yen LIBOR submissions to the BBA.

d. THOMPSON, MOTOMURA, Robson, and Yagami traded derivative products whose value was tied to the Yen LIBOR fix.

e. Traders such as THOMPSON, MOTOMURA, and Yagami requested that Robson and other Rabobank Yen LIBOR submitters, including, at times, ALLEN and CONTI, make Yen LIBOR submissions that benefitted the traders' positions.

11

f.   At times, Robson accommodated such requests by making and causing false and fraudulent Yen LIBOR submissions to be made.  Sometimes Robson submitted rates at a specific level requested by a defendant or Yagami and consistent with the requester's interests.  Other times, Robson made a higher or lower Yen LIBOR submission consistent with the direction requested by a co-defendant or Yagami and consistent with the requester's interests.  Robson also took his own positions into consideration. The manipulations and attempted manipulations of the Yen LIBOR submissions were intended to benefit the trading positions of Rabobank traders to the detriment of, among others, Rabobank's counterparties to derivative contracts.

g.   Robson, in addition to manipulating Rabobank's Yen LIBOR submission on behalf of one or more co-defendants or Yagami, occasionally coordinated his Yen LIBOR submission with Submitter-A at Lloyds.  At times Robson submitted Yen LIBOR at a level requested by Submitter-A, and, at other times, Submitter-A submitted Yen LIBOR at a level requested by Robson.

h.   From at least May 2006 through at least April 2009, CONTI had primary responsibility for making Rabobank's USD LIBOR submissions to the BBA.

i.   ALLEN, THOMPSON, Trader-R1, Trader-R2, and Trader-R3 traded derivative products whose value was tied to the USD LIBOR fix.

j.   ALLEN, THOMPSON, Trader-R1, Trader-R2, and Trader-R3 requested that CONTI and other Rabobank USD LIBOR submitters make USD LIBOR submissions that benefitted their trading positions.  These individuals often sat at the same desk and most commonly made such requests in person.  At times,

Yagami requested that ALLEN and CONTI make Yen LIBOR submissions that benefitted his trading positions.

k.   At times, CONTI accommodated such requests by making and causing false and fraudulent USD LIBOR submissions to be made.  Sometimes CONTI submitted rates at a specific level requested by a co-defendant or Traders-R1, R2, and R3 and consistent with the requester's interests.  Other times, CONTI made a higher or lower USD LIBOR submission consistent with the direction requested by a defendant or Traders-R1, R2, and R3 and consistent with the requester's interests. CONTI also took his own positions into consideration. The manipulations and attempted manipulations of the USD LIBOR submissions were intended to benefit the trading positions of Rabobank traders to the detriment of, among others, Rabobank's counterparties to derivative contracts.

l.   On many occasions, the combined effect of Rabobank's and Lloyds' false and fraudulent submissions moved the Yen LIBOR fix more than it otherwise would have if Rabobank alone submitted manipulated rates.

m. After January 2009, when Rabobank's Yen LIBOR submitters moved to Utrecht, and until at least November 2010, Yagami continued to send multiple requests for Yen LIBOR rates that benefitted his trading positions to the Rabobank submitters for them to submit to the BBA.

Overt Acts

30. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

September 2, 2005 through September 6, 2005

31. On or about September 2, 2005, Trader-R3 stated to CONTI that he would "prefer 1 and 3 month Libor on the high side for the next couple of days if possible."

32. On or about September 5, 2005, the following Monday, Rabobank submitted a 1-month USD LIBOR rate of 3.69 percent, which was two basis points higher than the previous day, moving Rabobank's submission from second lowest to tied for sixth lowest on the panel.

33. On or about September 6, 2005, Rabobank submitted a 3-month USD LIBOR rate of 3.8 percent, which was three basis points higher than the day before, moving Rabobank's submission from tied for second lowest to the highest on the panel.

May 10 and May 11, 2006

34. On or about May 10, 2006, Robson stated to Submitter-A that, "for info i've been asked by my singapore man [THOMPSON] to help him out with a silly low 6m fixing today."

35. Later that same day, Robson admitted to Yagami, "it must be pretty embarrasing to set such a low libor  (I was very embarrased to sey my 6 mth – but wanted to help thomo [THOMPSON]). tomorrow it will be more like 33 from me."

36. On or about May 10, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.26 percent, which was one basis point lower than the previous day, moving Rabobank's submission down from the panel's second highest to tied for second lowest, while the other panel banks submissions increased by an average seven basis points.

37. On or about May 11, 2006, the following day, THOMPSON thanked Robson "for yest" and indicated that he needed "6 mth Libor" low again.

38. On or about May 11, 2006, Robson responded, "6m sets at 31 today mate…will put in something rediculously low again tho – no probs."

39. On or about May 11, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.28 percent, remaining at second lowest.

May 19, 2006

40. On or about May 19, 2006, after THOMPSON informed Robson that his net exposure for his 3-month fixes was 125 billion Yen, he requested that Robson, "sneak your 3m libor down a cheeky 1 or 2 bp" because "it will make a bit of diff for me."

41. On or about May 19, 2006, Robson responded, "No prob mate I mark it low."

42. On or about May 19, 2006, Rabobank submitted a 3-month Yen LIBOR rate of 0.17 percent, four basis points lower than Rabobank's submission the day before, moving its submission from the panel's second highest to tied for the lowest.

July 17, 2006

43. On or about July 17, 2006, Trader-R1, who was in New York, New York, asked CONTI for a "really low 3s today." CONTI replied that this request was opposite Trader-R3's position, saying, "You're going toe to toe with the ambass [Trader-R3] at the moment mate." Trader-R1 then stated that his position had changed as well, telling CONTI, "Whatever the ambass [Trader-R3] wants, if any chance, a high 3mth today pl!"

44. On or about July 17, 2006, Rabobank submitted a 3-month USD LIBOR rate of 5.49 percent, moving the submission from tied for the lowest submission to tied for the third highest submission.

July 27, 2006 and July 28, 2006

45. On or about July 27, 2006, Robson wrote to Submitter-A, "morning skip....my little yellow friend in tokyo [Yagami] wants a high 1m fix from me today....am going to set .37 – just

for your info sir." To this, Submitter-A responded, "that suits me mate as got some month end

fixings so happy to ablige..rubbery jubbery.:-O"

46. On or about July 27, 2006, Lloyds submitted a 1-month Yen LIBOR rate of 0.37

percent, two basis points higher than Lloyds' submission the day before, moving its submission

from tied for the panel's lowest to tied with Rabobank for the second highest submission.

Rabobank also submitted a 1-month Yen LIBOR rate of 0.37 percent.

47. On or about July 28, 2006, after Robson wrote to Submitter-A, "morning

skipper.....will be setting an obscenely high 1m again today...poss 38 just fyi." Submitter-A

responded, "(K)...oh dear..my poor customers....hehehe!! manual input libors again today

then!!!!"

48. On or about July 28, 2006, Lloyds and Rabobank both submitted 1-month Yen

LIBOR rates of 0.38 percent, which tied the submission for the second highest submission that

day on the panel.

October 31, 2006

49. On or about October 31, 2006, Trader-R1, who was in New York, New York, asked

CONTI for "small favour as usual, low 2s high 3s if possible matey," to which CONTI replied,

"Will do matey on the libors  ..good luck."

50. On or about October 31, 2006, Rabobank submitted a 2-month USD LIBOR rate of

5.35 percent, half a basis point lower than the previous day, moving the submission from tied for

fourth lowest to the lowest submission on the panel.

51. On or about October 31, 2006, Rabobank submitted a 3-month USD LIBOR rate of

5.375 percent, half a basis point higher than the previous day, moving the submission from tied

for second lowest to the fifth highest submission on the panel.

<u>November 8, 2006 and November 9, 2006</u>

52. On or about November 8, 2006, THOMPSON stated to Robson, "Got a few big 3mth fixings in next 2 days, any chance you cud bump it up a couple? What do u actually think 3mth today 45.25 – 45.5 ish?"

53. On that same day, Robson responded, "will set them high and dry skip."

54. On or about November 8, 2006, Rabobank submitted a 3-month Yen LIBOR rate of 0.46 percent, which was 3 basis points higher than its previous day's submission, moving it from tied for the panel's second lowest to tied for the panel's third highest.

55. On or about November 9, 2006, the following day, THOMPSON stated, "Thx skip, 1 more today -- 3mths."

56. On that same day, Robson responded that he would set it high again asking "is 46 lvl ok or higher?"

57. On or about November 9, 2006, Rabobank again submitted a 3-month Yen LIBOR rate of 0.46 percent, keeping Rabobank's submission tied for the panel's third highest.

<u>November 16, 2006</u>

58. On or about November 16, 2006, Trader-R3 stated to Trader-R1, "I want a low 3's tomorrow....I'm short 5 yards. 37 will do!" Trader-R1, who was in New York, New York, responded that he had the opposite interest, writing, "AAAAAAAAAAAAAAAAAAHHHH high 3s pls guvnor."

<u>November 29, 2006</u>

59. On or about November 29, 2006, Trader-R1, who was in New York, New York, asked ALLEN, who at the time was the USD LIBOR backup submitter, for "low 1s high 3s

Libor pls !!! Dont tell the ambass [Trader-R3] haa haaaaaaa." ALLEN responded, "OK mate , will do my best …Speak later."

60. On or about November 29, 2006, Rabobank submitted a 1-month USD LIBOR rate of 5.345 percent, moving its submission from tied for second lowest to tied for fourth lowest.

61. On or about November, 29, 2006, Rabobank submitted a 3-month USD LIBOR rate of 5.37 percent, the same rate as the previous day, moving Rabobank's submission from being tied for third lowest the previous day to tied for second highest.

December 1, 2006

62. On or about December 1, 2006, Trader-R1, noting that 3-month USD LIBOR was trending down, stated to ALLEN, "a high 3s today would be nice… cheers chief." ALLEN responded, "I am fast turning into your LIBOR bitch!!!!" to which Trader-R1, who was in New York, New York, wrote, "Just friendly encouragement that's all , appreciate the help." ALLEN responded, "No  worries mate , glad to help."

December 13, 2006

63. On or about December 13, 2006, THOMPSON stated to Robson, "Wouldn't mind slightly higher 1m and slightly lower 6m if you have any room over the next 5 days..got a few biggies rolling off."

64. On or about December 13, 2006, Rabobank submitted a 1-month Yen LIBOR rate of 0.48 percent, one basis point higher than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's third highest.

65. On or about December 13, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.60 percent, 4 basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to the panel's lowest.

December 18, 2006

66. On or about December 18, 2006, after Yagami informed THOMPSON that he needed a high 1-month, THOMPSON responded that he would tell the person he believed to be submitting rates that day "to put a high 1s for you." THOMPSON further clarified that he would inform the backup submitter, "for choice put it higher rather than lower" and explained "I don't like to tell them in too black and white but Pookie [Robson] always understands."

67. On or about December 18, 2006, THOMPSON sent an email to the senior trader he believed to be submitting Rabobank's Yen LIBOR rates that day, stating, "your in the yen libors hot seat in Pooks absence. If in doubt can you go higher on 1m and 3m please as both myself and Tokyo are very long these fixings today so every little bit helps."

March 16, 2007 and March 19, 2007

68. On or about March 16, 2007, Trader-R1, who was in New York, New York, told ALLEN, "high 3mth libor on Monday pls." ALLEN replied, "ok will tell conti."

March 22, 2007 and March 23, 2007

69. On or about March 22, 2007, Robson told Submitter-A that he needed a high 1-month Yen LIBOR "set tomorrow" and stated, "if you can ask your man to set a nice high one like today pls?"

70. On or about March 22, 2007, Submitter-A forwarded Robson's message to a colleague at Lloyds stating, "We usually try and help each other out...but only if it suits."

71. On the following day, on or about March 23, 2007, Lloyds submitted a 1-month Yen LIBOR rate of 0.76 percent, the same rate as the previous day, keeping Lloyds' submission as the highest on the panel.

March 26, 2007 through March 30, 2007

72. On or about March 26, 2007, THOMPSON asked Robson, "On libors, this week have a fair bit of 6mths rolling off, I am short so if you can discreetly drop your 6m by 1-2 bp without any trouble would be great – if not no probs mate."

73. On that same date, Robson responded, "sure no prob – all my stuff is mainly 1 mth so will keep that high and drop 6's cheers."

74. On or about March 26, 2007, Rabobank submitted a 6-month Yen LIBOR rate of 0.74 percent. Over the course of that week, Rabobank's 6-month Yen LIBOR submissions dropped four basis points and went from being tied for second highest on the panel to being tied for lowest on the panel.  Rabobank's 1-month Yen LIBOR submission on March 26, 2007, stayed at the same level as the previous day and was tied for the second highest of all panel banks.

March 28, 2007 and March 29, 2007

75. On or about March 28, 2007, Trader-R1, who was in New York, New York, stated to CONTI and ALLEN that for the following day, "Low 3s Libor would be great if no one else has any preferences."

76. On or about March 29, 2007, Rabobank submitted a 3-month USD LIBOR rate of 5.345 percent, which was half a basis point lower than Rabobank's March 28, 2007 and March 30, 2007 submissions.

April 9, 2007 and April 10, 2007

77. On or about April 9, 2007, Trader-R1, who was in New York, New York requested that CONTI submit "High 3s tomorrow pls TC [CONTI]."

78. On or about April 10, 2007, Rabobank submitted a 3-month USD LIBOR rate of 5.36 percent, which was one basis point higher than the previous day.

June 15, 2007

79. On or about June 15, 2007, THOMPSON asked Robson, "can you try to keep your 6m high today?"

80. On or about June 15, 2007, after Robson told Yagami, "thomo wanted a high one," Yagami stated, "Thomo should have told me this. I wanted them to be lower."

August 9, 2007

81. On or about August 9, 2007, THOMPSON asked CONTI, "What u roughly thinking abt 1m and 3m LIBORs for the Rabo today pls mate." CONTI replied, "I'm 5.55 & 5.50 … i'm higher in 1's because we are long the fixing today & the next few days …" THOMPSON stated that this was acceptable to him because he had also taken a long position.

82. On or about August 9, 2007, Rabobank submitted a 1-month USD LIBOR rate of 5.54 percent, which was 19 basis points higher than the previous day's submission.

August 13, 2007

83. On or about August 13, 2007, Trader-R1, who was in New York, New York, asked CONTI for "high 3s and 6s pls today mate (esp 6mths!!)" and said, "gotta make money somehow!" CONTI replied, "cool." Trader-R1 said that "every little helps!"

84. On or about August 13, 2007, Rabobank submitted a 6-month USD LIBOR rate of 5.41 percent, moving it from tied for third lowest to the second highest on the panel.

August 13, 2007 and August 14, 2007

85. On or about August 13, 2007, Trader-R1, who was in New York, New York, asked CONTI, "Where do u see 6m LIBOR tomorrow pls ?" CONTI asked, "where do you like to see it, is more the question ?"

September 19, 2007

86. On or about September 19, 2007, CONTI told Submitter-R2, "today i have fixing so am low on the 3mth ..." and "i am happy to llose 3's but i did )*3's fra over today last night so want low fixing today ..libors."

87. On or about September 19, 2007, Rabobank submitted a 3-month USD LIBOR rate of 5.20 percent, moving it from tied for seventh lowest to tied for lowest on the panel.

September 21, 2007

88. On or about September 21, 2007, Yagami asked Robson, "wehre do you think today's libors are? If you can, I would like 1mth libors higher today." Robson responded, "Bookies reckon 1m sets at .85."

89. On or about September 21, 2007, Yagami informed Robson, "I have some fixings in 1mth so would appreciate if you can put it higher mate."

90. Robson answered, "No prob mate let me know your level." After Yagami asked for "0.90% for 1mth," Robson confirmed, "Sure no prob...I'll probably get a few phone calls but no worries mate...   there's bigger crooks in the market than us guys!"

91. On or about September 21, 2007, Rabobank submitted a 1-month Yen LIBOR rate of 0.90 percent, which was 7 basis points higher than the previous day, moving Rabobank's submission from the middle of the panel to the panel's highest.

October 17, 2007 through October 19, 2007

92. On or about October 17, 2007, Trader-R3 wrote to CONTI "A nice low 1 month for the rest of the week please matey. Cheers."

93. On or about October 17, 2007, Rabobank submitted a 1-month USD LIBOR rate of 4.98 percent, moving its submission from the fifth lowest to the lowest on the panel.

94. On or about October 18, 2007, Rabobank submitted a 1-month USD LIBOR rate of 4.98 percent, which moved its submission from the lowest to tied for second lowest.

95. On or about October 19, 2007, Rabobank submitted a 1-month USD LIBOR rate of 4.92 percent, moving its submission back to the lowest on the panel.

<u>October 30, 2007</u>

96. On or about October 30, 2007, Robson asked MOTOMURA, "Do you want me to set anything for you?"

97. On that same date, MOTOMURA replied, "if it is lower, it's better for me" and asked for "low 6's, please."

98. On or about October 30, 2007, Rabobank submitted a 6-month Yen LIBOR rate of 0.98 percent, three basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to the panel's second lowest.

<u>November 15, 2007</u>

99. On or about November 15, 2007, after referencing 1-month USD LIBOR, CONTI stated to Submitter-R2 that "the ambass had big fixing so we help him today."

<u>January 24, 2008</u>

100. On or about January 24, 2008, THOMPSON asked CONTI where 3-month USD LIBOR would fix because THOMPSON had a big reset that day. CONTI said, "seems to be 23 the shout mate .. i can go lower if you like ?" THOMPSON replied, "That will do mate, cheers."

101. On or about January 24, 2008, Rabobank submitted a 3-month USD LIBOR rate of 3.22 percent, which was ten basis points lower than their previous submission, and moved the submission from fourth lowest to tied for second lowest on the panel.

102. Because Bank-C had an interest swap agreement with Rabobank, the profitability of which was tied to LIBOR, Bank-C was directly affected by the Yen LIBOR rate on January 24, 2008.

February 27, 2008

103. On or about February 27, 2008, Yagami requested Robson submit, "1m 0.70% 3m 0.92% 6m 0.98% Please cheers." Robson responded, "Ok will do skip."

104. On or about February 27, 2008, Rabobank submitted 1-month, 3-month, and 6-month Yen LIBOR rates of 0.70 percent, 0.92 percent, and 0.98 percent, respectively.

March 12, 2008 and March 13, 2008

105. On or about March 12, 2008, Trader-R1, who was in New York, New York, stated to ALLEN, "High 3s and 6s pls tomorrow Tony."

106. On or about March 13, 2008, Rabobank submitted a 3-month USD LIBOR rate of 2.795 percent, 2.5 basis points lower than the previous day submission, while the other panel banks submitted an average five basis points lower, moving Rabobank's submission from the lowest of the panel to the fifth lowest.

March 19, 2008

107. On or about March 19, 2008, MOTOMURA stated to Yagami that they had 1,650 contracts and asked Yagami to make the rate as high as possible.

108. On or about March 19, 2008, Yagami wrote to Robson, "We have loads of 6mth fixings today. If possible, could you set 6m libor to 1.10% please? We don't have particular interest in other libors."

109. Robson wrote back, "Sry just to confirm 6m you want at 1.10??? Ok will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today... indications are... 1m 85 2m 91 3m 975 6m 1.03."

110. After learning that Robson expected the 6-month rate to be 1.03, Yagami responded, "actually,,, moto man [MOTOMURA] would like 6m to be higher today..... If it is not appropriate, it is fine mate, I will explain the situation to him." To this, Robson assured, "Well its no prob mate – I can set it that high....It will be quite funny to see the reaction!"

111. On that same day, Robson told Submitter-A that Yagami needed a "high 6m libor if you can help skip - asked me to set 1.10!"

112. Also on that same day, Yagami informed MOTOMURA that Robson would submit a 6-month Yen LIBOR rate of 1.1 percent and this would increase the resulting Yen LIBOR fix by 0.1 basis point. MOTOMURA responded that this was splendid.

113. On or about March 19, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 1.10 percent, eight basis points higher than Rabobank's submission the day before, moving its submission from the middle of the panel to the panel's second highest.

114. Because Bank-B had an interest swap agreement with Rabobank, the profitability of which was tied to LIBOR, Bank-B was directly affected by the Yen LIBOR rate on March 19, 2008.

April 17, 2008

115. On or about April 17, 2008, Yagami stated to Robson, "Moto [MOTOMURA] would like to have 6m libor lower mate."

116. On or about April 17, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.96 percent, which was three basis points lower than the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's third lowest.

<u>April 23, 2008</u>

117. On or about April 23, 2008, Yagami requested Robson submit "1m 0.68% 3m 0.93% 6m 0.97% pls cheers." Robson responded, "Ok will do."

118. On or about April 23, 2008, Rabobank submitted 1-month, 3-month, and 6-month Yen LIBOR rates of 0.68 percent, 0.93 percent, and 0.97 percent, respectively.

<u>July 18, 2008</u>

119. On or about July 18, 2008, in an exchange between Robson and a broker located in the United Kingdom regarding setting the one-month Yen LIBOR rate, the broker asked Robson to submit a rate "as low as possible basically," and told Robson that it was for "UBS...Tom [Hayes]." After offering to set 0.63 percent, Robson said "Make sure he [Hayes] knows... you know scratch my back."

120. On or about July 18, 2008, Rabobank submitted a 1-month Yen LIBOR rate of 0.63 percent, eight basis points lower than the previous day, moving Rabobank's submission from tied for the highest to tied for the second lowest.

<u>July 24, 2008 through July 30, 2008</u>

121. On or about July 24, 2008, Yagami asked Robson, "Could you set 6m at 0.97% please? Moto [MOTOMURA] has big fixings over the next couple of weeks so that it would be nice if you could keep it as low as possible for some time."

122. On that same date, Robson affirmed, "Will do mate."

123. On or about July 24, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.97 percent, which was three basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's second lowest.

124. On or about July 25, 2008, Rabobank submitted 0.97 percent which was the panel's second lowest 6-month Yen LIBOR rate.

125. Rabobank's submission for the 6-month Yen LIBOR rate remained at 0.97 percent-- the second lowest submission-- through July 30, 2008.

August 4, 2008 through August 7, 2008

126. On August 4, 2008, in a Bloomberg chat, MOTOMURA asked Robson, "Please set today's 6mth LIBOR at 0.96 I have chunky fixing." On that same day, Robson responded, "no worries mate."

127. On or about August 4, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.96 percent, which was three basis points lower than the previous day, moving Rabobank's submission from tied for the panel's fourth lowest to the second lowest.

128. On or about August 6, 2008, MOTOMURA stated to Robson, "Good Morning. I have another side of fixing today and tomorrow. Can we make 6mth libor at 0.98?"

129. On that same date, Robson replied, "OK higher?...sure thing."

130. On or about August 6 and August 7, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 1.00 percent, which was four basis points higher than August 5, 2008, moving Rabobank's submission from the panel's second lowest to the upper half.

September 16, 2008 and September 17, 2008

131. On or about September 16, 2008, Rabobank submitted a 1-month USD LIBOR rate of 2.78, an increase of 26 basis points over the previous day's submission of 2.52.

27

132. On or about September 16, 2008, Trader-R3 forwarded to Submitter-R1, who was in charge of submitting Rabobank's USD LIBOR submissions that day, an email summary of banks' USD LIBOR submissions.  Trader-R3 expressed his dissatisfaction with Submitter R2's submission by saying, "Before justifying from a cash perspective where the true rate should be etc, I, and you, know that if you were short of 1 month fixing you'd have put in a mid '60s LIBOR. P+L wise I couldn't give a fack but I just can't get my head around why you were being such an arse. I thought we were mates!"

133. On or about September 16, 2008, Submitter-R1 replied to Trader-R3, "I have no upside upseting you or setting the libor too high , I spoke to three diffewrent brokers and was told anywhere from 2.65 to 3.30 1month…"  Submitter-R1 concluded, "So I would rather  we move on from this , and anything u need tom tell me again and ill try my best."

134. On or about September 17, 2008, while speaking to an unknown person on the phone, Trader-R3 said, "We help ourselves to the LIBORs that we're on the panel. [Submitter-R1] fucked me over the LIBORs yesterday and there was no need, he had nothing in it.  Could have got away with something different, he knew exactly what I needed."

October 7, 2008

135. On or about October 7, 2008, THOMPSON asked ALLEN if LIBORs would remain the same for that day. ALLEN responded, "Where do you want 'em?" THOMPSON said, "…Smidgen lower?" Following further discussion about where to set LIBORs, ALLEN concluded, "Maybe a smidge lower, smidge lower."

136. On or about October 7, 2008, Rabobank submitted a 3-month USD LIBOR rate of 3.95 percent, which was five basis points lower than the previous day's submission of 4.00 percent.

28

October 31, 2008

137. On or about October 31, 2008, Yagami asked in an email to ALLEN, CONTI, and Trader-R2, "If possible could you put 0.99% for 3m libor and 1.07% for 6m LIBOR pls?"

138. On or about October 31, 2008, as requested, Rabobank submitted a 3-month Yen LIBOR rate of 0.99 percent.

139. On or about October 31, 2008, as requested, Rabobank submitted a 6-month Yen LIBOR rate of 1.07 percent.

November 4, 2008

140. On or about November 4, 2008, Yagami asked in an email to ALLEN, CONTI, and Trader-R2, "Could you set 6m libor at 0.98% today if possible please?" Trader-R2 responded, "SURE."

141. On or about November 4, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.98 percent, five basis points lower than the previous day.

May 15, 2009

142. On or about May 15, 2009, Yagami asked Robson, who, at that time was working at a brokerage firm, "How about 6m yen libor for today?"

143. Robson responded, "well strange one...guys think the same 72..problem is UBS wants a high one today so he will call his friends to get it higher if he can...but 72 it shud be again."

144. Yagami wrote back, "i anyway want it to be hight so,, fine with me  cheers."

145. Robson responded, "ok fair enough – will see what we can do for you mate !"

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Wire Fraud)

146. The allegations as set forth in paragraphs 1 through 26 and 28 through 145 are hereby realleged as if set forth herein.

147. On or about June 15, 2007, in the Southern District of New York and elsewhere, ANTHONY ALLEN and PAUL THOMPSON, the defendants, together with Paul Robson and Takayuki Yagami, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted by wire from a Rabobank counterparty in New York, New York via Tokyo, Japan to Rabobank in Utrecht, The Netherlands.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

COUNT THREE
(Wire Fraud)

148. The allegations set forth in paragraphs 1 through 26 and 28 through 145 are realleged as if set forth herein.

149. On or about March 28, 2008, in the Southern District of New York and elsewhere, ANTHONY ALLEN, the defendant, together with Paul Robson and Takayuki Yagami, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and

artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted by wire from a Rabobank counterparty in New York, New York to Rabobank in Singapore.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud)

150. The allegations set forth in paragraphs 1 through 26 and 28 through 145 are realleged as if set forth herein.

151. On or about April 28, 2008, in the Southern District of New York and elsewhere, ANTHONY ALLEN, PAUL THOMPSON, and ANTHONY CONTI, the defendants, together with others, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted by wire from Rabobank in Utrecht, the Netherlands to a Rabobank counterparty in New York, New York.

31

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Wire Fraud)

152. The allegations set forth in paragraphs 1 through 26 and 28 through 145 are realleged as if set forth herein.

153. On or about May 26, 2008, in the Southern District of New York and elsewhere, ANTHONY ALLEN, the defendant, together with Paul Robson and Takayuki Yagami, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted  by wire from a Rabobank counterparty in New York, New York to Rabobank in Singapore.

## COUNT SIX
### (Wire Fraud)

154. The allegations set forth in paragraphs 1 through 26 and 28 through 145 are realleged as if set forth herein.

155. On or about September 25, 2008, in the Southern District of New York and elsewhere, ANTHONY ALLEN and TETSUYA MOTOMURA, the defendants, together with Paul Robson and Takayuki Yagami, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud,  and for obtaining money and property by

means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted by wire from Rabobank in Utrecht, The Netherlands via Tokyo, Japan to a Rabobank counterparty in New York, New York.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH NINETEEN
### (Wire Fraud)

156. The allegations as set forth in paragraphs 1 through 26 and 28 through 145 are hereby realleged as if set forth herein.

157. On or about the dates set forth in Column C below, in the Southern District of New York and elsewhere, the defendants set forth in Column B below, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution, to wit, on or about the dates set forth below, among other dates, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades were tied, .Thomson Reuters published a) the rates submitted by Rabobank and the other panel banks and b)

33

the averaged rates – or LIBORs – by wire from the United Kingdom to New York, New York, among other places.

| A | B | C |
|---|---|---|
| **Count** | **DEFENDANTS** | **DATE** |
| **SEVEN** | Allen<br>Conti | September 5, 2005 |
| **EIGHT** | Allen<br>Conti | September 6, 2005 |
| **NINE** | Allen<br>Thompson | May 10, 2006 |
| **TEN** | Allen<br>Conti | October 31, 2006 |
| **ELEVEN** | Allen<br>Thompson | November 9, 2006 |
| **TWELVE** | Allen<br>Thompson | December 18, 2006 |
| **THIRTEEN** | Allen<br>Conti | April 10, 2007 |
| **FOURTEEN** | Allen<br>Thompson<br>Conti | August 9, 2007 |
| **FIFTEEN** | Allen<br>Conti | September 19, 2007 |
| **SIXTEEN** | Allen<br>Conti | October 17, 2007 |
| **SEVENTEEN** | Allen<br>Motomura | October 30, 2007 |
| **EIGHTEEN** | Allen<br>Robson<br>Motomura | July 24, 2008 |
| **NINETEEN** | Allen<br>Thompson | October 7, 2008 |

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 982(a)(2)(A) and 981(a)(1)(C))

158. The allegations contained in the General Allegations Section and in Counts 1 through 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which one or more of ANTHONY ALLEN, ANTHONY CONTI, PAUL THOMPSON, or TETSUYA MOTOMURA has an interest.

159. Upon conviction of any of the violations alleged in Counts 1 through 19 of this Indictment, ANTHONY ALLEN, PAUL THOMPSON, TETSUYA MOTOMURA, ANTHONY CONTI, shall forfeit all of their right, title and interest to the United States of any property, constituting or derived from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18, United States Code, Section 982(a)(2)(A).

160. Upon conviction of any of the violations alleged in Counts 1 through 19 of this Indictment, ANTHONY ALLEN, PAUL THOMPSON, TETSUYA MOTOMURA, ANTHONY CONTI, shall forfeit all of their right, title and interest to the United States of any property, constituting or derived from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

161. The property subject to forfeiture, pursuant to Forfeiture Allegations paragraphs 159 and 160 above, includes but is not limited to the sum of all proceeds the defendants derived from the offenses alleged in this indictment.

(All pursuant to Title 18, United States Code, Section 982(a)(2)(A); Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth at Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461.)

162. If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

(1) cannot be located upon the exercise of due diligence,

(2) has been transferred or sold to, or deposited with a third person,

(3) has been placed beyond the jurisdiction of the Court,

(4) has been substantially diminished in value, or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable through Title 18, United States Code, Section 982(b) and the provisions of Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

Dated: _October 25, 2012_

A TRUE BILL

_____
FOREPERSON


WILLIAM J. STELLMACH
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

_____
BRIAN YOUNG
Trial Attorney
CAROL L. SIPPERLY
Senior Litigation Counsel
Criminal Division
United States Department of Justice

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
United States Department of Justice

_____
MICHAEL T. KOENIG
Trial Attorney
Antitrust division
United States Department of Justice