## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,                   :
                                            :
        v.                                  :
                                            :   Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN,                              :
PAUL THOMPSON,                              :
TETSUYA MOTOMURA, and                       :
ANTHONY CONTI,                              :
                                            :
              Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO COMPEL THE GOVERNMENT TO IMMUNIZE
## SUBMITTER-R1 AND FOR A RULE 15 DEPOSITION OF SUBMITTER-R1,
## OR, IN THE ALTERNATIVE,
## <u>TO EXCLUDE TESTIMONY FROM GOVERNMENT WITNESSES</u>

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TOR EKELAND, P.C.**
Tor Ekeland
Aaron Williamson
195 Plymouth Street, 5th Floor
Brooklyn, New York 11201-1133
(718) 737-7264

*Attorneys for Defendant Anthony Conti*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    The LIBOR is a Benchmark for Short-Term Interest Rates. ...................................4

    B.    The Government Alleges that Defendants Committed Wire Fraud and
        Participated in a Criminal Conspiracy to Manipulate LIBOR.................................5

    C.    The Testimony of Submitter-R1 Proves Mr. Allen and Mr. Conti Did Not
        Conspire with Derivatives Traders to Manipulate LIBOR. ...................................7

    D.    To Keep Him Off the Witness Stand, the Government named Submitter-
        R1 as an "Unindicted" Co-Conspirator in the Superseding Indictment. ................9

LEGAL STANDARD.....................................................................................9

ARGUMENT ....................................................................................12

    I.    SUBMITTER-R1'S TESTIMONY IS MATERIAL, EXCULPATORY,
        NON-CUMULATIVE, AND IS NOT OBTAINABLE FROM ANY
        OTHER SOURCE. .......................................................................12

    II.    THE GOVERNMENT HAS OVERREACHED IN AN EFFORT TO
        KEEP SUBMITTER-R1 FROM TESTIFYING. ..................................14

    III.    THE DEFENDANTS SHOULD BE PERMITTED TO DEPOSE
        SUBMITTER-R1 PURSUANT TO RULE 15 OF THE FEDERAL
        RULES OF CRIMINAL PROCEDURE. ............................................16

CONCLUSION....................................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Blissett v. Lefevre*,
   924 F.2d 434 (2d Cir. 1991)..................................................................14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................5

*R v. Khan*,
   [2008] Crim. L.R. 391, CA ..................................................................16

*United States v. Bahadar*,
   954 F.2d 821 (2d Cir. 1992)..............................................................10, 14

*United States v. Cohen*,
   260 F.3d 68 (2d Cir. 2001)..................................................................11

*United States v. DePalma*,
   461 F. Supp. 778 (S.D.N.Y. 1978) ............................................................1

*United States v. Dolah*,
   245 F.3d 98 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington*,
   541 U.S. 36 (2004)..........................................................................10

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006)......................................................10, 11, 12, 14

*United States v. Gil*,
   297 F.3d 93 (2d Cir. 2002)..................................................................12

*United States v. Johnpoll*,
   739 F.2d 702 (2d Cir. 1984)..............................................................11, 17

*United States v. Khan*,
   No. 06-cr-255 (DLI), 2008 WL 2323375 (E.D.N.Y. June 2, 2008) ...............11, 16, 17, 18

*United States v. Moon*,
   93 F.R.D. 558 (S.D.N.Y. 1982) .........................................................11, 16, 17

*United States v. Pellon*,
   475 F. Supp. 467 (S.D.N.Y. 1979) ..........................................................10

*United States v. Skelly*,
   442 F.3d 94 (2d Cir. 2006)..................................................................11

*United States v. Viloski,*
    557 Fed. App'x 28 (2d Cir. 2014)....................................................................................14

*Washington v. Texas,*
    388 U.S. 14 (1967)............................................................................................................10

**Statutes**

*Criminal Justice Act 1987*, Ch. 38, Part 1, §2.................................................................16

*Criminal Justice Act 2003*, Ch. 2, Part 11, § 114(1)........................................................16

Fed. R. Crim. P. 15(a) ...............................................................................................11, 16

Defendants Anthony Allen and Anthony Conti respectfully submit this memorandum of law in support of their motion to compel the Government to immunize Submitter-R1.[1]

## PRELIMINARY STATEMENT

This case involves two defendants, both of whom are citizens of the United Kingdom. The allegations involve the supposed manipulation of a benchmark interest rate, which was created and administered by a British trade organization, and which is meant to reflect the London interbank market. Each of the overt acts allegedly committed by the Defendants took place in the United Kingdom. Despite these facts, the Government has determined that it is the proper entity to prosecute the Defendants, the law of the United States the proper legal standard to apply, and an American jury the best arbiter of whether the Defendants committed wrongdoing. The inherent unfairness of the Government's approach has been exacerbated by the Government's current strategy of keeping material, exculpatory witness testimony—evidence which would almost certainly be admitted in a trial in the United Kingdom—away from the jury.

The Government alleges that the Defendants conspired to manipulate the London Inter-bank Offered Rate, or LIBOR, for their own personal gain. Until 2009, Mr. Allen and Mr. Conti were employed on the Money Market desk in the London office of Coöperatieve Centrale Raiffeisen-Borenleenbank B.A. ("Rabobank"), a Dutch banking and financial services company. Every business day at 11:00 a.m. London time, the British Bankers' Association (the "BBA"), a London-based trade organization, asked Rabobank's London office to submit the interest rate at

---

[1]     Defendants are filing a public version of this motion that substitutes Submitter-R1's name with the title used to identify him in the Superseding Indictment, so as to protect his reputation. *United States v. DePalma*, 461 F. Supp. 778, 800 (S.D.N.Y. 1978) (inappropriate to identify unindicted co-conspirators by name, as they are afforded no forum in which to vindicate themselves and accordingly, should be protected from the "punishment of public reprimand.")

which it "perceived" it could borrow unsecured cash from other banks in the London market. The Government contends that Mr. Allen, the supervisor of the cash traders who made Rabobank's daily LIBOR submissions, and Mr. Conti, Rabobank's primary U.S. Dollar ("USD") LIBOR submitter, submitted rates to the BBA which were designed to generate profit for Rabobank derivatives traders, rather than rates that reflected the Defendants' good-faith perception of the price at which Rabobank could borrow cash.  As the Defendants will prove at trial, the Government's accusations are without merit.

However, Mr. Allen's and Mr. Conti's ability to prove their innocence at a trial in the United States depends, in great measure, on whether the jury is permitted to hear the testimony of Submitter-R1, a fellow British citizen, who worked on the same trading desk as the Defendants for over eight years.  Submitter-R1 can confirm for the jury that that neither Mr. Allen nor Mr. Conti was engaged in a conspiracy to submit improper LIBOR rates to the BBA. In a witness interview with the Government on July 30, 2013, Submitter-R1 explained that Rabobank's cash desk strove to submit proper LIBOR rates, even when the interbank lending market effectively disappeared.  Submitter-R1 told the Government that Rabobank's LIBOR setters were not instructed, by Mr. Allen or anyone else, to submit LIBOR rates based on the trading positions of derivatives traders, and that, as far as he was aware, Rabobank's LIBOR submissions were not calculated on that basis.  Submitter-R1 also informed the Government— and could inform a jury—of several *specific* interactions he had involving each of the Defendants, in which Messrs. Allen and Conti each acted *against* the interests of Rabobank derivatives traders, and which refute the Government's theory that the Defendants engaged in a conspiracy to manipulate LIBOR.  Submitter-R1's testimony is highly exculpatory for the Defendants and not available from any other source.

The Government knows this and is determined to keep Submitter-R1 from testifying at trial for the defense.  As part of this effort, the Government identified Submitter-R1 in its Superseding Indictment as an unindicted co-conspirator—"Submitter-R1"—even though it does not allege a single instance in which Submitter-R1 participated in the alleged conspiracy. In doing so, the Government has intimidated Submitter-R1into believing he is a legitimate target for prosecution, and, in turn, Submitter-R1 has indicated not only that he will invoke his Fifth Amendment privilege against self-incrimination if called to testify on the Defendants' behalf, but also that he refuses to appear voluntarily in the United States to provide testimony.  Had Mr. Allen and Mr. Conti been prosecuted in the United Kingdom for their supposed crimes, Submitter-R1's invocation would not bar the Defendants from presenting his important and exculpatory testimony to the jury.  Here, however, the Defendants are at a loss, unless the Government immunizes Submitter-R1.  But, when the Defendants asked the Government if they would be willing to offer Submitter-R1 immunity, so that the jury could hear his critical testimony, the Government refused.

There are certain circumstances in which the Second Circuit permits a court to order the prosecution to grant a witness immunity:  where the prosecution's overreaching forces a witness to invoke the Fifth Amendment privilege against self-incrimination and where the witness's testimony will be material, exculpatory, not cumulative, and not obtainable from any other source.  The Government's attempt to silence Submitter-R1, a key defense witness, exemplifies precisely the prosecutorial "overreaching" prohibited by the Second Circuit.  The evidence Submitter-R1 can offer is highly exculpatory to the Defendants, and without his testimony, will be unavailable to the jury.

For this reason, this Court should order the Government to immunize Submitter-R1. In addition, because Submitter-R1 is unavailable to testify at trial and his testimony is material and necessary to prevent a failure of justice, this Court should order Submitter-R1 to appear for a deposition in the United Kingdom, pursuant to Rule 15 of the Federal Rules of Criminal Procedure. Alternatively, the Defendants request that this Court preclude the testimony of the Government's cooperating witnesses at trial.

## STATEMENT OF FACTS

### A.    The LIBOR is a Benchmark for Short-Term Interest Rates.

The BBA published the LIBOR from 1986 until 2014. (*See* Superseding Ind. ¶¶ 1-3, 9, June 25, 2015, ECF No. 62 ("the Superseding Indictment").) Every day, the BBA asked a selection of sixteen London-based "Panel Banks" to predict the interest rate at which they "perceive[d] that they could borrow" unsecured cash in the London interbank market. (*Id.* at ¶ 2.) Each day "at or before approximately 11:00 a.m. in London," an employee from each Panel Bank, known as a "submitter" or "setter," was asked to submit the interest rates at which he or she subjectively perceived that the bank "could borrow unsecured funds from other banks." (*Id.*) Each Panel Bank submitted rates for fifteen "tenors," or borrowing periods, ranging from overnight to 12 months. (*Id.*) The BBA did not ask Panel Banks to report an interest rate that they *actually* paid for cash, or even an average of interest rates that they actually paid: from the outset, LIBOR was purely theoretical and not based on any objectively verifiable market data.[2]

---

[2]    The interbank lending market began to dry up as the financial crisis approached and submitters were increasingly forced to rely on guesswork when making LIBOR submissions. In August of 2007, the U.S. Federal Reserve Bank was informed that LIBOR was no longer credible. (Ex. 1 (August 28, 2007 email to the Federal Reserve Bank from Barclays, disclosing that LIBOR did not reflect interbank borrowing).) By September 2007, LIBOR's unreliability was public knowledge, with the *Financial Times* reporting that LIBOR rates were nothing but "fiction." (Ex. 2 (September 5, 2007 *Financial Times* article "Growing Sense of Crisis Over Interbank Deals").) Indeed, in March 2013, Judge Buchwald dismissed civil claims under the Commodity Exchange Act on the basis that they were time-barred, because "a person of ordinary intelligence would clearly have been on notice that LIBOR was probably being set at artificial levels, and

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 719 n. 17 (S.D.N.Y. 2013).

**B.    The Government Alleges that Defendants Committed Wire Fraud and Participated in a Criminal Conspiracy to Manipulate LIBOR.**

On April 28, 2014, the Government filed an Indictment against Paul Robson, Tetsuya Motomura, and Paul Thompson, three former Rabobank employees who traded derivative products whose "value was tied to the [Japenese] Yen LIBOR fix." (*See* Ind. ¶¶ 17-19, 22, Apr. 28, 2014, ECF No. 5 ("Original Indictment").)  The Government alleged that from 2005 through 2011, Mr. Robson, Mr. Motomura, and Mr. Thompson conspired to make "false and fraudulent Yen LIBOR submissions" in an effort to increase the "profitability" of their own "trading positions." (*Id.* at ¶¶ 17-21.)

In the summer of 2014, Mr. Robson agreed to plead guilty and cooperate with the Government's investigation. (Ex. 3 (Robson Plea Agr., Aug. 5, 2014).)  On October 16, 2014, seven months after filing the Original Indictment, the Government filed a Superseding Indictment against Mr. Allen and Mr. Conti. (*See generally* Superseding Ind., Oct. 16, 2014, 1:14-cr-00272-JSR, ECF No. 24 ("First Superseding Indictment").)

Mr. Allen served as Rabobank's Head of Liquidity and Finance in the bank's Client Trading & Money Markets department from 2005 through October 2008, when he was laid off due to a restructuring at the bank. (Ex. 4.)  While he was at Rabobank, Mr. Allen supervised its Money Markets desk (the "MM Desk"), traders on which made Rabobank's LIBOR submissions to the BBA, and Mr. Allen occasionally acted as a backup LIBOR submitter when other employees were unavailable. (*See* Superseding Ind. at ¶ 23.)  Mr. Conti was a cash

---

consequently that [derivatives] contract prices had also been artificial." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 705.

trader on the MM Desk and the bank's primary USD LIBOR submitter.  (*Id.* at ¶ 26.)  In early

2009, when Rabobank restructured its operations and moved the MM Desk to Utrecht,

Netherlands, Mr. Conti was offered a choice between redundancy and transfer to Utrecht.  (Ex.

5.)  He chose redundancy after a brief trial period in Utrecht.  (*Id.*)

        The Government claims that Mr. Allen "directed Rabobank traders to advise

Rabobank's LIBOR setters of any financial interest they had in LIBOR on a particular day"

while also ordering the setters to "make LIBOR submissions that favored the traders' positions."

(Superseding Ind. at ¶ 29(a).)  The Government insists that Mr. Allen issued such instructions

because he wanted "to benefit Rabobank's traders," even though Mr. Allen's LIBOR

submissions are demonstrably inconsistent with requests made to him by derivatives traders.  (*Id.*

at ¶29 (b).)  It is the Government's contention that Mr. Allen was looking to maximize the profits

of Rabobank's derivatives traders—even though those employees did not work for Mr. Allen and

their performance had no impact on him—to the "detriment of, among others, Rabobank's

counterparties to derivative contracts."  (*Id.* at ¶ 29(j)-(k); Ex. 6 (organizational chart of

Rabobank derivatives department and its supervisor, Henk Rozendaal).)

        The Government's case against Mr. Conti is premised on a handful of instances

between 2005 and 2009 in which Mr. Conti, according to the Government, submitted USD

LIBOR rates at "a specific level requested" by one of Rabobank's derivatives traders or that

were "consistent with the direction" of a trader's "interest."  (Superseding Ind. at ¶29(k).)

Ignoring the many documented occasions on which Mr. Conti's submissions were contrary to

trader requests, the Government concludes that Mr. Conti's conduct demonstrates his desire to

"manipulat[e]" LIBOR and to defraud counterparties to Rabobank's derivatives transactions.

(*Id.*)

**C.**    **The Testimony of Submitter-R1 Proves Mr. Allen and Mr. Conti Did Not Conspire with Derivatives Traders to Manipulate LIBOR.**

The allegations against Mr. Allen and Mr. Conti are unfounded.  The Government knows this to be the case because it has interviewed Submitter-R1, an individual who worked on the London MM Desk during the period at issue and whose testimony directly contradicts the allegations set forth in the Superseding Indictment.  Submitter-R1 is a UK citizen who sat adjacent to the Defendants on the MM Desk for more than eight years.  (Ex. 7 (July 30, 2013 FBI Interview of Submitter-R1 ("Submitter-R1 Interview") at 2).  Submitter-R1 acted as a back-up USD LIBOR submitter when Mr. Conti was not available. (Ex. 7 (Submitter-R1 Interview) at 3.)

Contrary to the Government's allegation that the LIBOR submitters on the MM Desk ignored the definition of LIBOR in order to follow the bidding of derivatives traders, Submitter-R1 explained to the Government that he based his LIBOR submissions on a wide range of information: "the prior day's submission, what happened in overnight trading, internal bids and offers, and broker opinions as to how the market looked."  (*Id.* at 4.)  Submitter-R1 reminded the Government that because the LIBOR-setting process was "based on judgment," it was often "impossible to come to a specific, exact rate that was absolutely correct."  (*Id.* at 5.)  Even though setting LIBOR was difficult, Submitter-R1 was adamant that he was "never directed by management to accommodate requests from traders" and never heard Mr. Allen tell Rabobank's LIBOR setters to accommodate requests from derivatives traders.  (*Id.* at 10.)

Submitter-R1 acknowledged that Rabobank derivatives traders would pester the MM Desk about LIBOR submissions.  (*Id.* at 6.)  However, the employees on the MM Desk encouraged one another to submit accurate LIBOR rates and to ignore the traders' requests.  For example, on May 7, 2008, after Mr. Conti received a request from derivatives trader Lee Stewart, Submitter-R1 urged Mr. Conti to "stay strong on th[e]se libors" no matter how "desperate" Mr.

Stewart might be for "high fixings."  (Ex. 8.)  Mr. Conti did not need the moral support: he

confirmed that Mr. Stewart could "whistle" all he wanted, he, Conti, would "just ignore him."

(*Id.*)  Submitter-R1 understood that Mr. Conti "didn't care about Stewart's needs or requests and

wouldn't take Stewart's needs into account" when setting LIBOR.  (Ex. 7 (Submitter-R1

Interview) at 8.)

   Submitter-R1 told the Government that although there were "frequent instances

when traders were unhappy with the LIBOR rates he submitted," he continued to submit rates

that he believed were correct.  (*Id.* at 5, 7 (denying ever having changed his LIBOR rate "to suit

a trader's request.").)  For example, on September 16, 2008, when Submitter-R1 was responsible

for submitting Rabobank's USD LIBOR, Lee Stewart began to hassle the MM Desk to set a low

one-month USD LIBOR and began "trying to influence [Submitter-R1] in a way to benefit" his

own trading book.  (*Id.* at 7.)  Despite the pressure from Mr. Stewart, Submitter-R1 made

Rabobank's LIBOR submissions in accordance with MM Desk practice:  he set a "fair rate and

didn't take Stewart's interests into account."  (*Id.*)

   After seeing Rabobank's one-month USD LIBOR submission, Mr. Stewart

became irate and confronted Submitter-R1, exclaiming, "I don't want to have a row about it

Submitter-R1 but can't understand why you were such an arse this morning?"  (Ex. 9.)  Even

though Mr. Stewart was angry, Submitter-R1 reminded him of the MM Desk's practice

regarding LIBOR submissions: "I honestly thought and still do think 2.78 was fair."  (*Id.*)

Submitter-R1 knew that Mr. Stewart had behaved inappropriately and that Mr. Allen would not

condone such behavior.  For this reason, Submitter-R1 "complained about this exchange to

Allen," and "Allen told Submitter-R1 he was going to speak with Stewart's boss [Henk]

8

Rozendaal about it" to ensure that this kind of behavior would not happen again. (Ex. 7 (Submitter-R1 Interview) at 7.)

### D. To Keep Him Off the Witness Stand, the Government named Submitter-R1 as an "Unindicted" Co-Conspirator in the Superseding Indictment.

The Government, aware that Submitter-R1's testimony undermines its theory of this case, has gone to considerable lengths to keep him off the witness stand. As part of this effort, the Government identified Submitter-R1 in the Superseding Indictment as an unindicted co-conspirator—"Submitter-R1"—even though it does not allege a single instance in which Submitter-R1 participated in the alleged conspiracy. (*See* First Superseding Ind. at ¶¶ 16, 131-134; Superseding Ind. at ¶¶ 16, 133-36.) Indeed, the *sole* reference to Submitter-R1 in the Superseding Indictment is a summary of the aforementioned September 16, 2008 confrontation between Submitter-R1 and Mr. Stewart over Submitter-R1's LIBOR submission for that day. (*Id.*)

The Government's efforts to intimidate Submitter-R1 have been successful. When approached to testify on Mr. Allen's and Mr. Conti's behalf, Submitter-R1 indicated not only that he would invoke his Fifth Amendment privilege against self-incrimination if called to testify, but also that he would not appear voluntarily in the United States. The Government has refused to grant Submitter-R1 the immunity that would enable his testimony—which is highly exculpatory to both Messrs. Allen and Conti—to be heard by a jury. In light of the Government's refusal to immunize a material defense witness, the Defendants are forced to seek judicial intervention to ensure that they receive a fair trial.

### LEGAL STANDARD

The compulsory process clause of the Sixth Amendment grants a defendant not only the right to produce witnesses in his defense, but also the right to have them heard by a jury.

*See Washington v. Texas,* 388 U.S. 14, 19 (1967) ("[T]he right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies...This right is a fundamental element of due process of law.") (alteration in original). The right to a fair trial notwithstanding, the decision to immunize witnesses is "preeminently a function of the Executive Branch." *United States v. Bahadar,* 954 F.2d 821, 824 (2d Cir. 1992). The Second Circuit has recognized, however, that the use of prosecutorial grants of immunity "in a one-sided manner can result in a basic unfairness that rises to the level of a violation of procedural due process." *United States v. Dolah,* 245 F.3d 98, 106 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36 (2004). In such instances, the trial court is permitted to use its "coercive powers to force the government to grant immunity." *Bahadar,* 954 F.2d at 825.

A court should order the prosecution to immunize defense witnesses when "(1) the government...through its own overreaching, has forced the [defense] witness to invoke the Fifth Amendment; and (2) the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source." *United States v. Ebbers,* 458 F.3d 110, 118 (2d Cir. 2006). Where the prosecution continues to refuse to immunize a defense witness, it is appropriate for the court to preclude from trial the testimony of cooperating prosecution witnesses.[3] *See id.* at 119. The Second Circuit has held that "a court may order the prosecution to choose between forgoing the testimony of an immunized government witness or granting use

---

[3]     In the present case, the Government's cooperating witnesses should be treated as if they were immunized and their testimony should be excluded from trial. *United States v. Pellon,* 475 F. Supp. 467, 479 (S.D.N.Y. 1979) (where a cooperation agreement promises use immunity in return for testimony, the agreement is enforceable to the same extent as formal grant of immunity under 18 U.S.C. § 6002); Ex. 3 (cooperation agreement between Government and Mr. Robson explicitly stating that "no testimony or other information given by [Mr. Robson] (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution" and promising that Mr. Robson "will not be further prosecuted criminally by [the Government] for any crimes, except for criminal tax violations, related to his participation in a conspiracy to manipulate the LIBOR benchmark.")

immunity to potential defense witnesses." *Id.*; *United States v. Skelly*, 442 F.3d 94, 101 (2d Cir. 2006) ("[t]he Government is required to provide this immunity, or not immunize its own witnesses").

Where a defense witness is unavailable and cannot be compelled to appear at trial, Rule 15 of the Federal Rules of Criminal Procedure provides that the witness's testimony can be preserved for the jury through a pre-trial deposition.  Fed. R. Crim. P. 15(a)("A party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice.").  Although the court has full discretion to decide whether or not to order a Rule 15 deposition, it is appropriate to do so where "(1) the prospective witness is unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).

A witness's unavailability is to be determined "according to the practical standard of whether under the circumstances the [moving party] has made a good-faith effort to produce the person to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984). Courts have assessed whether a witness's testimony would be material "in a variety of ways, asking, for example, whether the testimony is essential or critical to the defense, exculpatory or capable of negating an element of the government's case, or instead cumulative or merely corroborative." *United States v. Khan*, No. 06-cr-255 (DLI), 2008 WL 2323375, at * 2 (E.D.N.Y. June 2, 2008).  Where a witness is unavailable and his or her testimony is material, courts have held that a Rule 15 deposition is necessary to prevent a failure of justice. *See id.* at 4; *United States v. Moon*, 93 F.R.D. 558, 559 n.1 (S.D.N.Y. 1982).

11

## ARGUMENT

The content of Submitter-R1's testimony, were he to testify, is material, exculpatory, non-cumulative, not obtainable from any other source, and creates reasonable doubt as to Mr. Allen's and Mr. Conti's participation in the alleged criminal conspiracy. The Government's decision to include Submitter-R1 in the Superseding Indictment, despite the fact that Submitter-R1's actions are at odds with the conspiracy alleged, amounts to overreaching that has the effect of silencing a critical defense witness and denying Mr. Allen and Mr. Conti their right to a fair trial.

## I.   SUBMITTER-R1'S TESTIMONY IS MATERIAL, EXCULPATORY, NON-CUMULATIVE, AND IS NOT OBTAINABLE FROM ANY OTHER SOURCE.

In the Second Circuit, "exculpatory evidence is material when it 'tends to show that the accused is not guilty.' The bottom line at all times is whether the non-immunized witness's testimony would materially alter the total mix of the evidence before the jury." *Ebbers*, 458 F.3d at 119 (quoting *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002)). Submitter-R1 would offer testimony that is non-cumulative, unavailable from any other source, and both material and exculpatory to Messrs. Allen and Conti.

Submitter-R1's testimony would be both material and exculpatory because it would squarely refute the Government's allegations concerning Mr. Allen's and Mr. Conti's supposed participation in a conspiracy to manipulate LIBOR. Submitter-R1 would testify that in the eight years he spent working on the MM Desk, he never heard Mr. Allen instruct LIBOR submitters to accommodate requests made by derivatives traders to benefit their trading books. (*See* Ex. 7 (Submitter-R1 Interview) at 10.) This evidence directly contradicts the Government's allegation that Mr. Allen directed the MM Desk to "make LIBOR submissions that favored the traders' positions." (Superseding Ind. at ¶ 29(a).)

Submitter-R1's testimony would be unattainable from any other source because he would be able to describe for the jury *specific* interactions that he—and he alone—had with both Messrs. Allen and Conti, which create reasonable doubt regarding the Defendants' participation in the Government's alleged scheme.  For example, Submitter-R1 is expected to testify that when he became uncomfortable with the requests for LIBOR submissions he received from Lee Stewart, he complained to Mr. Allen and was subsequently assured by him that Mr. Stewart's requests were inappropriate and that he would escalate the matter to Mr. Stewart's supervisor.  (Ex. 7 (Submitter-R1 Interview) at 7.)  Similarly, Submitter-R1 would tell the jury about discussions he had with Mr. Conti—whom he worked next to for eight years—regarding their mutual frustration with Rabobank's derivatives traders and their requests for favorable LIBOR submissions.  (*Id.* at 8.)

Submitter-R1's testimony would be non-cumulative because no similar evidence will be presented at trial.  Although the Government's case against the Defendants is predicated on the alleged conduct of the MM Desk, without Submitter-R1's testimony, the jury may never learn what actually transpired on the Desk.  Paul Robson, who also sat on the MM Desk, has been left with no choice but to cooperate with the Government because he could not afford the expense of mounting a viable defense to their charges.  (*See* Ex. 10 (May 31, 2014 letter from Paul Robson to Mark Francois MP, pleading, "I have nowhere near the millions of pounds of resources to build a robust defense in the US for a technical fraud case.  This leaves me with no choice but…to a plea bargain with them, on charges I simply did not commit!").)  Lee Stewart, who has pled guilty and will likely be offered by the Government as a cooperating witness, did not work on the MM Desk, was not supervised by Mr. Allen, and has every incentive to shift the blame for his requests for favorable LIBOR submissions onto Mr. Allen's and Mr. Conti's

13

shoulders.  The Government's final cooperating witness, Mr. Yagami, lived and worked in

Toyko during the period at issue, spoke halting English, and likewise has every incentive to

scapegoat Mr. Allen and Mr. Conti for his own actions.  These witnesses cannot, and will not,

convey an accurate picture of the London MM Desk to the jury.  Submitter-R1, however, can,

and the Government should not be permitted to keep his testimony from the jury.

## II.     THE GOVERNMENT HAS OVERREACHED IN AN EFFORT TO KEEP SUBMITTER-R1 FROM TESTIFYING.

Even if a defense witness's testimony would be material, a court will not order the

prosecution to immunize the witness unless the prosecution "through its own overreaching, has

forced the witness to invoke the fifth amendment."  *Ebbers*, 458 F.3d at 118; *see also Bahadar*,

954 F.2d at 826.  The prosecution is culpable of the "overreaching" prohibited by the Second

Circuit when its conduct "substantially interferes with the defense, or with a potential defense

witness's unfettered choice to testify," or involves a "deliberate denial of immunity for the

purpose of withholding exculpatory evidence and gaining a tactical advantage through such

manipulation."  *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991).

Here, the Government has taken actions that have substantially interfered with

Submitter-R1's "unfettered choice to testify."  (*Id.*)  The Government knows its identification of

Submitter-R1 in the Superseding Indictment as an unindicted co-conspirator left him with no

rational choice but to invoke his Fifth Amendment privilege against self-incrimination when

asked to testify at trial by the Defendants.  In the past, Submitter-R1 has been forthcoming about

his recollections concerning the MM Desk and its practices regarding LIBOR submissions.

Submitter-R1 agreed to talk to the FBI.  *Cf. United States v. Viloski*, 557 F. App'x 28, 35 (2d Cir.

2014) (finding significant that the proposed defense witness refused to proffer with the

government and invoked his Fifth Amendment privilege against self-incrimination when

subpoenaed to testify).   In light of his past willingness to participate in the Government's investigation, Submitter-R1's current refusal to testify on the Defendants' behalf can only be seen as a direct consequence of the Government's tactics.

The Government cannot seriously be entertaining a case against Submitter-R1. The Original Indictment, dated April 28, 2014, makes no mention of Submitter-R1.  (*See generally* Original Ind.)  It was only in October 2014, when Messrs. Allen and Conti were added to the First Superseding Indictment that the Government thought it prudent to reference Submitter-R1 as an unindicted co-conspirator. (*See* First Superseding Ind. at ¶ 16.)  There is no indication that the Government uncovered new information relating to Submitter-R1's supposed involvement in the alleged conspiracy in the period between the filing of the Original Indictment and the First Superseding Indictment.  Had the Government discovered any new information about Submitter-R1's alleged criminality after filing the Original Indictment, such information would be described in the Superseding Indictment.

Instead, Submitter-R1's identification as a conspirator in the First Superseding Indictment is based solely on Submitter-R1's refusal to accommodate the requests of Mr. Stewart on September 16, 2008.  (*See* First Superseding Ind. at ¶¶ 16, 131-134; Superseding Ind. at ¶¶ 16, 133-36.)  This conduct was not only known to the Government well in advance of the filing of the Original Indictment, but, as described above, is antithetical to the goals of the conspiracy. (S*ee generally* Ex. 7 (Submitter-R1 Interview)(Government questioning Submitter-R1 on July 30, 2013 about dispute with Mr. Stewart).)  Submitter-R1 was added to the First Superseding Indictment not because the Government believes him to be a co-conspirator, but rather because the Government wants to prevent him from informing the jury that there was no conspiracy to begin with.

15

The Government's ability to keep Submitter-R1 from testifying for Mr. Allen and Mr. Conti is unique to this venue. If the proceedings against Mr. Allen and Mr. Conti had been brought in the United Kingdom, where the alleged criminal conduct took place and where Mr. Allen and Mr. Conti both live, the UK jury would hear Submitter-R1's testimony. Although the United Kingdom recognizes a right against self-incrimination, a witness may not invoke that right where, as in this instance, his testimony is not incriminatory. *R v. Khan [2008] Crim. L.R. 391, CA* ("It must be emphasised that the privilege is designed to provide protection in relation to questions which might incriminate. …If his position is made no worse by answering a question, then there can be no basis for him to invoke the privilege."). In addition, the statements Submitter-R1 made during his July 30, 2013 interview with the Government could be entered into evidence at a trial in the United Kingdom. *See* Criminal Justice Act 2003, Ch. 2, Part 11, § 114(1) (allowing statements into evidence in the "interests of justice"); Criminal Justice Act 1987, Ch. 38, Part 1, §2 (authorizing UK's Serious Fraud Office to compel testimony from a witness, which may then be admitted into evidence). It is especially unfair that the Government not only maneuvered to prosecute the Defendants in the United States for conduct that occurred in the United Kingdom, but also that it has engaged in tactics designed to keep the Defendants from presenting to the jury exculpatory evidence that they would certainly be entitled to present to a jury in their home country.

## III. THE DEFENDANTS SHOULD BE PERMITTED TO DEPOSE SUBMITTER-R1 PURSUANT TO RULE 15 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Under Rule 15 of the Federal Rules of Criminal Procedure, a party may move that a prospective witness be deposed in order to preserve testimony for trial. Fed R. Crim. P. 15(a). Where a witness is unavailable and his testimony is material, courts have held that a Rule 15 deposition is necessary to prevent a failure of justice. *Khan*, 2008 WL 2323375, at *4; *Moon*, 93

F.R.D. at 559 n.1.  Here, Submitter-R1 is unavailable for trial, and his testimony is both material and necessary to prevent a failure of justice.

Submitter-R1 is unavailable for trial because, as a citizen of the United Kingdom, he is beyond this Court's subpoena powers, and has indicated a steadfast refusal to appear voluntarily in the United States.  Messrs. Allen and Conti have tried, in good-faith, to convince Submitter-R1 to come to the United States: the Defendants have engaged in multiple discussions with Submitter-R1's counsel and with the Government, none of which have managed to persuade Submitter-R1 to appear voluntarily to give testimony.  In such circumstances, the Second Circuit has deemed prospective witnesses to be unavailable for Rule 15 purposes.  *See Johnpoll*, 739 F.2d at 709 (Swiss witnesses were unavailable where they were beyond the court's subpoena powers and "flatly refused to come to the United States" after the government requested their voluntary appearance); *see also Khan*, 2008 WL 2323375, at *1 (foreign nationals residing in Guyana were unavailable because they were beyond the court's subpoena powers and indicated that they would not "participate in the case at any level.").

As described more fully in Point I above, Submitter-R1's testimony is material because he can squarely contradict the Government's allegations concerning Mr. Allen's and Mr. Conti's alleged participation in a conspiracy to manipulate LIBOR.  Submitter-R1 would testify that he never heard Mr. Allen instruct Rabobank's LIBOR submitters to accommodate requests made by derivatives traders, and that it was the MM Desk's practice to submit rates that reflected the setters' good-faith belief about the rate at which the bank could obtain cash.  *Supra* at Point I. Submitter-R1's exculpatory testimony is critical to the defense and is thus material within the meaning of Rule 15.  *See, e.g.*, *Moon*, 93 F.R.D. at 559 (finding testimony that the witnesses contributed to a fund which deposited monies into a defendant's checking account material

because it countered the prosecution's allegations that the monies originated from accounts and stocks owned by the defendant which he failed to report as taxable income); *Khan*, 2008 WL 2323375, at *2-3 (testimony that the defendant was hostile towards his alleged co-conspirators was material because it could rebut the prosecution's allegations that the defendant and the co-conspirators were engaged in drug trafficking together). Further, Submitter-R1's testimony is non-cumulative and not merely corroborative, as no similar evidence will be presented at trial.

Submitter-R1's testimony is necessary to prevent a failure of justice because, as the Defendants have demonstrated, he is unavailable and his testimony is material for purposes of Rule 15. *See Khan*, 2008 WL 2323375, at *4 ("The final factor [of the Rule 15 inquiry]—the necessity of the testimony to prevent a failure of justice—is likely satisfied when the first two factors are met."). Accordingly, the Defendants should be permitted to take the deposition of Submitter-R1 in the United Kingdom.

Submitter-R1's testimony would provide the jury with the material and exculpatory evidence needed to acquit Mr. Allen and Mr. Conti. To allow the Government to engage in tactics which keep critical information away from the jury is a violation of the Defendants' due process rights. For these reasons, the Court should order the Government to immunize Submitter-R1 and allow the Defendants the opportunity to take Submitter-R1's testimony through a Rule 15 deposition.

## CONCLUSION

Accordingly, the Defendants respectfully move this Court for an order compelling the Government to immunize Submitter-R1 and allowing Submitter-R1's deposition to be taken in the United Kingdom pursuant to Rule 15 of the Federal Rules of Criminal Procedure. In the alternative, Defendants respectfully request that the Court remedy the Government's prosecutorial overreach by precluding from trial the testimony of the Government's cooperating witnesses.

Dated:   New York, New York
         July 17, 2015

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TOR EKELAND, P.C.**

By:  /s/ Tor Ekeland
(electronic signature w/permission)
Tor Ekeland
Aaron Williamson
195 Plymouth Street, 5th Floor
Brooklyn, New York 11201-1133
Phone: (718) 737-7264

*Attorneys for Defendant Anthony Conti*