UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | S4:14-cr-00272-JSR |
| | : | |
| | : | |
| ANTHONY ALLEN, et al | : | |
| | : | |
| Defendants. | : | |
| | : | |

# MEMORANDUM IN OPPOSITION TO DEFENDANTS'
# MOTION TO COMPEL DOCUMENTS

ANDREW WEISSMANN
Chief, Fraud Section
CAROL SIPPERLY
Senior Litigation Counsel
BRIAN R. YOUNG
Senior Trial Attorney
U.S. Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, D.C. 20005
(202) 616-3114

JEFFREY D. MARTINO
Chief, New York Office
MICHAEL T. KOENIG
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, N.W.
Washington, D.C., 20001
(202) 616-2165

## TABLE OF CONTENTS

BACKGROUND…..………………………………………………………………………….1

ARGUMENT……………………………………………………………………………….....4

DISCUSSION OF EXHIBITS………………………………………………………….......7

## TABLE OF AUTHORITIES

**Cases**

*In re Terrorist Bombings* ............................................................................................... 6, 13
    552 F.3d 93, 124 (2d Cir. 2008)

*United States v. Giffen* .......................................................................................................... 4
    379 F.Supp. 2d 337, 342 (S.D.N.Y. 2004)

*United States v. McGuinness* ............................................................................................... 4
    764 F.Supp. 888, 895 (S.D.N.Y. 1991)

*United States v. Reddy* ............................................................................................... 5, 6, 7
    190 F.Supp. 2d 558, 572 (S.D.N.Y. 2002)

*United States v. Stein* ......................................................................................................5-6
    488 F. Supp. 2d 350 (S.D.N.Y. 2007)

*United States v. Stevens* ...................................................................................................... 6
    985 F.2d 1175, 1180 (2d Cir. 1993)

**Statutes**
Sherman Act, 15 U.S.C. § 1 .......................................................................................... 10, 11

**Rules**
Fed. R. Crim. P. 16 ........................................................................................... 1, 2, 4, 7, 12

The defendants' motion to compel (Dkt. 81) should be denied because they cannot make a *prima facie* showing that each of the eighteen documents they seek is "material" under Fed. R. Crim. P. 16.  On the whole, these documents make arguments about the application of the Sentencing Guidelines to Rabobank's conduct, analyze the "Filip Factors" pertaining to corporate prosecution, challenge theories of liability not asserted in the indictment, and analyze data already in the defendants' possession.  These sorts of materials are not discoverable under Rule 16 because they do not significantly alter the quantum of proof in the defendants' favor.  This materiality analysis turns on how each unique document relates to the evidence as a whole and cannot be performed, as the defendants have attempted, through generalized assertions about entire categories of documents.

**BACKGROUND**

On October 29, 2013, Rabobank and the Department of Justice executed a Deferred Prosecution Agreement in which Rabobank admitted that a number of its employees, including defendants Anthony Allen and Anthony Conti, improperly manipulated the London Interbank Offered Rate (LIBOR) and agreed to pay $325 million to resolve the charges.  This resolution did not happen overnight but was instead preceded by months of negotiations with Rabobank's counsel, Milbank, Tweed, Hadley & McCloy LLP ("Milbank").  During the negotiation process, Milbank presented the United States with several advocacy pieces, or "white papers," which presented Rabobank's position as to its relative culpability, the scale of the harm caused, and the application of the Sentencing Guidelines to its misconduct.[1]  The entire universe of white papers consists of thirty unique documents.  Many of Milbank's arguments relied on work done by the

---

[1] Milbank produced these documents pursuant to a confidentiality agreement with the United States, which did not limit the government's discovery obligations.  The agreement did, however, place restrictions on other uses that the government could make of the documents.

1

consulting firm KPMG LLP, which performed analyses of Rabobank's derivative trading data as well as the LIBOR submissions that Rabobank made to the British Bankers' Association. After finalizing the Deferred Prosecution Agreement with Rabobank, the United States charged several former Rabobank employees, including Messrs. Allen and Conti with conspiracy to commit bank fraud and wire fraud and substantive counts of wire fraud.

At Mr. Allen's initial appearance on March 20, 2015, the United States provided its discovery on a hard drive that contained emails and phone calls involving the defendants (including "hot document" folders intended to ease defense counsel's review burden by focusing their attention on the most pertinent items) and the FBI 302 interview reports that were created as of that date. Dkt. 81-2.[2] In its cover letter, the government advised that it was in possession of at least two Millbank white papers that it did not intend to produce in discovery. Defense counsel's subsequent request for access to the Milbank white papers resulted in a series of meet and confer discussions, which are recounted incompletely, but at great length, in the defendants' motion to compel. While the government disputes portions of defense counsel's description of the parties' conversations regarding the white papers, a point-by-point refutation will not help to clarify the sole issue presented in this motion: whether the white papers sought by the defense will significantly alter the quantum of proof in favor of the defendant such that they must be disclosed under Fed. R. Crim. P. 16.

Following discussions with defense counsel, and in an effort to provide fulsome discovery, the United States attempted to segregate those white paper documents that contained raw data or purely factual information from those white papers that analyzed the data and made arguments based on those analyses. The government produced the former category and withheld

---

[2] On March 30, 2015, the government produced these materials to Mr. Conti, who made his initial appearance on April 13, 2015.

the latter.  After it became apparent that the parties would not be able to resolve the defendants' request for all white papers, the United States provided the defense with a letter dated June 3, 2015 which described the entire universe of the thirty white papers and noted the twelve unique documents that were being produced and the eighteen unique documents that were being withheld.  This letter was intended to enable the defense to articulate why it is entitled to each individual document and it is attached to the defendants' motion as Dkt. 81-4.  The table below re-creates the description of the eighteen items that were withheld and are therefore at issue in this motion.  For ease of reference, each item is marked as an exhibit and is available for *in camera* inspection if so ordered.

| Exhibit | Description | Date |
|---|---|---|
| A | The Proper Treatment of JPY LIBOR Interbank Communications of Interest | 6/20/2013 |
| B | Annex II | 6/19/2013 |
| C | Rabobank Interbank Cost of Funds Analysis | 8/7/2013 |
| D | JPY LIBOR Trading Analysis | 8/7/2013 |
| E | Rabobank Consistency Analysis | 8/7/2013 |
| F | Mitigating Circumstances and Factors Relevant to Resolution of Interest Rate Benchmark Investigations | 8/13/2013 |
| G | Appendix 3: Composition of Interest Rate Derivatives Volume Traded by Certain USD Panel Banks | 8/9/2013 |
| H | Appendix 5: KPMG Analysis of Rabobank's Liquidity and Debt Position | 8/9/2013 |
| I | Appendix 6: External Communications of Interest | Undated |
| J | Letter from Milbank to DOJ and CFTC | 8/30/2013 |
| K | External Communications Under the Sherman Act | 9/6/2013 |
| L | Appendix A: List of External Communications of Interest | Undated |
| M | Appendix B: Summary of Analysis of Tenor References | Undated |
| N | Email from Milbank to DOJ | 9/27/2013 |
| O | Overview of Rabobank's Disciplinary Actions | NA |
| P | Summary of Rabobank's Non-Disciplinary Actions | NA |
| Q | Email from Milbank to DOJ Regarding Sentencing Guidelines | 10/15/2013 |
| R | Letter from Milbank to DOJ Regarding Rabobank's Financial Penalty | 10/16/2013 |

## ARGUMENT

Rather than articulating how each individual item would alter the quantum of proof in their favor, the defendants make the blanket assertion that each one of the eighteen items at issue "refutes" the government's theory of the case. As set forth below, the defendants' motion fails to make a *prima facie* showing that attorney advocacy pieces which make arguments based on data that they possess are "material" to the defense for the purposes of Fed. R. Crim. P. 16.

Because the United States is not going to use the items at issue in its case-in-chief and because the items do not belong to the defendants, the defendants are entitled only to those documents that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(E)(i). A defendant cannot establish entitlement to materials under Rule 16 through conclusory allegations. Instead, the defendants carry the burden of making a *prima facie* showing that the documents sought are material to the preparation of the defense. *United States v. Giffen*, 379 F.Supp. 2d 337, 342 (S.D.N.Y. 2004). Evidence is "material" if its pretrial disclosure will enable a defendant to alter significantly the quantum of proof in his favor. *United States v. McGuinness*, 764 F.Supp. 888, 895 (S.D.N.Y. 1991). The government is aware of no cases holding that papers which might help a defendant to formulate legal theories are discoverable under Rule 16.

The defendants have not made the *prima facie* showing of materiality because, while they assert generally that "the Milbank Documents would bolster their defense," they do not even attempt to explain how. Specifically, the defendants make no effort to identify the uses that they would make of a letter that one lawyer sent to another during the course of a settlement negotiation or of KPMG's analysis of data which they possess. As such, Messrs. Alan and Conti's motion has the same shortcoming as the motion to compel rejected by the Court in

*United States v. Reddy*, in which Judge Swain denied a defendant's request for "work product of [a company's] investigators, such as documents created by [the company's] investigators during the course of the investigation setting forth the investigator's analysis of the evidence they had gathered." 190 F.Supp. 2d 558, 572 (S.D.N.Y. 2002). Specifically, the Court denied a motion to compel because the defendant did not specify "what use he intends to make of the information . . . in other words, how such materials could help the Defendants counter the Government's case. . . ." *Id*. The Court also observed that "the defendants have not indicated how the opinions, conclusions and analysis of the investigators meet the materiality standard. . . ." *Id*. at 573. Messrs. Allen and Conti attempt to distinguish *Reddy* on the ground that they "have clearly demonstrated that the Milbank Documents would bolster their defense," but their brief makes no effort to explain *how* they intend to use the documents. This is because there is no use to which communications between lawyers who are not going to testify at the trial could be put.[3]

The district court's decision in *United States v. Stein* provides additional support for the proposition that settlement communications between two parties are immaterial to a fraud case. 488 F. Supp. 2d 350 (S.D.N.Y. 2007). There, the Court ruled that the defendants were not entitled to portions of a white paper in which KPMG, which had previously entered into a Deferred Prosecution Agreement with the Department of Justice over its role in promoting tax shelters, argued that it should not be indicted. *Id*. at 357. The Court concluded that the portion of the white paper that argued unconvincingly that KPMG did not obstruct justice in connection with the investigation was material but that, "[i]n the main, they are not material to the preparation of the defense." *Id*. at 359. Although the Court did not provide a detailed description of those portions of the white papers that it considered immaterial, it appears that the

---

[3] Unlike *Reddy*, the white papers at issue in this case do not contain summaries of interviews performed by Milbank as part of an internal investigation.

5

Court held those portions of the white papers "in which KMPG argued that the firm should not be indicted," *id.* at 357, were not discoverable.

The defendants' failing to make a *prima facie* showing of materiality is highlighted by the fact that their brief makes no effort to explain how it would use each individual document. Instead, it lumps all eighteen documents into one category that it describes as "the Milbank Documents" and asserts, without making any distinctions, that they are all material for the same reason. This approach is insufficient to establish materiality, which assesses the discoverability of evidence on a case-by-case basis considering "not only the logical relationship between the information and the issues in the case, but also the importance of the information in light of the evidence as a whole." *In re Terrorist Bombings*, 552 F.3d 93, 124 (2d Cir. 2008) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).

A document-by-document analysis of the materiality of each disputed item demonstrates that the defendants cannot make a *prima facie* showing of materiality. As in *Reddy*, the documents below contain third parties' commentary on evidence. While it is true that some of the documents at issue rely on analysis of data undertaken by KPMG, the defendants are in a position to perform their own independent analysis because the United States provided in discovery the data upon which KMPG's analysis relies. Specifically, the United States turned over in discovery the emails and chats in which the defendants seek to manipulate LIBOR, trading data pertaining to Rabobank traders' derivative positions, and the LIBOR submissions that Rabobank made to the British Bankers' Association, which calculated LIBOR.

The eighteen documents at issue are described below.

**Exhibit A – "the Proper Treatment of JPY LIBOR Interbank Communications of Interest" (6/20/2013)**

This is a document created by Rabobank's lawyers which makes two legal arguments based on email communications and trading data already provided to the defendants. First, the paper argues that "*Bona fide* suggestions for LIBOR submissions are not unlawful." Second, the paper argues that "the content, context and relevant trading positions associated with [Japanese Yen] communications show that they were not improperly motivated." As was the case in *Reddy*, the document is essentially a third party's analysis of factual information and is therefore immaterial under Rule 16. 190 F.Supp. 2d at 573 ("the defendants have not indicated how the opinions, conclusions and analysis of the investigators meet the materiality standard. . . ."). Although the document describes a KPMG analysis of whether certain LIBOR manipulation requests identified by Rabobank were consistent with the book positions of the traders who made the requests, the defendants are in a position to perform this analysis themselves because they are in possession of Rabobank's trading data.

**Exhibit B – "Annex II" (6/19/2013)**

This document is a spreadsheet that is attached to Exhibit A as an "annex." It merely describes the communications upon which KPMG's analysis was based. The government previously produced to the defendants the communications themselves.

**Exhibit C – "Rabobank Interbank Cost of Funds Analysis" (8/7/2013)**

This document compares Rabobank's LIBOR submissions to its estimation of the interest rates that Rabobank would pay if it borrowed funds on the interbank market. Rabobank submitted this analysis in support of its argument that there was no evidence that Rabobank had a policy of "lowballing," i.e., submitting artificially low LIBOR rates to make it appear that the bank was more creditworthy than it actually was. This document is immaterial because the

7

indictment alleges that the defendants manipulated LIBOR to accommodate trading positions, not to send the markets false signals about Rabobank's solvency.

**Exhibit D – "JPY LIBOR Trading Analysis" (8/7/2013)**

This document is an analysis of how often the net trading positions of specific traders who requested LIBOR manipulations were congruent with the manipulation requests that they put to the LIBOR setters, i.e. whether the trader's position would have benefitted from his request.  This analysis is immaterial because the defendants possess Rabobank's trading data and are capable of doing their own independent analysis.

**Exhibit E – "Rabobank Consistency Analysis" (8/7/2013)**

This item is an analysis of whether Rabobank's rate submissions to the British Bankers' Association were consistent with manipulation requests sought by traders, i.e. Rabobank's assessment of whether its LIBOR submitters made submissions that were consistent with requests put by derivative traders.  This analysis is immaterial because the defendants possess the manipulation requests at issue as well as the submissions that Rabobank made to the British Bankers' Association and are therefore capable of doing their own independent analysis.

**Exhibit F – "Mitigating Circumstances and Factors Relevant to Resolution of Interest Rate Benchmark Investigations" (8/13/2013)**

This document is an advocacy piece in which Rabobank's lawyers identified several "mitigating" factors which they argued were probative of the scope and severity of the conduct that was ultimately resolved through the Deferred Prosecution Agreement being negotiated with the Department of Justice.  The paper discusses remediation efforts undertaken by the bank, the internal controls that it has since put in place, and the bank's level of cooperation with DOJ.  It also asserts that Rabobank was less culpable than other panel banks that resolved allegations of

LIBOR manipulation. Because this document constitutes legal argument, it is unclear how it could alter the quantum of proof in the defendants' favor.

**Exhibit G – "Appendix 3: Composition of Interest Rate Derivatives Volume Traded by Certain USD Panel Banks" (8/9/2013)**

Using annual financial reports available on each bank's website, KPMG performed an analysis of the size of Rabobank's derivative holdings and compared the size of Rabobank's derivative holdings to those of other institutions on the U.S. Dollar LIBOR panel. The analysis suggests that Rabobank held smaller derivative positions than other LIBOR panel banks. The applicability of this analysis to the charges in the indictment is far from clear and, in any event, because the analysis was based on publicly available data, the defendants are capable of re-creating it themselves.

**Exhibit H – "Appendix 5: KPMG Analysis of Rabobank's Liquidity and Debt Position" (8/9/2013)**

This document analyzes Rabobank's liquidity position and concluded that Rabobank was in a strong capital position during the time period at issue. As with Exhibit C, Rabobank submitted this analysis in support of its argument that there was no evidence that Rabobank had a policy of submitting artificially low LIBOR rates to make it appear that the bank was more creditworthy than it actually was. This document is immaterial because the indictment alleges that the defendants manipulated LIBOR to accommodate trading positions, not to send the markets false signals about Rabobank's solvency.

**Exhibit I – "Appendix 6: External Communications of Interest" (undated)**

Appendix 6 identifies the bates numbers of several emails and chats from Rabobank traders which were the subject of KPMG's analysis. The United States provided these communications to the defendants in discovery.

**Exhibit J – "Letter from Milbank to DOJ and CFTC" (8/30/2013)**

This document is a letter in which Milbank replies to several questions that DOJ and Commodity Futures Trading Commission officials asked about the methodology that Milbank applied in the submission entitled "The Proper Treatment of JPY LIBOR Interbank Communications of Interest," which is marked as Exhibit A.  The paper responds to three questions.  First, whether KPMG's analysis revealed a correlation between the size of a trading position for which a trader requested a LIBOR accommodation and the likelihood that the position was accommodated.  Second, whether KMPG's analysis accounted for the trading positions of individuals other than the sender of the communications at issue.  And third, the DOJ inquired about the date on which Rabobank migrated to an updated electronic records system.  This document is immaterial for the same reasons that Exhibit A is immaterial.  Indeed, this letter simply elaborates on an analysis of data that the defendants possess.

**Exhibit K – "External Communications Under the Sherman Act" (9/6/2013)**

This communication analyzes whether the facts of the case give rise to criminal liability under the Sherman Act, 15 U.S.C. § 1.  In support of its position, Milbank made four assertions.  First, there are few communications between a Rabobank employee and another panel bank or cash broker that could be viewed as attempts to influence LIBOR submissions in concert with another panel bank.  Second, unlike conduct described in settlements with other institutions, no Rabobank employee ever (a) engaged multiple panel banks in a cartel of manipulation; (b) bribed brokers to manipulate other panel banks' submissions; (c) defrauded other panel banks for the purpose of influencing their LIBOR submissions; or (d) aligned their commercial interests with traders at other panel banks so that multiple panel banks would benefit from successful LIBOR manipulation. Third, there was no evidence that any manager at Rabobank, let alone any senior

manager, was involved in any collusive activity with another Panel Bank regarding LIBOR submissions or was aware that lower-level employees might have been involved in such activities.  Fourth, recent case law holds that agreements between or among panel banks regarding LIBOR submissions do not constitute a violation of Section 1 of the Sherman Act.

Disclosure of this document will not alter the quantum of proof in the defendants' favor because the indictment does not allege a violation of the Sherman Act.  Moreover, the manner in which Rabobank's lawyers characterized evidence of LIBOR manipulation is irrelevant because it is the jury's task to examine and evaluate the evidence in the case.  Indeed, Rabobank ultimately entered into a Deferred Prosecution Agreement in which it stipulated that employees, including the defendants, participated in LIBOR manipulation.

**Exhibit L – "Appendix A: "List of External Communications of Interest" (undated)**

Rabobank's white paper on Sherman Act liability attached an appendix which identified the bates numbers of the emails and chats cited therein.  Because the United States has produced these underlying documents, this appendix is not material.

**Exhibit M – "Appendix B: Summary Analysis of Tenor References" (undated)**

This document is the second of the two appendices attached to Rabobank's white paper on Sherman Act liability.  It describes an analysis performed by KPMG which attempted to determine how frequently Rabobank LIBOR submitters made submissions that were consistent with 61 specific LIBOR manipulation requests.  KPMG's analysis is immaterial because the defendants possess the communications identified in the indictment as well as Rabobank's LIBOR submissions to the BBA.

**Exhibits N, O, and P – "Email from Milbank to DOJ With Attachments" (9/27/2013)**

In this email (marked as Exhibit N), Milbank advised DOJ officials of the types of employment and remedial actions that Rabobank took in response to the LIBOR scandal. The email attaches two charts, marked as Exhibits O and P. The first chart (Exhibit O) describes the disciplinary actions taken against 19 Rabobank employees. The chart does not address any actions taken against Anthony Allen, Anthony Conti, Lee Stewart, or Paul Robson. It describes employment actions relating to Tetsuya Motomura, and Takayuki Yagami. The second chart (Exhibit P) describes the non-disciplinary remedial actions taken by Rabobank, such as policy changes, compliance initiatives, structural changes, and training initiatives. The body of the email also asserts, without attribution, that Milbank believes that the traders did not manipulate LIBOR to benefit Rabobank as an institution but instead manipulated LIBOR to benefit their own trading positions. The employment actions that Rabobank took against individuals other than the defendants are not material for the purposes of Rule 16.

**Exhibit Q – "Email from Milbank to DOJ Regarding Sentencing Guidelines" (10/15/2013)**

This email undertakes a legal analysis of which sentencing guideline enhancements apply to Rabobank's conduct. It is difficult to imagine how legal arguments between two lawyers concerning the applicability of the sentencing would be material for the purposes of Rule 16.

**Exhibit R – "Letter from Milbank to DOJ regarding Rabobank's Financial Penalty" (10/16/2013)**

On October 16, 2013, Milbank sent a letter to DOJ addressing the financial penalty that DOJ proposed for Rabobank. In the letter, Milbank argued that Rabobank was less culpable than other LIBOR panel banks who had entered into Deferred Prosecution Agreements. Specifically, the letter addressed the number of Rabobank's manipulation attempts as compared to other panel banks and the number of currencies that Rabobank manipulated as compared to other panel

banks.  The defendants point to no authority supporting the proposition that this sort of legal argument constitutes material information under the Rules.

Because the United States produced some white papers but not others, the defendants accuse the United States of engaging in the "selective" disclosure of documents.  Def. br. at 5.  The government's production of the white papers was indeed selective, which is what Rule 16 requires.  Unlike the defendants, who make blanket assertions about the entire universe of documents, the government undertook a document-by-document review of each item at issue to determine its relevance to the facts of this particular case.  *See In re Terrorist Bombings*, 552 F.3d at 124.  Having considered each document individually, the government declined to produce those documents that consisted of legal argument and analyses of data that were available to the defendants.

The defendants' brief makes much of the fact that the government produced a white paper dated June 20, 2013, which they say "directly refutes certain of the [indictment's] allegations." Def. br. at 6.  Putting aside that the government's disclosure of a particular white paper that the defendants consider helpful seems to undercut their "selective disclosure" allegation, Rule 16 contains no waiver provisions in which the production of a sub-set of documents requires production of an entire category.  It may very well be that the June 20, 2013 white paper is in fact a non-material advocacy piece, such that the government erred on the side of disclosure in making its production.  But this does not change the fact that Rule 16 requires a document-by-document showing of materiality.  The defendants are unable to do so and, as such, are not entitled to the material which they seek.

| | |
|---|---|
| ANDREW WEISSMANN<br>Chief, Fraud Section | JEFFREY D. MARTINO<br>Chief, New York Office |
| /s Brian R. Young<br>CAROL SIPPERLY<br>Senior Litigation Counsel<br>BRIAN R. YOUNG<br>Senior Trial Attorney<br>U.S. Department of Justice<br>Criminal Division<br>1400 New York Ave., NW<br>Washington, D.C. 20005<br>(202) 616-3114 | MICAHEL T. KOENIG<br>Trial Attorney<br>U.S. Department of Justice<br>Antitrust Division<br>450 5th Street, N.W.<br>Washington, D.C., 20001<br>(202) 616-2165 |

Dated: July 31, 2015

14