## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |  |
|---|---|---|---|
| | : | | |
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| | : | | |
| | : | | |
| | : | | |
| v. | : | S4:14-cr-00272-JSR | |
| | : | | |
| | : | | |
| | : | | |
| | : | | |
| ANTHONY ALLEN, *et al.,* | : | | |
| Defendants. | : | | : |

### GOVERNMENT'S POST-*"KASTIGAR"* HEARING BRIEF

RAYMOND HULSER
Chief, Public Integrity Section

BRITTAIN SHAW
Trial Attorney, Fraud Section
U.S. Department of Justice
Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
(202) 616-2162

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    THE GOVERNMENT DID NOT USE DEFENDANTS' FCA TESTIMONY. ................ 2

   A.  "Evidentiary Use" Under Kastigar ................................................................ 2

   B.  The Prosecution Team Was Never Exposed to the Defendants' FCA Testimony........... 5

   C.  The Government Had Substantial, Prior Knowledge of the Defendants' Roles and Involvement in the Conspiracy. ............................................................. 7

II.   ALL OF THE EVIDENCE SUPPORTING THE INDICTMENT AND THE CONVICTIONS DERIVED FROM WHOLLY INDEPENDENT SOURCES. ...................... 8

   A.  Independent Sources for the Grand Jury Evidence......................................... 8

   B.  Independent Sources for the Government's Evidence at Trial ...................................... 13

   D.  The Defendants' FCA Testimony Provided Nothing to Use. ........................................ 20

III.   ANY ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT................. 28

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Kastigar v. United States*,
    406 U.S. 441 (1972)..................................................................................... 1

*United States v. Anderson*,
    450 A.2d 446, 451 (D.C. 1982) .................................................................. 5

*United States v. Bartel*,
    19 F.3d 1105, 1112-13 (6th Cir. 1994) ................................................ 3, 5, 20

*United States v. Bianco*,
    534 F.2d 501, 510 (2d Cir. 1976)................................................................. 4

*United States v. Blau*,
    159 F.3d 68, 73 (2d Cir. 1998)........................................................... 3, 5, 17

*United States v. Byrd*,
    765 F.2d 1524, 1529 (11th Cir. 1985) ......................................................... 3

*United States v. Caporale*,
    806 F.2d 1487, 1518 (11th Cir. 1986) ................................................ 3, 5, 20

*United States v. Catalano*,
    491 F.2d 268, 272 (2d Cir. 1974)............................................................ 4, 8

*United States v. Dynalectric Co.*,
    859 F.2d 1559, 1578 (11th Cir. 1988) ................................................ 3, 15, 21

*United States v. Gallo*,
    859 F.2d 1078, 1090-91 (2d Cir. 1988) ..................................................... 29

*United States v. Gallo*,
    863 F.2d 185, 190 (2d Cir. 1988)...................................................... 4, 20, 21

*United States v. Harloff*,
    807 F. Supp. 270, 283 (W.D. N.Y. 1992) ......................................... 4, 7, 18

*United States v. Helmsley*,
    941 F.2d 71, 80 (2d Cir. 1991)................................................................... 3

*United States v. Kurzer*,
    534 F.2d 511, 517 (2d Cir. 1976) ............................................................... 5

*United States v. Mariani*,
    851 F.2d 595, 600 (2d Cir. 1988)........................................................................... 3, 21, 28

*United States v. Mauro*,
    846 F. Supp. 245, 255 (W.D. N.Y. 1994) ........................................................................ 4

*United States v. Mechanik*,
    475 U.S. 66, 70 (1986)........................................................................................... 29

*United States v. Mendizabal*,
    214 Fed. Appx. 496, 501-502 (6th Cir. 2006) ................................................................ 1

*United States v. Poindexter*,
    727 F.Supp. 1488, 1496 (D.D.C. 1989), *overruled on other grounds,* 951 F.2d 369, 373-
    77 (D.C. Cir. 1991) ........................................................................................... 4, 18

*United States v. Rivieccio*,
    919 F.2d 812, 814 (2d Cir. 1990)................................................................... passim

*United States v. Slough*,
    36 F.Supp.3d 37, 47-48 (D.D.C. 2014)........................................................................ 19

*United States v. Slough*,
    641 F.3d 544, 551 (D.C. Cir. 2011) .................................................................. passim

*United States v. Smallwood*,
    311 F. Supp.2d 535, 541-42 (E.D. Va. 2004) ................................................................ 1

*United States v. Turner*,
    936 F.2d 221, 224 (6th Cir. 1991) ........................................................................... 1

*United States v. Vander Luitgaren*,
    556 F. Supp. 2d 1313, 1319 (M.D. Fla. 2008)........................................................... 5, 21

*United States v. Washington*,
    431 U.S. 181, 185 (1977)....................................................................................... 28

*Zicarelli v. New Jersey State Comm'n of Investigation*,
    406 U.S. 472, 478 (1972)......................................................................................... 2

**Statutes**

18 U.S.C. § 6002 ................................................................................................... 1

## PRELIMINARY STATEMENT

The defendants have advanced the novel legal claim that their immunized testimony—which was "compelled" by the U.K. Financial Conduct Authority ("FCA"), not the United States—was used against them in their U.S. prosecution in violation of *Kastigar v. United States*, 406 U.S. 441 (1972). [1]   Not only does their motion fail as a matter of law, but it founders under the weight of the facts in the extensive record before the Court. [2]   As demonstrated by the overwhelming evidence at trial and the post-trial "*Kastigar*" hearing, no prohibited use occurred. The prosecution team—who walled itself off from any exposure to the defendants' FCA testimony or its substance well before the defendants ever testified before the FCA– presented overwhelming, independent evidence to the jury from which it found beyond a reasonable doubt that the defendants had conspired to commit wire fraud by manipulating the London Interbank

---

[1] *Kastigar* held that the protection afforded by 18 U.S.C. § 6002 must be coextensive with the Fifth Amendment and thus restricts the government from both direct and derivative use of immunized testimony. *Kastigar*, 406 U.S. at 453.  By contrast, here, the "immunity" the U.K. regulator provided the defendants only protected against direct use, and, in fact, specifically allowed for derivative use. *See* Gov. Exh. 205, at 1-4; Gov. Exh. 206 at 1-2.  Courts have declined to apply *Kastigar* in cases where a witness was only granted informal immunity, not statutory immunity under 18 U.S.C. § 6002.  *See, e.g., United States v. Mendizabal*, 214 Fed. Appx. 496, 501-502 (6th Cir. 2006) (noting that an agreement allowing the government to make derivative use of defendant's testimony is "a classic informal immunity agreement"); *United States v. Turner*, 936 F.2d 221, 224 (6th Cir. 1991) (affirming district court's denial of *Kastigar* hearing where defendants only received informal immunity); *United States v. Smallwood*, 311 F. Supp.2d 535, 541-42 (E.D. Va. 2004) (applying principles of contract law and determining that immunity agreement only binds parties to it and that plain terms of immunity agreement only provide direct use immunity).

[2] The Government incorporates by reference the Government's Opposition to Defendants' Motion to Dismiss Based Upon *Kastigar* ("Gov. Opp."). As set forth in its Opposition, and at oral argument, the government maintains that the application of *Kastigar* to a foreign sovereign's grant of immunity directly conflicts with Supreme Court precedent.  Moreover, such a ruling would create a dangerous vehicle for nations with interests hostile to the United States to engage in strategic behavior that would frustrate and impede the United States' ability to prosecute violations of its own laws in its own courts.

Offered Rate ("LIBOR").  *See* Memorandum in Opposition to Def.'s Motion for Judgment of

Acquittal, Dkt. 196.  Moreover, with respect to the indictment, as demonstrated at the "*Kastigar*"

hearing, the prosecution's grand jury evidence derived entirely from legitimate, independent

sources: chats and emails produced to the government by Rabobank and interviews of

approximately 10 Rabobank traders who participated in the scheme to manipulate LIBOR, all of

which were in the government's possession *prior* to the government's first meeting with Paul

Robson, the only witness exposed to defendants' FCA testimony.  (Hearing Tr., 12/16/15, at 134;

137; *see also* Gov. Exhs. 178-185; 208).  Indeed, only two small portions of the case agent's

testimony to the grand jury were based exclusively on information from Paul Robson.  (Hearing

Tr., 12/16/15, at 155-158).  And those discrete pieces of information—that defendant Allen

specifically or explicitly directed Robson to accommodate trader's positions in submitting

Rabobank's LIBOR rate—*could not have* derived from the defendants' FCA testimony because

both defendants' FCA testimony on the same point consisted of denials and self-serving,

exculpatory responses. *Compare* Gov. Exh. 186, at 5; 10, *with* Gov. Exh. 205, at 67-68 (Allen

denies directing Robson to consult Yagami or Thompson regarding LIBOR submissions) *and*

Gov. 206, at 49 (Conti does not recall anyone directing him to take traders' positions into

account).  Accordingly, defendants' motion to dismiss based upon "*Kastigar*" should be denied.

## ARGUMENT

## I.    THE GOVERNMENT DID NOT USE DEFENDANTS' FCA TESTIMONY.

### A.  *"Evidentiary Use" Under Kastigar*

Consistent with the fundamental principle "that the [Fifth Amendment] privilege protects

against real dangers, not remote and speculative possibilities," *Zicarelli v. New Jersey State

Comm'n of Investigation*, 406 U.S. 472, 478 (1972), what constitutes "use" under *Kastigar* is not

limitless.  To the contrary, *Kastigar* violations may not be premised on a hypothetical chain of taint.  *United States v. Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991)*; see also United States v. Slough*, 641 F.3d 544, 551 (D.C. Cir. 2011) (*Kastigar* only implicated where there is a "firm foundation resting on more than suspicion" that the proffered evidence was tainted by exposure to immunized testimony); *United States v. Blau*, 159 F.3d 68, 73 (2d Cir. 1998) (defendant's "series of 'but for' causation connections" between immunized testimony and conviction insufficient for *Kastigar* claim).  Nor is the government is "required to negate every abstract possibility of taint in order to carry its burden of showing a legitimate, independent source for contested evidence." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1578 (11th Cir. 1988); *see also United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985).

Indeed, the Second Circuit has specifically limited *Kastigar*'s application to the "evidentiary use" of immunized statements. *Helmsley*, 941 F.2d at 80. That is, "use" only occurs "where the immunized testimony has some *evidentiary effect* in a prosecution against a witness." *Id.* (emphasis added).  Where immunized testimony does not furnish an investigatory lead or new information that allows the government to build a case against a defendant, it cannot be said to have had any "evidentiary effect." *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986); *United States v. Bartel*, 19 F.3d 1105, 1112-13 (6th Cir. 1994).   *Kastigar* does not apply to non-evidentiary uses of immunized testimony, such as where it "might have tangentially influenced the prosecutor's thought process in preparing the indictment and preparing for trial." *United States v. Rivieccio*,  919 F.2d 812, 814 (2d Cir. 1990); *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988); *see also Slough*, 641 F.3d at 554 (stating that "as to  decisions to indict, we join those circuits refusing to find such decisions vulnerable on the  ground of links to immunized statements").

3

The government may meet its burden of showing its evidence was derived from legitimate, independent sources in several ways, all of which apply here. First, "[p]roof that a witness was never exposed to immunized testimony . . . would obviously satisfy the requirement." *Slough*, 641 F.3d at 550; *see also United States v. Bianco*, 534 F.2d 501, 510 (2d Cir. 1976) (evidence sufficient where prosecution had no access to immunized testimony or knowledge of its existence); *United States v. Mauro*, 846 F. Supp. 245, 255 (W.D. N.Y. 1994) (same). Second, if a witness who was exposed cannot recall the contents of the immunized testimony, there can be no possible use of it under *Kastigar*. *See United States v. Poindexter*, 727 F.Supp. 1488, 1496 (D.D.C. 1989), *overruled on other grounds,* 951 F.2d 369, 373-77 (D.C. Cir. 1991) (where witnesses have no recollection of contents of immunized testimony they cannot "possibly make any use of it"); *see also United States v. Harloff*, 807 F. Supp. 270, 283 (W.D. N.Y. 1992) (denying *Kastigar* claim where witness, who reviewed immunized testimony years before, had no recollection of the contents of it and thus could not possibly use it.). Third, where the prosecution had "prior knowledge of substantially all of the information covered in the defendant's immunized testimony," the possibility of use is foreclosed. *United States v. Catalano*, 491 F.2d 268, 272 (2d Cir. 1974); *see also Rivieccio*, 919 F.2d at 815 (denying *Kastigar* claim where government was "clearly aware" of the defendant's involvement in the scheme before he even gave immunized testimony). Fourth, it bears emphasis in this case that there can be no use and no *Kastigar* violation, where a witness's immunized testimony consists of denials, self-serving, exculpatory responses or ambiguous answers that are of no value to prosecutors. *United States v. Gallo*, 863 F.2d 185, 190 (2d Cir. 1988); *United States v. Harloff*, 807 F. Supp. 270, 282 (W.D.N.Y. 1992). Courts routinely deny *Kastigar* claims on the grounds that the government cannot make an improper "use" of a compelled statement which contains

only "suspect and exculpatory" information. *United States v. Anderson*, 450 A.2d 446, 451 (D.C. 1982); *see also United States v. Bartel*, 19 F.3d 1105, 1112-13 (6th Cir. 1994) (affirming district court's denial of *Kastigar* claim and finding that defendant's "exculpatory testimony before the grand jury could not have contributed to the grand jury's decision to indict him."); *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986) (no *Kastigar* violation where prior self-serving testimony was believed by prosecutor to be untrue and was of no real value to the investigation); *United States v. Vander Luitgaren*, 556 F. Supp. 2d 1313, 1319 (M.D. Fla. 2008) ("Prior self-serving testimony that is not useful to the subsequent investigation cannot be used to show a *Kastigar* violation and defeat the indictment.").  Fifth, even where a witness was exposed to immunized testimony, where there is a "complete absence of overlap" between challenged testimony and the immunized statements, such as where a witness's recollection has "no referent" or "antecedent" in the immunized statements, the testimony cannot be tainted.  *Slough*, 641 F.3d at 550.  Finally, the fact that a cooperating witness was exposed to immunized testimony does not demonstrate, *ipso facto*, that he was "motivated" to testify by virtue of his exposure. *See, e.g., United States v. Kurzer*, 534 F.2d 511, 517 (2d Cir. 1976). To the contrary, as in this case, an expressed desire to obtain leniency at sentencing or a reduced sentence provides a legitimate, independent basis for a cooperating witness's testimony. *Blau*, 159 F.3d at 73.

### B.  The Prosecution Team Was Never Exposed to the Defendants' FCA Testimony.

Simply put, where, as here, the government never possessed the defendants' FCA transcripts or learned of their substance, the government could not have used their testimony against them—either in the grand jury or at trial.  *Slough*, 641 F.3d at 550. As described in the numerous detailed declarations from current and former Department of Justice trial attorneys and

supervisors assigned to the investigation, none of the former or current trial attorneys, supervisors, paralegals, or case agents had any exposure whatsoever to the substance of the defendants' FCA transcripts. (Gov. Exhs. 199; 211-218). In fact, well before the defendants were ever interviewed by the FCA, the government took affirmative steps to shield itself from any substance of the FCA's investigation. (Gov. Exhs. 213-217). In support of its efforts to shield trial team members or witnesses from the FCA's investigation, one of the supervisors for the Rabobank investigation even gave a presentation to FCA representatives in London to provide context for and explain the importance of maintaining a "wall" between the investigations in light of the uncertain application of U.S. Constitutional law to the FCA's exercise of its regulatory powers. (Gov. Exh. 213). And, in a further effort to maintain the integrity of the wall, trial attorneys routinely warned FCA representatives and witnesses during any meetings, conversations, or interviews not to share any substance from their investigation. Trial attorneys also avoided exposure to any written materials, such as warning notices that might contain such information. (Gov. Exhs. 215; 216). Beyond repeated warnings to their FCA counterparts and witnesses, prosecutors tried to adhere to a "day one/day two" model when scheduling any interviews of subjects in the LIBOR investigation. Under that approach, the DOJ attorneys would specifically ask the FCA to allow them to interview the subjects first, *prior* to the FCA, in order to memorialize witness testimony independently in advance. (Hearing Tr., 12/16/15, at 135-136). For example, in the case of defendant Conti, the FCA accommodated DOJ's "day one/day two" approach and defendant Conti interviewed on a voluntary basis with the DOJ prosecution team six days prior to the FCA. (Gov. Exh. 178; Gov. Exh. 206).

The FCA only disclosed the defendants' FCA transcripts, which it treats as confidential, to one individual, Paul Robson, when it issued him a warning notice of FCA action against him.[3] But Paul Robson, who reviewed the FCA testimony one time in late 2013, did not expose the prosecution team to any information derived from the defendants' FCA testimony either. First, as both Mr. Robson and Special Agent Jeffrey Weeks testified, Mr. Robson was specifically advised not to share any information derived from any part of the FCA investigation with the government, and he did not do so. (Hearing Tr., 12/16/15 at 9-10; 136-37; Def. Exh. 177). More important, however, Mr. Robson could not recall the substance of the defendants' FCA, and thus he could not have derived his testimony or statements from it. (Hearing Tr., 12/16/15, at 8, Hearing Tr. 12/17/15, at 213). *Harloff*, 807 F. Supp. at 282. To the contrary, as discussed in further detail *infra*, neither Mr. Robson's statements to the government nor his testimony at trial was shaped, affected, motivated, or at all informed by his one-time review of the defendants' FCA testimony, but instead derived from a legitimate independent source: his personal experience and first-hand observations from years of working around the same desk with the defendants. (Hearing Tr., 12/16/15, at 12-15; 12/17/15, at 214).

### C.  The Government Had Substantial, Prior Knowledge of the Defendants' Roles and Involvement in the Conspiracy.

Notwithstanding their lack of exposure to the FCA transcripts, the government did not need to use defendants' FCA testimony, as the prosecution team had already developed substantial evidence of the defendants' involvement in the scheme to manipulate LIBOR in its own independent investigation, and did so well before the defendants were interviewed in the U.K., or before the government met with Paul Robson for the first time. *Rivieccio*, 919 F.2d at

---

[3] The FCA did not even share the FCA materials with their counterparts at the Serious Fraud Office ("SFO") until after the U.S. trial concluded. (Gov. Exh. 220).

815; *Catalano*, 491 F.2d at 272 (holding that evidence that government had prior knowledge of substantially all of the information coerced in defendant's immunized testimony "forecloses the possibility" of any direct or indirect use).   In October 2013, the government and Rabobank entered into a Deferred Prosecution Agreement ("DPA"), which incorporated a detailed summary of the scheme and relied on numerous chats and emails that plainly implicated the defendants. (Gov. Opp., at 2-4; Gov. Exh. 196).   These chats and emails were amongst the thousands of documents produced to the government from Rabobank beginning in 2011. (Gov. Exh. 208).   Moreover, when the current trial team was assigned to the case in the fall of 2013, it was immediately apparent, based on the review of this documentary evidence and the interviews that had been conducted, that defendants Allen and Conti were involved in and knew of the accommodation of traders' requests by Rabobank's LIBOR submitters.   (Gov. Exh. 216). Indeed, all of the chats and emails presented to the jury at trial were among those possessed by the government prior to the defendants' FCA interviews.   (Gov. Exh. 191). Likewise, all of its cooperating witnesses, Paul Robson, Takayuki Yagami, and Lee Stewart, were known to the government by the time of the Rabobank DPA.   *Rivieccio*, 919 F.2d at 815.   Moreover, Yagami, Stewart, and other Rabobank traders who were centrally involved in the scheme had already met with the government *a year before* the government first met with Paul Robson in July 2014, and had voluntarily provided inculpatory information concerning the defendants role in the scheme. (Gov. Exhs. 178-185).

## II.   ALL OF THE EVIDENCE SUPPORTING THE INDICTMENT AND THE CONVICTIONS DERIVED FROM WHOLLY INDEPENDENT SOURCES.

### A.   *Independent Sources for the Grand Jury Evidence*

In October 2014, Special Agent Jeffrey Weeks, the FBI case agent assigned to the Rabobank LIBOR investigation, testified before the grand jury in support of the indictment of

Allen and Conti for their involvement in the scheme to manipulate LIBOR submissions at Rabobank.  (Hearing Tr., 12/16/15, at 132-134; Hearing Tr., 12/17/15, at 249-250; Gov. Exh. 186).  Agent Weeks explained to the grand jury that "Allen was really the person who directed all the LIBOR submitters how to submit their rates," (Gov. Exh. 186, at 5), and that "Conti adjusted his U.S. dollar LIBOR rates both for his own benefit and for the benefit of other traders." (Id. at 6).  Allen, who was the "unquestioned boss," participated at "round-table discussions" at the trading desk in which Rabobank traders requested LIBOR submitters, including Conti, to take their trading positions into account and adjust their LIBOR rate submissions to benefit them.  (Id. at 5, 10-11, 14-15; 22-23; 28-29; 46).  Agent Weeks further testified that he learned in the course of his investigation that, "Allen specifically communicated his expectation, to among others, Conti relating to accommodating the request[s] of traders" and "created this expectation . . . for submitters to take into consideration trader positions. (Id. at 37). In addition to summarizing information derived from interviews of Rabobank traders involved in the conspiracy, (Id. at 4-16), Agent Weeks also testified about numerous chats and emails, and some audio recordings, obtained from Rabobank between 2011 and 2013, which clearly demonstrate Rabobank traders making requests for LIBOR submissions and the defendants' acknowledgement and accommodation of them.  (Id. at 16-22) (discussing chats and emails including trial exhibits, Gov. Exhs. 101E, 101J, 101O, 1901A).[4]

---

[4] Agent Weeks also testified about two summary exhibits. The first one correlated trader requests in the chat and email exhibits with the resulting Rabobank LIBOR U.S. dollar rate submission and showed the monetary benefit that resulted to the trader's position from the manipulated rate. (Gov. Exh. 186, at 23-33).  The second summary exhibit showed Rabobank LIBOR submissions for the trader requests as compared with the submissions of other banks on the LIBOR panel, (Id. at 33-43), and then showed that payments to or from Rabobank were transmitted by wire into the United States. (Id. at 33-35).  Finally, Agent Weeks explained to the grand jury how Rabobank's LIBOR submissions that took traders' LIBOR requests into account were fraudulent because the

At the "*Kastigar*" hearing in December 2015, the government demonstrated that Agent Weeks' testimony in support of the grand jury's indictment was based on legitimate, independent and untainted sources of evidence.  First, Agent Weeks, like all other members of the prosecution team, established that he had no exposure whatsoever to the defendants' FCA interviews or their substance in any manner. (Hearing Tr., 12/16/15, at 135-36; Gov. Exh. 199).  He specifically explained to the Court how witnesses who had already been interviewed by the FCA, such as Robson, were advised not to share any information they may have learned in the FCA investigation with the government.  (Hearing Tr. 12/16/15, at 136).  Additionally, he told the Court how the government, when coordinating the scheduling of interviews of subjects with the FCA, endeavored to follow a "day one/day two" model, which allowed the government to obtain information from subjects in advance of the FCA compelled interviews, on a voluntary basis. (Hearing Tr., 12/16/15, at 135; 137; Gov. Exhs. 178-185).

Agent Weeks then detailed for the Court the specific sources for his grand jury testimony. (Hearing Tr., 12/16/15, at 134; 137-142).   First, Weeks explained the documentary sources for his testimony, "documents that were available, that currently existed at that time, consisting of communications, organizational charts from Rabobank, [and] descriptions from the bank itself as to who worked on the cash desk over a period of time." (Id. at 134; Hearing Tr., 12/17/15, at 249-50; see also Gov. Exh. 196.)  The communications he reviewed included emails, chats and telephone calls, all materials that were produced to directly to DOJ from Rabobank via MLAT and in some instances, the Commodities Futures Trading Commission. (Hearing Tr., 12/16/15, at

definition of the LIBOR does not allow for trader positions to factor into a rate submission. (Id. at 53). None of this evidence was derived in any way from the FCA testimony.

134-35).  Weeks explained that no witness, including Robson, ever directed the trial team to a document, such as an email or chat. (Hearing Tr., 12/16/15, at 142-43).  Rather, in the course of interviewing Robson and other traders, the prosecution would use documents that had already been reviewed and marked as "hot" and ask the witness to clarify or interpret the email or chat. (Hearing Tr., 12/16/15, at 143-145).

In addition to deriving his testimony from documentary evidence, Weeks based his grand jury testimony on information obtained in interviews with approximately 10 Rabobank traders, including defendant Anthony Conti, Paul Butler, Christian Schleup, Damon Robbins, Takayuki Yagami, Paul Thompson,[5] Paul Robson, Lee Stewart and Saleem Khatri. (Id. at 137; 137-141; Gov. Exhs.178-185).   These traders, who were all interviewed prior to Robson, provided DOJ information that corroborated in most important respects, what Robson had told the government beginning in July 2014, and what he testified at trial.  For example, defendant Anthony Conti, who submitted to a voluntary interview with DOJ prior to his FCA interview, "stated that Mr. Allen was present on the desk, and would have heard requests coming from traders on the cash desk related to LIBOR submissions." (Hearing Tr., 12/16/15, at 140; Gov. Exh. 178, at 6-7).[6]

---

[5] Paul Thompson also corroborated this information and told DOJ that "[m]anagement was aware [he] communicated LIBOR requests to Robson. . . because there was an email between Thompson and Allen, who was Thompson's functional supervisor, in which Allen asked him what he needed in reference to LIBOR rates." (Gov. Exh. 179, at 6).  Thompson also told prosecutors that "Allen, who was the desk head, sat next to Conti and would not have been able to miss hearing these types of requests." (Id. at 4).

[6] During that interview, Conti told the prosecutors that traders requested accommodation of their trading positions in "internal conversations among a huge pot of emails," (Gov. Exh. 178, at 5), and that "Allen was aware that Rabobank's derivative traders made requests for accommodation to Conti and was copied on some of the email requests." (Gov. Exh. 178, at 6-7).  Conti further told prosecutors that Allen was aware of Stewart's verbal requests from at least 2005 until Allen left the bank and that Conti never heard Allen tell Conti or anyone else that such requests were improper. (Id. at 12).

Similarly, Agent Weeks had also interviewed Damon Robbins, who stated that "Mr. Allen knew about these requests," and that he believes he told Allen that he was uncomfortable with these requests and believed them to be inappropriate. (Hearing Tr., 12/16/15, at 140; Gov. Exh. 181, at 5).  In addition, Saleem Khatri, another trader who admitted to making his own requests, said he heard Stewart make requests directly to Allen and Conti and he believed that such requests were not ignored. (Hearing Tr. 12/16/15, at 141; Gov. Exh. 182, at 7-8).[7]   Agent Weeks also obtained information from Takayuki Yagami, who trained in London and observed the operations at the cash desk, and told the government he "absolutely certain that Allen heard the requests that occurred on the cash desk." (Hearing Tr. 12/16/15, at 141; see also Gov. Exh. 183, at 5 ("Allen 'definitely, absolutely, certainly heard' Robson ask traders for input on LIBOR submissions")).[8] Yagami's interview also told the government that Conti adjusted his U.S. dollar LIBOR rates to benefit himself and other traders. (Hearing Tr., 12/17/15, at 256).  Trader Christian Schleup, who trained on the cash desk in London alongside Lee Stewart, observed Stewart make requests to Allen and Conti on a regular basis, and later felt comfortable making his own requests from New York because "Allen was neutral to encouraging in these requests and he thought it was OK because Mr. Allen never told him otherwise." (Hearing Tr., 12/16/15, at 141-42; Gov. Exh. 184, at 6-7, 9-10).

---

[7] Khatri had told prosecutors that "LIBOR rate requests were done in the open at Rabobank. The requests were made to benefit a trader's position. The rate submitter would take into consideration these requests when determining their rates. This activity benefitted the bank." (Gov. Exh. 182, at 7).

[8] When interviewed by the government, Yagami stated that he saw all the London cash traders, including Allen and Conti "closely share information" and this observation made him feel "comfortable sending his requests to Mr. Allen if Mr. Robson was unavailable." (Hearing Tr. 12/16/15, at 141; Gov. Exh. 183, at 26, 28).

Every other trader interviewed by the DOJ prior to the grand jury gave information that corroborated and illuminated facts the government already knew from the documents: that Allen and Conti were knowing participants in the LIBOR rate manipulation scheme at Rabobank. Moreover, the other Rabobank trader interviews corroborated, in virtually all respects, what Robson later told the government.  In fact, those portions of Weeks' testimony based exclusively on information provided by Robson formed only a small portion of the bases for Weeks' testimony.  Agent Weeks parsed out for the Court those specific portions of his grand jury testimony that were derived exclusively from information provided by Paul Robson, the only witness whose testimony has been challenged due to his one-time exposure to defendants' FCA testimony.  (Hearing Tr., 12/16/15, at 155-159).  For example, Agent Weeks told the Court that Robson had said that Allen "specifically instructed" him to take traders needs into account, "explicitly instructed" LIBOR submitters to consider traders' positions, and that Robson perceived his job would be jeopardy if he did not comply with that instruction. (Id. at 157-158). Also, in several instances, Weeks explained that in the grand jury, when he was asked questions, such as "what did Mr. Robson say about Tony Allen?" his answers conveyed what Robson had told him, but he had also learned the same information from the other Rabobank traders he had interviewed. (Hearing Tr., 12/17/15, 236-243).

### B.  Independent Sources for the Government's Evidence at Trial

All of the government's trial evidence—established beyond a reasonable doubt to the jury—was untainted and derived from legitimate independent sources.[9] Every single chat and

---

[9] During the three-week jury trial, the government introduced substantial evidence showing coordination between the defendants and Rabobank swap traders to manipulate LIBOR to the traders' benefit.  Exhibit after exhibit painted a clear picture for the jury of how defendants Allen and Conti and other traders at Rabobank made submission requests for the purpose of benefitting

email introduced by the government at trial was in its possession prior to the government's first meeting with Paul Robson. (Gov. Exh. 208). Indeed, many of the most compelling chats and emails that inculpated the defendants had even been specifically isolated as "hot" by the prosecution team by 2013. (Hearing Tr., 12/16/15, at 145). Not a single chat or email was brought to the attention of the prosecution team by any witness or by the FCA, which walled off its investigation at the government's request. (Id. at 142-43). To the contrary, the government conducted its own independent review and analysis of the documents, which were produced to it directly from Rabobank between 2011 and 2013. (Id.; Gov. Exh. 208). These chats, emails and telephone calls, standing alone, offered the jury provided powerful, direct evidence of the defendants' guilt, and included the following "greatest hits:"

> **GX101E**: Sclheup says "Appreciate 3s go down, but a high 3s today would be nice." Allen replies, "I am fast turning into your LIBOR bitch!!!!" When Schleup replies, "Just friendly encouragement that's all, appreciate the help, Allen replies, "no worries mate, glad to help." (Just a few days before, as shown in GX101AJ, Allen tells Schleup that he had to get out of an "Ambass headlock" to put in rates that Schleup requested. Allen's prior accommodation of Schleup's request explains why he felt like a "LIBOR bitch.")

> **GX101J**: Schleup asks Conti "TC, where do u see 6m LIBOR tomorrow pls?" to which Conti responds "where do you like to see it, is more the question?"

> **GX101C**: Schleup asks Allen for "3s at 37" to which Allen responds "NEVER IN DOUBT!" (On October 6, 2006, Rabobank submitted 5.37 for the 3m USD LIBOR.)

> **GX124B**: Transcript of a phone call in which Conti tells Schleup: "Today's LIBORs were on the high side from where they should've been, shall we say. . . 16 tick from yesterday to today but yeah today's was on the high side probably not specifically correctly. Certainly the one month at five twenty was a bit mmmmm, yeah, I was five twenty as well just because Lee had a fixing." (The audio file was marked as GX124A.)

> **GX111B**: Transcript of a call between Conti and Yagami, in which Conti agrees to help Yagami recruit the new Yen LIBOR setter into the conspiracy. Conti says "send us a specific interest today so that you can CC us cause I think we haven't got any yen LIBOR

their trading positions. *See* Government's Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal, Dkt. 196.

preferences at the moment, so if it suits you for us to go a bit higher or a bit lower, I'm sur that's not a problem at all."  (The audio file was marked as 111A.)

**GX101K**: On August 13, Schleup tells Conti "gonna need a frickin high 6 mth fix tomorrow if OK with u… 5.42?" to which Conti responds by asking Schleup to send me a reminder email.

**GX101L:** The reminder email sent on August 13 in which Schleup asks Conti with a copy to Sliney for "41/42."

**GX101M**: On August 14, Allen tells Sliney that Rabobank is going to submit 42 because "I think that's what Christian needs."  (The data showed that on August 14, 2007, Rabobank submitted 5.42 for the 6m USD Libor, which was the highest submission of the panel.)

These communications speak for themselves: defendants Allen and Conti were directly involved in accommodating trader requests in setting LIBOR submissions.  Thus, as these exhibits make clear, by the fall of 2013, the prosecution team were already well aware, through legitimate, independent sources, of the defendants' active roles, knowledge, and involvement in the scheme to manipulate LIBOR submissions at Rabobank.  (Gov. Exh. 216).

Every single witness's trial testimony derived from a legitimate, independent source: their own personal knowledge, observations, and experience. *Slough*, 641 F.3d at 552.  The FCA did not provide the defendants' FCA transcript to any other individual or entity inside or outside Rabobank (other than to the defendants' themselves). (Gov. Exh. 221).  As such, no other government witnesses, including the two other cooperators, Lee Stewart and Takayuki Yagami, were ever exposed to defendants' FCA testimony, let alone, presented tainted testimony or had any improper motive to testify. (Gov. Exhs. 212; 221). *See Dynalectric*, 859 F.2d at 1578 (under *Kastigar*, the government is not required to negate all abstract possibility of taint).  And, with respect to the testimony of cooperators Yagami and Stewart, the government had memorialized much of their testimony in their voluntary interviews in 2013 and early 2014, before Robson was ever exposed to FCA testimony.  (Gov. Exhs. 180; 183; 185).  In addition, Stewart and Yagami

forthrightly told the jury their motivation for cooperating was the hope of receiving leniency or consideration at sentencing.  (Tr. 10/15/15, at 167; Tr. 10/23/15, at 798).

### C.  Paul Robson's Testimony Derived from a Legitimate, Independent Source: His Personal Observations and Experience.

Paul Robson's testimony at the post-trial "*Kastigar*" hearing made it abundantly clear that defendants' claim of taint from his one-time reading of their FCA transcripts amounts to nothing more than unsubstantiated speculation that is completely at odds with the overwhelming factual evidence in the record before the Court.  Robson told the Court that he read through the FCA material one time, in the latter part of 2013, at the direction of his counsel. (Hearing Tr., 12/16/15, at 4-7).  He described the clear instructions he received not to impart to the government any information from the FCA material. (Id. at 9-10) ("I was not to discuss them or allude to them in any way"), and his compliance with those instructions. (Id.).  Moreover, Robson told the Court that he did not have any specific recollection of the FCA materials when he met with the government in 2014, (Id. at 8-9; Hearing Tr., 12/17/15, at 213), nor did he have any specific recollection of what either defendant had said in his FCA interview as he testified in the "*Kastigar*" hearing. (Id. at 16).   He did not learn any new facts from his review of the transcripts nor did they refresh his recollection.  (Gov. Exh. 209).  In fact, even when confronted with a copy of the original FCA transcripts that contained his markings, Robson could not recall marking any specific parts of the transcripts. (Hearing Tr., 12/17/15, 213-221).   Only *after* reviewing and being confronted by defense counsel with the marked passages in the midst of the hearing, was Robson able to tell the Court that he would have marked  "a statement being made that was in line with the story I told the FCA,"  that he "circled anything that I felt was untrue. I circled anything that was a fact. I circled anything that would have been a reference point" to

16

discuss with his lawyers, and "sometimes I would have just circled things because I've got a pen in my hand." (Id. at 185-186).

Robson testified about the source of the information he provided to the government and in his trial testimony—his own "observations, personal experiences, and . . . professional understanding of the terminology in the market at the time." (Id. at 11-12). *See Slough*, 641 F.3d at 552 (stating that a "witness's testimony need not have *any* exterior antecedent, *i.e.,* any precursor other than the witness's perceptions of what happened"). He told the Court his testimony was "based upon what was happening at the time, what I'd lived through at Rabobank and what I'd observed." (Id. at 12). Robson also explained that his testimony concerning his various chats and emails he was shown at trial was "because I was involved in them, I recognized them as . . . my actions, as what I was doing in those emails. (Id. at 13). When asked about other co-conspirators' emails or chats, Robson told the Court his testimony derived from "confirming what was already in the documents, as far as what was happening at the time and my observations at the time as well," and was not informed in any way by his review of the FCA materials in 2013. (Id. at 13-14).

Nor did his review of the transcripts motivate him to approach DOJ and cooperate in July 2014. (Hearing Tr., 12/16/15, at 8; 11). Robson forthrightly told the Court that he chose to plead guilty and cooperate after he was indicted in the United States. He told the Court, "it was based upon the fact that my situation was such that I had to take ownership of what, for what I'd done, and once I realized if I cooperated, it would be helpful to my cause hopefully, rather than trying to be obstructive." (Id. at 15). *See Blau*, 159 F.3d at 73 (affirming district court's finding that cooperating witness's desire to be released early from prison provided a legitimate, independent motivation unrelated to his exposure to immunized testimony). Robson, who was cross-

17

examined extensively at trial and at the hearing on his motives for cooperating, was unshaken. He forthrightly acknowledged to both the jury and to the Court that he had not been truthful with the FCA, and consistently explained that his indictment in the United States motivated him to take responsibility for his actions.  (Tr., 10/19/15, at 303-04; Tr., 10/22/15, at 614-15; Hearing Tr., 12/16/15, at 15).   Accordingly, Robson's motivation for cooperation derives from a legitimate, independent basis.

Moreover, Robson's testimony at the hearing makes clear that  he could not have "used" the defendants' FCA transcripts because he could not remember any specifics of what was said in the transcripts, having read them through only one time in late 2013.  *See Poindexter,* 727 F.Supp., at 1496 (finding no taint under *Kastigar* where witness's "have no recollection of the contents of defendant's immunized testimony" and therefore "neither could possibly use it"); *Harloff,* 807 F. Supp. at  283 (same).   Indeed, his forthright, unimpeached testimony at the hearing, where he was subject to full cross-examination over the course of two days, only underscored the fact that Robson's trial testimony was untainted and derived from a legitimate independent source—his own personal experience from working at Rabobank's London cash desk alongside defendants Allen and Conti.

A line-by-line comparison of Paul Robson's trial testimony with each defendant's FCA transcripts, (Gov. Exhs. 209; 210), also demonstrates that his testimony was not affected, shaped, or otherwise derived from defendants' FCA testimony.  Large portions of Robson's testimony have no specific antecedent in either defendants' FCA testimony. (Gov. Exh. 209, at 9-12; 13-15; 17-22; Gov. Exh. 210, at 3; 6-17).  For example, at trial, Robson testified about the following chats and emails, admitted as the following government exhibits: 101A; 101AB; 401; 101I; 124A; 124B; 201C; 115A; 101Q; 117C; 113; 125B.  Neither Allen nor Conti were shown or

asked about *any* of these particular communications during their FCA interviews.  (Gov. Exhs. 209; 210).  And, Robson's testimony about these documents was corroborated at trial by either the testimony of Yagami or Stewart (or both).  Thus, not only did the government have legitimate, independent sources for the same evidence, but Robson's non-overlapping testimony could not have derived from the defendants' immunized testimony. (Gov. Exh. 209; 210).  *See Slough*, 641 F.3d at 552 (stating that a witness's exposure to immunized testimony cannot taint their testimony on completely non-overlapping points); *United States v. Slough*, 36 F.Supp.3d 37, 47-48 (D.D.C. 2014) (finding no basis for use where witnesses' testimony describes elements and details not found in defendants' immunized statements).

A comparison of those specific portions of Robson's trial testimony that do overlap with the defendants' FCA testimony also demonstrates that Robson's testimony derived from an independent source.[10]  In the main, Robson testified at trial that Allen directed him to accommodate traders' LIBOR requests, including those from Yagami, Thompson and Motomura, and that Allen and Conti were both present and openly participated in discussions of the LIBOR submissions at the desk where trader requests, such as Stewart's verbal requests, were solicited and acknowledged.  (Tr. 10/19/15, at 322-324) (E.g., "In general, it would be the setter, so Tony Conti would say, "Right, guys, what are we going for LIBORs today?) (Id. at 324).  Robson's testimony about the defendants' knowledge and participation in the improper accommodation of traders' LIBOR requests was corroborated by the testimony of both Yagami and Stewart, as well as the documentary evidence.  And, given the nature of Allen's and Conti's

---

[10] With respect to background facts concerning Rabobank, some of Robson's testimony overlaps and is consistent with defendants' statements to the FCA.  However, these overlaps are on non-inculpatory, foundational facts that are not material or in dispute, such as job titles and responsibilities, and do not furnish any new information or any investigatory leads.[10] (*See, e.g.,* Gov. Exh. 209, at 1-4; Gov. Exh. 210, at 1-3). *Dynalectric*, 859 F.2d at 1579.

testimony to the FCA, Robson's testimony could not have derived from it.  Far from providing

information of any evidentiary value, the defendants' statements to the FCA, beginning with

their responses concerning the fundamental factual allegation at issue in the case—the improper

accommodation of  Rabobank traders' LIBOR requests to benefit their positions—amounted to

nothing more than denials, embellished with self-serving, exculpatory explanations and afflicted

by a chronic lack of recall.  Accordingly, as discussed below, none of their testimony provides a

basis for a claim of taint under *Kastigar*.  *See United States v. Bartel,* 19 F.3d 1105, 112-13 (6th

Cir. 1994); *United States v. Caporale*, 806 F.2d 1487, 1518-19 & n. 34 (11th Cir. 1986); *Gallo*,

863 F.2d at 190.

### D.  The Defendants' FCA Testimony Provided Nothing to Use.

Given the tenacity with which defendants have pressed their "*Kastigar*" claim, one might

reasonably imagine that their FCA testimony contains significant admissions and far-reaching

*mea culpas*.   To the contrary, as even the most cursory review of the transcripts betrays, if the

defendants' FCA testimony is remarkable in any regard, it is for the defendants' lack of candor.

Thus, even if the government had not already compiled substantial evidence clearly

demonstrating the defendants' involvement in the manipulation of LIBOR at Rabobank, the

prosecution would not have used the defendants' FCA testimony, directly or indirectly, either in

the grand jury or at trial.  And for good reason: the defendants' FCA testimony was riddled with

denials of knowledge or participation in the scheme, self-serving and often absurd responses

when confronted with chats or emails plainly refuting such denials, and was characterized by a

stunning degree of lack of recall.[11]  In short, the defendants' FCA testimony provided "nothing

---

[11]For example, Mr. Allen stated "I don't recall" over 50 times in his interview. (Gov. Exh. 209).

to use." *Gallo*, 863 F.2d at 190; *see also Vander Luitgaren*, 556 F. Supp. at 1326 (denying *Kastigar* claim where defendant's exculpatory testimony had "no logical place in the government's case and buttressed conclusion of no use" by government). Instead, defendants' answers to questions from the FCA suggest a calculated effort to obfuscate and throw off the FCA investigation. *See, e.g., Dynalectric*, 859 F.2d at 1579 (finding no use of defendant's self-serving testimony which "drew the [investigation] to a halt for 13 months"); *Mariani*, 851 F.2d at 601 (finding no evidentiary use where government did not prepare a cross-examination of defendant, noting that defendant "elected to deceive and obstruct" rather than testify truthfully to the grand jury). Accordingly, as discussed below, neither the grand jury nor the trial evidence could have origins in the "smoke screen" the defendants attempted to erect in their FCA interviews.

As the defendants' FCA transcripts plainly show, their testimony could not form the basis for the information provided by Robson, let alone be of any use to the prosecution. To the contrary, Allen's statements to the FCA about the LIBOR submission process that took place around the London cash desk diverge wildly from the accounts provided by the traders, including defendant Conti, who sat at the very same desk. Allen denied that LIBOR discussions at the London desk involved trader requests, and instead described the internal discussions about LIBOR as "opinion-based." (Gov. Exh. 205, at 45) ("Yes, there were discussions about LIBORS, "Where do you think LIBORs are going to be set? You know, opinion on where is—"where that particular LIBOR? Where do you see it coming in?"). He also told the FCA that, when setting LIBOR, "I wouldn't have relied upon any traders" and if [Conti] was sitting there, then I wouldn't be discussing LIBOR with him, because he would be setting LIBORs." (Id. at 46). Allen denied making LIBOR requests or submissions to benefit his trading positions. (Id. at

90).[12]  Allen didn't recall "having an exact conversation" with submitters on how to submit

LIBORs properly, but believes they did so because he "sat alongside the desk with them" and

"could see—sort of hear what flows were going through." (Id. at 49).[13]  Allen did not recall

telling Robson to consult the yen Center of Competence for purposes of deciding his LIBOR

submissions, (Id. at 66). And, he specifically denied telling Robson to consult with Yagami or

Thompson for purposes of setting yen LIBOR. (Id. at 67-68).

Indeed, the description of LIBOR setting that Allen recounts to the FCA is so directly at

odds with the information provided by traders seated at the same desk that one might have good

cause to wonder if Allen had been in a fugue state when he presided over the cash desk.  His

testimony about an argument at the desk between Stewart and Robbins illustrates this further.

Allen denied that the argument concerned Robbins failing to accommodate Stewart's LIBOR

request, and instead claimed it was just a heated difference of opinion. (Id. at 141).  Allen's

statements to the FCA directly conflict with Robson's and other trader accounts, including the

two traders—Stewart and Robbins—who were the actual participants in the argument. (Gov.

Exh. 180; 181).  It would appear that Allen the *only* person sitting at the desk who interpreted

---

[12] Allen denied asking for trader requests or cannot recall doing so: "[FCA]: "Did you ever solicit a request from a trader? Allen: Sorry, can you repeat that? [FCA]: Did you ever ask a trader for his LIBOR preference? Allen: No. . .Not—not that I recall, no. I mean, I'm sort of, you know, I'm sort of saying, "No" to something, but no. Not that I believe." (Id. at 120).

[13] Remarkably, despite being the Global Head of Liquidity and Finance, Allen told the FCA he did not believe it was his job to oversee LIBOR submitters, even though the LIBOR rate is based on the cash market. (Id. at 48). Nonetheless, even though he did not remember ever telling submitters to ignore trader requests (requests, as the documents show, which were made on a consistent basis since at least 2005), Allen was sure that senior traders like Conti understood not to consider them.  (Id. at 164). At the same time, Allen also told the FCA that if such requests had been made, he would not have raised any flag or instructed traders to stop making them. The government submits that this "ostrich defense" is self-serving, contained nothing inculpatory or useful to the government, and provides no basis for any claim that Robson's testimony derived from it.

traders' direct requests for LIBOR submissions to favor their fixes—which were made in plain

terms—as mere expressions of "opinion."  Not only did Allen deny giving instructions to

accommodate such requests, he claimed not to be aware of such requests being made. (Id. at

104).  For example, when he was confronted with the chat in which a trader clearly asks him to

submit a "high six month" LIBOR, Allen claimed he could not recall the request and, despite its

plain language, "did not know" whether the trader was "trying to influence" him. (Id. at 99-105).

Likewise, Conti's FCA testimony also could not form the basis for any claim of

derivative use under *Kastigar*.  While admitting that traders made requests, Conti denied that he

ever accommodated trader requests, and embellished his denials with incredulous and self-

serving explanations, even when he was confronted with documents that directly contradicted his

denials.  As a preliminary matter, it should be noted that the government had already interviewed

Conti prior to his FCA interview. In his voluntary interview, Conti told the DOJ the same

essential story he told the FCA—that traders Stewart and Schleup made requests, but that,

despite his email replies to traders such as "will do matey on the libors," or "Yeah, will do. Sure,

no problem," he ignored their requests and did not take their requests into account when

submitting LIBOR. (Gov. Exh. 178, at 5-6; 8; Gov. Exh. 206, at 11).  Importantly, the proffer

agreement setting forth the terms of Conti's voluntary DOJ interview specifically permitted the

government to make derivative use of any information he provided. (Gov. Exh. 219).  Thus, the

government already possessed this same essential information and was free to make derivative

use of it.  Second, the nature of Conti's statements to the FCA about the LIBOR submission

process in London provides no basis for a claim of derivative use, as they amount to self-serving,

exculpatory denials.  Specifically, even though Conti acknowledged to the FCA (and DOJ) that

he received repeated verbal requests for LIBOR submissions from Stewart, and via email from

Schleup, he claimed he "would have forgotten it almost immediately, or put it out of my mind when I went to set rates at 11am." (Gov. Exh. 219, at 49; Gov. Exh. 178, at 7-11).  According to Conti, if he had not "forgotten it almost immediately," he would "try to blank it out" and made "no conscious decision" to accommodate the request. (Gov. Exh. 219, at 49.).  Moreover, Conti told the FCA that when he replied to Schleup by saying, "Yeah, sure," or "Will do," he was *ignoring* Schleup's requests (Id. at 49-50; Gov. Exh. 219, Part 2, at 10-11).  Conti ignored Schleup's or Stewart's requests for years and never told them to stop sending them. (Id. at 49).  In sum, apart from the fact that the prosecution already had the same information from an independent source—Conti himself—his FCA responses, by their very nature, do not support a *Kastigar* claim.

        Defendants' testimony in their FCA interviews about various chats and emails was equally self-serving, often implausible, and at times, even absurd.  During their interviews, the FCA confronted the defendants with emails or chats, some of which overlapped with government exhibits shown to Robson at trial. (Gov. Exhs. 209; 210).  For example, Allen was shown an August 2005 email from Justin Sliney (Gov. Exh. 205, at 99), which is the email introduced as GX101AM,[14] about which Robson (and Stewart) testified at trial.  (Tr. 10/20/15, at 404; 10/19/15, at 237).  First, Allen doesn't recall the email. (Gov. Exh. 205, at 100).  He then goes on to acknowledge that "I believe he's asking for . . . six month LIBOR to be as high as possible" but claims he does not know what Sliney's reason for the request might be, ("I don't know. This—I've not written it so I don't—as I—as I read it now it could be connected, yeah . . . it's very difficult for me to speculate . . ."), (Id. at 100-101), or what Sliney expected him to do

---

[14] GX101AM was received by DOJ on June 26, 2013. (Gov. Exh. 208.). In this email, Sliney emails Allen, "If you are indifferent, can you please set tomorrow's 6mL as high as possible? Have a large reset here in NY."  Allen then forwards this email to Conti. (Gov. Exh. 101AM).

with the information. (Id. at 102).  Despite the plain language of the request, Allen claims "if he's trying to influence me then I don't---you know, I can't say." (Id. at 103).  Allen went on to say that trader "opinion[s]' were not part of the LIBOR definition and he denied considering them. (Id.) ("I set it where—I believe I set it to where it should be set.").  He did not recall asking Sliney why he made requests, nor does he recall telling anyone else at the bank about trader requests or having a conversation with anyone about them. (Id. at 104).  When asked what Allen understood Sliney meant by "if you are indifferent," he dissembled, "I don't—I don't— honestly. . . I don't know. It's—it's—it's almost like, you know, I'm trying—I'm trying to recollect what that would have meant. I mean, it's just I'm—I'm coming up with all sorts of ideas that I just don't think are correct for that time. I just—I don't know. If you are indifferent means, or if you don't have a view.  I don't know.") (Id. at 105).   When asked directly if the phrase "if you are indifferent" could mean "if you don't have a position fixed to LIBOR at this time," Allen claims, "I don't get that inference, no."[15] (Id.).

And again, when asked about GX201A, an email where Robson tells Thompson "if you need any libor settings probably best to e-mail ghosty [Allen's nickname]and conti from Monday onwards," Allen claimed not to recall the email or know why it was sent.  (Id. at 136-141) ("I don't know why he's saying that . . . I can't get into Paul Robson's head but what he's referring to, 'any LIBOR settings' doesn't make sense to me.").  Likewise, with respect to GX101Q, an October 31, 2008 email from Yagami to Allen, Conti and Butler, in which Yagami makes a request, Allen claimed, "I'm not sure why he sent it," and could not recall the email, nor did he recall asking Yagami about it. (Id. at 188.).   Allen was also confronted with documents showing

---

[15] Nor would the email have "triggered in [his] mind" that Sliney might be trying to manipulate LIBOR to benefit his positions. (Id. at 113-14).

Schleup making a request to Conti, (GX101K), a follow-up on the same request to Conti, where Sliney is copied, (GX101L), and then a chat the next day between Allen and Sliney. (GX101M).[16]   When Allen was asked why he told Sliney that he was setting LIBOR at, "6 month 42, I think that is what Christian needs," he claims it was his "opinion" of where he saw LIBORs and it was "just coincidentally" where Schleup needed it. (Id. at 157).[17]

And, finally, perhaps the most notable example of the strained explanations Allen offered the FCA concerns an email exchange between Allen and Schleup, admitted at trial as GX101E.[18] (Id. at 130-35).  Allen, again, cannot recall the email, but told the FCA, "reading it now, um, to me it reads like he's giving me an opinion and sort of telling me this is where the market is." (Id. at 131) (Schleup had written, "Appreciate 3s go down, but a high 3s today would be nice. Cheers Chief").  And most incredibly, Allen goes on to explain his "colorful" response, "I am fast turning into your LIBOR bitch!!!!" is an expression of frustration and "pushing it back a bit." (Id. at 132).  Indeed, Allen did not agree that the statement could be read to say "I'm turning into someone who does your LIBOR bidding." (Gov. Exh. 209, at 132-35).  He also claimed that his further response, "No worries, mate, Glad to help," was merely a "polite" response and he did not believe it could be seen as suggesting that Allen would help or that Allen encouraged, rather than confronted, such requests. (Id. at 133).

---

[16] Robson was not asked at trial about GX101M, which appears to be a portion of the same email chain used in the FCA interview.

[17] The FCA also asked Allen about an email from Schleup directly to Allen, admitted at trial as GX101C.  In that email, Schleup asks, "Can u  put 3s at 37  for me tomorrow pls," and Allen responds, "Never in doubt."  Allen could not recall what he meant and told the FCA, "reading it now, it may not be referenced to anything." (Id. at 125).

[18] This exhibit was not shown to Robson at trial.

Conti's explanations of emails and chats were just as self-serving and tortured.  As noted above, Conti claimed he *ignored* trader requests, but he made a point of responding to the requests with his "standard response," "Sure, will do. No probs mate," or "Will do, fella . . . "Yeah will do. Sure no problem." (Gov. Exh. 219, Part 2, at 8-11).  Similarly, when asked about the chat that appeared at trial as GX101O, in which a trader tells Conti, "I do the fixing I ask swap desk what they have," and Conti replies, "the ambass had a big fixing so we help him today," Conti claims he does not know what he meant and that the conversation did not make sense and he could not "decipher it." (Gov. Exh. 219, Part 3, 10-11).  When asked how he might have helped the "ambass," Conti claimed that he did not know, it did not make sense and he does not think anyone would have made a submission to help Stewart.  (Id. at 12).[19]  He also claims not to recall the conversation. (Id. at 12).  (It bears noting that Conti had been shown the exact same chat six days prior in his voluntary DOJ interview.) (Gov. Exh. 178, at 11).  Only one document shown to Conti by the FCA overlapped with those shown to Robson at trial. With respect to that exhibit, GX1401, Robson's trial testimony on that document was limited to explaining the terms  "1M," "3M," and the numbers, which were interest rates. (Tr., 10/20/15, at 387). When asked about the same document, an August 9, 2007 chat between Conti and Thompson, in which Conti states, "I'm higher in the 1s because we're long in the fixing today and the next few days," (Gov. Exh. 210, Pt. 3, at 21-22), Conti claims he was referring to an interest rate swap against the cash book, or a hedge for the cash, and not a proprietary trade in his own book. (Id. at 23). And, when Thompson replies, "That's fine with me, mate—So am I,"

---

[19] When asked if he ever adjusted one of his LIBOR submissions to help Stewart's fix, Conti told the FCA, "Uh, no, I don't think I did, no. No." (Gov. Exh. 210, Pt. 3, at 13).

Conti does not know why Thompson is telling him that and it "wouldn't even have registered with me." (Id.).

In sum, as evidenced by their tortured interpretations of documents written in plain English, both defendants' testimony to the FCA consisted of self-serving and exculpatory responses.  Throughout their FCA interviews, the defendants repeatedly denied their participation in the submission of LIBOR rates to benefit trader positions at Rabobank.  And, despite the wealth of documentary evidence showing that Rabobank traders made LIBOR requests on a routine basis for *years*, the defendants apparently could not recall such requests, even when clear examples of the requests were put directly in front of them.  Accordingly, by their nature, defendants' FCA testimony provided "nothing to use," and thus, cannot support a *Kastigar* claim.  *Mariani*, 851 F.2d at 601 ([The defendant's] "dilemma and convictions are the result of his choosing to deny, under oath, any knowledge or part in the conspiracy" and "he elected to deceive and obstruct" and thus "ran the risk that others would tell the story and implicate him").

## III.  ANY ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT.

If the government fails to carry its *Kastigar* burden as to the contested evidence, the remedy is not dismissal of the indictment or reversal.  *United States v. Washington*, 431 U.S. 181, 185 (1977) (stating that "an indictment returned by a properly constituted grand jury is not subject to challenge on the ground that it was based on unconstitutionally obtained evidence).  As explained by the Second Circuit, a violation of . . . the privilege against self-incrimination . . . requires only the suppression at trial of a defendant's compelled testimony."  *Rivieccio*, 919 F.2d at 814 (affirming post-trial denial of *Kastigar* motion because "the Government had demonstrated an

independent source for all the evidence *introduced at trial*." (emphasis added)). Thus, the Court must evaluate any tainted evidence in light of the non-tainted evidence presented to the jury at trial to determine whether any error was harmless beyond a reasonable doubt. *United States v. Gallo*, 859 F.2d 1078, 1090-91 (2d Cir. 1988).

Apart from Robson's testimony, a wealth of other evidence, all derived from independent sources, was presented to the jury and supports its guilty verdict. Two other cooperators, Yagami and Stewart, provided direct evidence concerning the defendants' knowledge and active participation in the scheme. Their testimony, combined with the compelling chats, emails, phone calls, and other documentary evidence, more than amply supports the jury's guilty verdict. *United States v. Mechanik*, 475 U.S. 66, 70 (1986) (finding that "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged"). Thus, even without Robson's testimony that Allen "specifically instructed" him to take trader requests into account, the government had legitimate independent sources for all its evidence at trial, and any error is harmless beyond a reasonable doubt. *Rivieccio*, 919 F.2d at 814.

**CONCLUSION**

For the reasons stated above, the defendants' motion to dismiss based upon *Kastigar* should

be denied.


RAYMOND HULSER
Chief, Public Integrity


_____/s/_____
Brittain Shaw
Trial Attorney, Fraud
U.S. Department of Justice
Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
(202)-616-2162