## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

    v.

ANTHONY ALLEN,
PAUL THOMPSON,
TETSUYA MOTOMURA, and
ANTHONY CONTI,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. S4 14-CR-272 (JSR)

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR MOTION
## <u>TO DISMISS THE SUPERSEDING INDICTMENT ON KASTIGAR GROUNDS</u>

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TOR EKELAND, P.C.**
Tor Ekeland
Aaron Williamson
195 Plymouth Street, 5th Floor
Brooklyn, New York 11201-1133
(718) 737-7264

*Attorneys for Defendant Anthony Conti*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

RELEVANT FACTUAL BACKGROUND..............................................3

LEGAL STANDARD................................................................................8

ARGUMENT...........................................................................................9

I.   THE GOVERNMENT CANNOT SATISFY ITS AFFIRMATIVE BURDEN OF PROVING THAT MR. ROBSON WAS UNAFFECTED BY HIS REVIEW OF DEFENDANTS' COMPELLED TESTIMONY................................................9

   A.   The Evidence Does Not Support Mr. Robson's Claim That He Was Unaffected by His Review of Mr. Allen's Compelled Testimony. .....................14

      1.   As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr. Robson Learned That Mr. Allen Would Not Corroborate His Story.........14

      2.   As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr. Robson Became Aware of Facts Previously Unknown to Him................16

      3.   As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr. Robson Created "Facts" to Implicate Mr. Allen........................................20

   B.   The Evidence Does Not Support Mr. Robson's Claim That He Was Unaffected by His Review of Mr. Conti's Compelled Testimony. .....................22

      1.   Mr. Robson Learned from Mr. Conti's Compelled Testimony That Mr. Conti Would Not Corroborate His Story. ...........................................22

      2.   Mr. Robson Learned from Mr. Conti's Compelled Testimony That Mr. Conti Had Shared Information with the FSA That Mr. Robson Had Not Revealed..............................................................................23

      3.   Mr. Robson Learned New Facts from Mr. Conti's Compelled Testimony and Incorporated Them into His Own ....................................24

II.   THE GOVERNMENT HAS FAILED TO PROVE THAT ITS PROSECUTION OF DEFENDANTS WAS BASED ENTIRELY ON LEGITIMATE SOURCES WHOLLY INDEPENDENT OF DEFENDANTS' COMPELLED TESTIMONY.........27

III.   THE GRAND JURY INDICTED DEFENDANTS ON THE BASIS OF TAINTED EVIDENCE PROVIDED BY PAUL ROBSON AND SUMMARIZED TO THE GRAND JURY BY THE CASE AGENT. ...........................31

A.    The Grand Jury Indicted Mr. Allen on the Basis of Tainted Information from Mr. Robson.................................................................................32

B.    The Grand Jury Indicted Mr. Conti on the Basis of Tainted Information from Mr. Robson.................................................................................33

IV.   THE GOVERNMENT FAILED TO SATISFY ITS BURDEN OF PROVING THAT IT WAS NOT EXPOSED TO DEFENDANTS' COMPELLED STATEMENTS THROUGH ITS COMMUNICATIONS WITH BRITISH AUTHORITIES. ...................................................................................35

CONCLUSION...........................................................................................................38

# TABLE OF AUTHORITIES

**Case**                                                                                           **Page(s)**

*Kastigar v. United States*,
    406 U.S. 441 (1972)..................................................................................................9, 28, 35

*United States v. Bianco*,
    534 F.2d 501 (2d Cir. 1976).......................................................................................29

*United States v. Hampton*,
    775 F.2d 1479 (11th Cir. 1985) ...............................................................................36

*United States v. Hinton*,
    543 F.2d 1002 (2d Cir. 1976).....................................................................................31

*United States v. Hubbell*,
    530 U.S. 27 (2000)..............................................................................................16, 17

*United States v. Kristel*,
    762 F. Supp. 1100 (S.D.N.Y. 1991).......................................................................9, 29

*United States v. Kurzer*,
    534 F.2d 511 (2d Cir. 1976).................................................................................9, 14, 29

*United States v. Mariani*,
    851 F.2d 595 (2d Cir. 1988).................................................................................20, 29

*United States v. Nanni*,
    59 F.3d 1425 (2d Cir. 1995).......................................................................................29

*United States v. Nemes*,
    555 F.2d 51 (2d Cir. 1977).................................................................................32, 37

*United States. v. North "North I"*
    910 F.2d 843 (D.C. Cir. 1990) .......................................................................... *passim*

*United States v. North "North II"*,
    920 F.2d 940 (D.C. Cir. 1990) .........................................................................10, 35, 37

*United States v. Pelletier*,
    898 F.2d 297 (2d Cir. 1990).......................................................................................32

*United States v. Poindexter*,
    951 F.2d 369 (D.C. Cir. 1991) ........................................................................8, 10, 11

*United States v. Rivieccio*,
    919 F.2d 812 (2d Cir. 1990).........................................................................28, 29, 32

*United States v. Slough,*
    641 F.3d 544 (D.C. Cir. 2011) ...........................................................................29

*United States v. Tantalo,*
    680 F.2d 903 (2d Cir. 1982)..................................................................9, 11, 36

Defendants Anthony Allen and Anthony Conti respectfully submit this supplemental memorandum of law in further support of their motion to dismiss the Superseding Indictment.[1]

## PRELIMINARY STATEMENT

Under penalty of imprisonment, Defendants Anthony Allen and Anthony Conti were forced to answer questions put to them by U.K. authorities, a process which would never have occurred in the United States, absent a grant of immunity.  When a defendant in a criminal case has been compelled to give testimony, the Fifth Amendment imposes a heavy burden upon the Government to prove that no use, or derivative use, was made of his compelled testimony in any respect.  When a Government witness has been exposed to a defendant's compelled testimony, the Government must prove that the witness was completely unaffected by it.  The Government must find some way to demonstrate, via credible and reliable evidentiary methods, that the witness's "recollection" was not refreshed by his review of the defendant's testimony, that the review process did not focus his mind or assist in organizing his thoughts, and that he did not alter his prior or contemporaneous statements about the events at issue with the aid of the compelled testimony.  Absent "canned" testimony of the witness, showing that his testimony before exposure was identical to his testimony after exposure, the Government's burden is nearly insurmountable.

The Government cannot possibly sustain its heavy burden here.  *First*, the Government cannot prove that Mr. Robson's decision to cooperate was uninfluenced by his review of Defendants' compelled testimony, where both Mr. Allen and Mr. Conti offered

---

[1] Defendants previously submitted briefing on this *Kastigar* motion on July 17, 2015 (Dkt. 76) and August 20, 2015 (Dkt. 102).  Defendants do not repeat the legal and factual arguments made previously but rather incorporate those arguments into this post-hearing memorandum.

testimony that demonstrated that neither corroborated the defense that Mr. Robson had proffered to the FSA.

*Second*, the Government cannot prove that the testimony Mr. Robson provided to the jury was unaffected by his review of Defendants' compelled statements. In fact, it is beyond dispute that portions of the story Mr. Robson conveyed to the Government, and subsequently the jury, were based on information he learned exclusively from his review of Defendants' compelled statements. For example, Mr. Robson informed the Government that Mr. Allen and Mr. Conti had received LIBOR requests from New York-based derivative trader, Christian Schluep, even though—as Mr. Robson now admits—that information was not based on his personal knowledge, but rather his review of Defendants' compelled testimony, where those communications were discussed in detail. In addition, Mr. Robson's testimony to the jury about an altercation involving Mr. Robbins, Mr. Stewart and Mr. Allen was not based on his own personal observation, but rather was based on the description he read of the dispute in Mr. Allen's compelled interview. Similarly, Mr. Robson's review of the portions of Mr. Conti's compelled testimony in which Mr. Conti testified about requests that he had received from swap traders—requests that Mr. Robson was not a party too—coalesced into "facts" presented to the jury about requests Mr. Thompson supposedly made over the phone to Mr. Conti.

Mr. Robson also altered his previous testimony and manufactured evidence, which he then testified about to the jury. For example, while reviewing Mr. Allen's compelled testimony, Mr. Robson learned that Mr. Allen, like Mr. Robson himself, had no recollection of any compliance training on conflicts-of-interest. Mr. Robson took this information and developed a fabricated story about a conversation he supposedly had with Mr. Allen while walking back from a conflicts-of-interest training, in which Mr. Allen reassured him that it was

appropriate to take Mr. Stewart's trading needs into account when setting LIBOR.  Because the Government cannot sustain its heavy burden of proving that Mr. Robson was completely unaffected by his review of Defendants' compelled testimony, the use of his testimony at trial must result in the setting aside of Defendants' convictions.

*Finally*, it is beyond dispute that Mr. Robson's testimony played an important role in securing Defendants' indictment, and for this reason as well, their indictment must be dismissed.  Messrs. Allen and Conti were not indicted when the Government first presented evidence to the grand jury in April 2014, even though the Government possessed every "incriminating" communication Defendants had ever sent or received, and it had met with every Rabobank witness that it ever would, save for Mr. Robson.  It wasn't until Mr. Robson pled guilty in August 2014 and the Government was able to describe his testimony to the grand jury, in October 2014, that the grand jury returned an Indictment against Mr. Allen and Mr. Conti.  Under these circumstances, the Government cannot sustain its burden of proving that Mr. Robson's cooperation did not play an important role in the grand jury's, and the Government's, decision to indict.  Accordingly, the Indictment must be dismissed.

## RELEVANT FACTUAL BACKGROUND

On January 17, 2013, Mr. Robson testified before the FSA as part of its investigation into potential LIBOR manipulation at Rabobank.  When the FSA asked if he was "told to make submissions to benefit other traders' [positions]," Mr. Robson denied that was the case, responding: "I was told to set submissions to the best of my ability within a range of where LIBOR could be."  (Hrg. 28:20-13 (regarding DX608B, at 105); *see also* DX608B, at 33 (testifying that Mr. Allen "told" him to "submit a rate where [he] felt cash would be trading in the market").)

Mr. Robson told the FSA that, at the time, he had not considered his communications with Rabobank's swap traders to be inappropriate, because he was just "applying the guidelines [he'd] been given by Tony Allen to discuss liquidity" with traders in the Asian market.  (DX608B, at 100.)  From Mr. Allen's instruction "to discuss liquidity," Mr. Robson explained to the FSA, he followed the "thought process" of "long on derivative, short cash, [short] liquidity equals higher LIBOR."  (*Id*. at 100.)  Thus, Mr. Robson explained, when, for example, Mr. Thompson asked him to "bump it up a couple," *see* GX1101A, that implied Mr. Thompson was "long derivative" and therefore "short cash," which translated to "short liquidity" which "equals higher LIBOR."  (DX608B, at 100.)  Accordingly, Mr. Robson's response to Mr. Thompson—"will set them high and dry skip!"—was entirely legitimate, because Mr. Robson was ensuring that his JPY LIBOR submission reflected Mr. Thompson's input "on the liquidity in the market in Asia," as Mr. Allen had instructed.  (*Id*. at 99.)

Over the course of his two-day FSA interview, Mr. Robson referenced Mr. Conti's name only seven times. (*See generally* DX608B.)  None of these statements implicated Mr. Conti in manipulation of LIBOR.  (DX608B, at 31:1007-1009 (Mr. Conti "was primarily [LIBOR] submitter for dollars."); 32:1030-1048 (Mr. Conti, among "other members of the desk," would sometimes "make [Yen LIBOR] submissions on [Robson's] behalf when [he] was unable to."); 88:2882-2910 (Mr. Robson discussed openly with Rabobank's London "money market team," including Mr. Conti, that the "[LIBOR] process [was] completely broken" and that the BBA "want[ed the bank] to align" submissions with other panel banks.); 206:6774-206:6777 (initials "TC" in conversation with Mr. Robbins refer to Mr. Conti).)

In November or December 2013, Mr. Robson received the transcripts of Mr. Allen's and Mr. Conti's compelled testimony and Mr. Robson spent "2-3 successive days"

reviewing them.  (DX608S, at ¶¶ 4, 5.)  This was not a casual review.  Mr. Robson had been

"directed" by his attorney to carefully read Defendants' compelled statements, in anticipation of

a "planned discussion" with counsel about the serious charges Mr. Robson was facing in both the

United Kingdom and the United States.  (*See* Robson Opp'n to Defs.' Mot. to Cpl. ("Robson

Opp."), Dec. 29, 2015, ECF No. 203, at 5, n.4; 9, n.7; *see also* Hrg.[2] 21:14-24:3 (criminal

investigation was pending when Mr. Robson reviewed Defendants' compelled testimony).)

       As he read, Mr. Robson annotated Mr. Allen's and Mr. Conti's compelled

statements, adding notes in the margins, "underline[s]," circles, and "asterisks" wherever the

testimony was "of importance" to him.  (Hrg. 186:3-9, 76:4-77:7; *see generally* DX900A (mark-

up of Mr. Allen's compelled testimony); DX901A (mark-up of Mr. Conti's compelled

testimony).)  He also drafted five pages of "handwritten notes" and "comments" about what he

had read in Defendants' compelled testimony.  (Hrg. 79: 2-8, 81:13-21; Robson Opp.'n, at 5, n.4;

7.)

       As he read Mr. Allen's compelled testimony, Mr. Robson learned that Mr. Allen

had contradicted the defense that Mr. Robson had proffered to the FSA, regarding Mr. Allen's

instruction to "discuss liquidity" with Asian traders.  When Mr. Robson saw that Mr. Allen had

been asked, and had denied, that he had ever "instructed Paul Robson to refer to Mr. Yagami for

information about how to submit LIBOR," he drew black lines under Mr. Allen's denial.

(DX900A, at 67.)  The FSA also asked Mr. Allen, "Did you ever tell Mr. Robson himself to talk

to Mr. Thompson about LIBOR?"  (DX900A, at 122-123.)  Here too, Mr. Robson underlined

Mr. Allen's answer:  "No, I don't.  I don't remember telling him that."  (*Id.*)

---

[2] Citations to the transcript of the *Kastigar* Hearing, held on December 16-17, 2015 are noted as "Hrg." and are attached as Ex. A.  Citations to the trial transcript are noted as "Tr." and are attached as Ex. B.

When he reviewed Mr. Conti's testimony, Mr. Robson saw that Mr. Conti acknowledged that he received requests from two derivatives traders, Mr. Schluep and Mr. Stewart.  (DX901-1, at 43:1418-1419, 45:1481.)[3]  Mr. Robson underlined this portion of Mr. Conti's compelled testimony.  (DX901A-1, at 43:1418-1419, 45:1481.)  Mr. Robson saw that, unlike him, Mr. Conti did not aver that these requests were made "from a liquidity perspective," but instead acknowledged that he "must have presumed" that the requests "would suit positions they had."  (DX901-1, at 45:1476-1477.)  Mr. Robson also underlined this portion of Mr. Conti's testimony.  (DX901A-1, at 45:1476-1477.)

Less than five months later, Mr. Robson was indicted in the United States, s*ee* Ind., Apr. 28, 2014, ECF No. 5 (the "April 2014 Indictment"), and "came to learn" that his "best hope of avoiding jail" was through a cooperation agreement, *see* Tr. 465:4-23, that would obligate him to "assist[] [the Government] in prosecuting others."  (*See* Tr. 468:2-7; *see also* DX608O (Robson Plea Agr., Aug. 5, 2014).)

In the hope of obtaining such an agreement, Mr. Robson met with the Government for a two-day interview on July 17 and 18, 2014, and told them a story which bore no resemblance to the testimony he had provided to the FSA.  He told the Government that Mr. Allen had given him "explicit" directions to "receive the interests of traders" when making LIBOR submissions and that "Mr. Allen had acted as an example" on the cash desk because "he had received and acknowledged requests from swap traders to move the rate higher or lower."  (GX186, at 10:3-15; Hrg. 47:8-13.)  He described a "LIBOR roundtable" at which Rabobank traders were supposedly invited to express their preferences to submitters.  (DX608C, at 5.)  Mr.

---

[3] The transcript of Mr. Conti's compelled testimony is divided into four parts, each beginning at page 1. We cite these parts as DX901-1, DX901-2, etc. (and in references to Mr. Robson's annotated copy, as DX901A-1, etc.).

Robson also informed the Government that Christian Schluep had "submitted some requests regarding USD LIBOR" in "writing" to Mr. Allen and Mr. Conti, a fact which he now admits he knew of only from his review of Defendants' compelled testimony, and which he knew would be corroborated in light of his review of Mr. Allen's and Mr. Conti's testimony.  (DX608C, at 7; Hrg. 220:15-221:8.)

Approximately two weeks later, on August 5, 2014, the Government entered into a cooperation agreement with Mr. Robson.  (DX608C; DX608O.)  He pled guilty on August 18, 2014, at which time the Government informed the Court that it was "considering" filing a "superseding indictment  . . . involv[ing] other individuals," because of "information that ha[d] come to light" due to Mr. Robson's and Mr. Yagami's cooperation.   (DX608T, at 25:15-23.)

Then, on October 7, 2014, six weeks after Mr. Robson pled guilty, the Government presented evidence to the grand jury regarding Mr. Allen and Mr. Conti.  Special Agent Weeks summarized Mr. Robson's statements to the grand jury.  Agent Weeks told the grand jury that "[his] investigation ha[d] revealed that Mr. Conti adjusted his U.S. dollar LIBOR rates both for his own benefit and for the benefit of other traders."  (GX186, at 6:21-23.)  He testified that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions."  (*Id.* at 12:20-24.)  He recounted Mr. Robson's story about "an open, round-table discussion" where "traders and submitters would discuss . . . who had an interest and who would have a request associated with the LIBOR." (GX186, at 10:21 – 11:2.)  And he presented Mr. Robson's statements that "he would routinely observe and hear Lee Stewart submit requests explicitly related to his own trading positions, and the requests were to the U.S. dollar LIBOR submitter asking him to accommodate his positions." (GX186 at 11:22-26.)

Agent Weeks characterized Mr. Allen, on the basis of Mr. Robson's testimony, as the "boss" who had "instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR." (GX186, at 5:12-20.)  Special Agent Weeks informed the grand jury that Mr. Robson had told the Government that Mr. Allen's "instructions" were "explicit," *id*. at 10:8, that those instructions pertained to "both yen and dollar," *id*. at 7:8-11, and that Mr. Robson felt that "his job was in jeopardy" if he didn't comply with Mr. Allen's "guidance." *Id*. at 10:6-15.  Indeed, the Government made clear that the grand jury should consider Mr. Allen responsible for all of the unsavory Rabobank emails presented, not just those that he was copied on, because "even though Mr. Allen doesn't show up in the communication, he's still involved as a supervisor" who issued the "guidance."  (GX186, at 28:21-29:23. )  At the *Kastigar* hearing, Special Agent Weeks admitted that Mr. Robson was the only witness interviewed by the Government during the Rabobank investigation who said he was "instructed" by Mr. Allen to submit higher or lower LIBOR rates upon swap traders' requests.  (Hrg. 253:10-14.)

## LEGAL STANDARD

The Fifth Amendment's "total prohibition" on the use, or derivative use, of compelled testimony encompasses a broad range of impermissible "uses."  *Kastigar v. United States*, 406 U.S. 441, 453 (1972).  If Mr. Robson was "affected" by his review of Mr. Allen's or Mr. Conti's compelled statements, or if the information Mr. Robson provided to the Government, or to the jury, was "shaped" or "altered" by his exposure, there has been a *Kastigar* violation.  *United States v. Poindexter*, 951 F.2d 369, 373 (D.C. Cir. 1991).  Likewise, if Mr. Robson's recollection was "refreshed" by his review of Defendants' FSA testimony, or if he used their compelled testimony to "focus [his] thoughts, organize [his] testimony, or alter [his] prior or contemporaneous statements," Defendants' convictions cannot stand.  *United States. v.*

*North*, 910 F.2d 843, 856, 860 (D.C. Cir. 1990) (hereinafter "*North I*") (also holding that

*Kastigar* is violated if a witness "studied, reviewed, or [was] exposed to the [compelled]

testimony in order to prepare themselves or others as witnesses").  Further, if Defendants'

compelled testimony had any "influence" in the decision of Mr. Robson to cooperate, there has

been a constitutional violation.  *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir. 1976).

If tainted information from Mr. Robson played an "important" role in the

Government's decision to indict Mr. Allen or Mr. Conti, *Kastigar* mandates that the Indictment

be dismissed.  *United States v. Kristel*, 762 F. Supp. 1100, 1109 (S.D.N.Y. 1991).  Similarly, if

the grand jury indicted Mr. Allen or Mr. Conti on the basis of Mr. Robson's tainted information

to the Government, the Indictment is invalid.  *United States v. Tantalo*, 680 F.2d 903, 908-09 (2d

Cir. 1982).

The Government bears the "burden of disproving use" of Mr. Allen's and Mr.

Conti's compelled statements—in all of the above contexts—and its burden is "not limited to a

negation of taint." *Kastigar*, 406 U.S. at 460-61.  Rather, the Government has an "affirmative

duty to prove that the evidence it [used was] derived from a legitimate source wholly

independent of the compelled testimony." *Id*.  The Government's burden on this *Kastigar*

motion is "heavy" because "any failure to meet [the constitutional] standard" mandates a ruling

in Defendants' favor.  *North I*, 910 F.2d at 873.

## ARGUMENT

**I.      THE GOVERNMENT CANNOT SATISFY ITS AFFIRMATIVE BURDEN
OF PROVING THAT MR. ROBSON WAS UNAFFECTED BY HIS
REVIEW OF DEFENDANTS' COMPELLED TESTIMONY.**

The primary question in front of the Court is whether the Government has proven

that Mr. Robson was unaffected by his review of Mr. Allen's and Mr. Conti's compelled

testimony.  *Poindexter*, 951 F.2d at 376 (if a prosecution witness offers testimony against the

defendant that is "in any way shaped, altered, or affected" by his or her exposure to compelled testimony, a constitutional violation has occurred); *North I*, 910 F.2d at 860 ("When the government puts on witnesses who refresh, supplement, or modify [their testimony] with compelled testimony, the government uses that testimony to indict and convict.").  The Government cannot possibly sustain that burden here.

When a Government witness is exposed to a defendant's compelled testimony prior to testifying at trial, it is "extremely difficult for the prosecutor to sustain its burden of proof" under *Kastigar*, unless the prosecutor has "canned" statements given by the witness prior to his exposure to the compelled testimony that are nearly identical to the witness's trial testimony.  *United States v. North*, 920 F.2d 940, 943 (D.C. Cir. 1990) (hereinafter "*North II*").  Without "canned" testimony, it is nearly impossible for the Government to reliably demonstrate that the witness's testimony at trial was identical to the testimony he gave before his exposure, which is what the Government needs to show to defeat a *Kastigar* claim.

In the present case, the Government possesses "canned" testimony of Mr. Robson, from his interview with the FSA in January 2013, eleven months before he reviewed Defendants' compelled testimony.  The Government, however, has not made any attempt to compare Mr. Robson's canned testimony to the testimony Mr. Robson provided to the jury, or to the Government during his cooperation.  Instead, the Government attempted to satisfy its *Kastigar* burden by asking Mr. Robson about "general categories" of "information" that he testified about, and more specifically, whether the testimony was "informed in any way by [his] review of Mr. Allen's or Mr. Conti's FCA testimony."  (Hrg. 11:1–15:8.)  Mr. Robson claimed that it was not.  *Id*.  Rather, he said, his testimony was "based upon [his] observations, personal experiences, and [his] own professional understanding of the terminology in the market at the time."  (Hrg. 11:9-

13.)  Mr. Robson also denied that his review of Mr. Allen's and Mr. Conti's compelled testimony "motivate[d]" his "approach" to the Government for a cooperation agreement in 2014.  (Hrg. 8:12-14, 15:9-18.)

This showing is wholly insufficient under *Kastigar*.  The Second Circuit has made clear that rote denials of use, like those offered by Mr. Robson, do not satisfy the Government's burden.  *Tantalo*, 680 F.2d at 908 (bare assertion that immunized testimony was not used is inadequate).  Mr. Robson's claim that his testimony was "based upon [his] observations" and "personal experiences" is also meaningless because "there is no way a trier of fact can determine whether the memories" of Mr. Robson "would be substantially different" had he not reviewed Defendants' compelled testimony, especially considering that his testimony at trial concerned events that took place between five and fifteen years ago.  *North I*, 910 F.2d. at 860 (internal citations omitted); *Poindexter*, 951 F.2d at 374 (even if a witness demonstrates "personal knowledge in the evidentiary sense; . . .it simply does not rule out the possibility that the witness's memory was refreshed or influenced by the immunized testimony.").

In any case, there is ample cause to question Mr. Robson's claim that his trial testimony was based on his "personal experiences."  The clearest indication that Mr. Robson is lying about the source of his information is his own testimony.  If Mr. Robson's testimony was based on his "personal experiences," and not his review of Defendants' compelled testimony, his testimony would be consistent with the testimony he gave to U.K. authorities in January 2013, prior to his exposure.  Assuming, as he claims, that his review of Defendants' compelled testimony did not "refresh his recollection" in any way, everything Mr. Robson remembers now is information from his own "personal experience" that he would have known in January 2013 when testifying to the FSA.

Of course, as the Court is well aware, Mr. Robson's post-exposure testimony to the jury bears no resemblance to the testimony he gave prior to reviewing Mr. Allen's and Mr. Conti's compelled testimony. The Government, therefore, cannot establish that Mr. Robson's testimony was unaffected by his exposure and the Court should therefore grant Defendants' motion.

The Government has attempted to justify the irreconcilable conflicts between Mr. Robson's pre-exposure and post-exposure testimony by eliciting an admission from Mr. Robson that he was "less than truthful" with UK authorities. (Hrg. 125:19-126:7.) Therein lies the fundamental problem that the Government has on this motion: Paul Robson is not credible. The Government can offer the Court nothing but Mr. Robson's word to demonstrate, affirmatively, that Mr. Robson was not affected by Defendants' compelled statements.

But Mr. Robson's word has little value. If Mr. Robson was lying to the FSA because he wanted "the whole affair" to "go away," as he claims, he would have told the FSA that he was only acting at Mr. Allen's direction. But, Mr. Robson did *not* tell the FSA that he accommodated LIBOR requests from traders because Mr. Allen directed him to, or because Mr. Allen engaged in the same conduct. The fact that Mr. Robson didn't think to make that argument until he needed a cooperation agreement from the Government in July 2014 suggests that Mr. Robson is not, and has not, been truthful with the Court.

Mr. Robson concedes that he has previously testified untruthfully, despite being under oath. (Tr. 416:19-418:10.) At trial, his testimony was contradicted repeatedly by the documentary record and the testimony of the Government's other cooperating witnesses. (*Compare* Tr. 324:1-24 (Mr. Robson's testimony about the daily practice of "LIBOR time," including a "shout" on the desk for "Right, LIBOR time!" or "Right, guys, time for LIBOR!"

12

followed by a gathering and a group discussion) *with* Tr. 192:7-13, 259:7-21 (Mr. Stewart's testimony that requests were not made on a daily, or even weekly basis and usually got a response "along the lines" of "ok, noted"); *compare* 629:10-11 (Mr. Robson's testimony that he had "started manipulating" in 2002) *with* 718:9-719:2, 750: 3-21 (Mr. Yagami's testimony that he and Mr. Robson did not start exchanging LIBOR requests until "late 2006"); *compare* 322: 3-17 (Mr. Robson's claim that he knew he wasn't permitted to "bias" LIBOR) *with* 262:1-8 (Mr. Stewart's testimony that it "wasn't considered inappropriate" at Rabobank to share LIBOR preferences with the LIBOR setter).

In fact, at the *Kastigar* hearing alone, Mr. Robson offered testimony that was provably untrue on at least three occasions. First, when the Court asked Mr. Robson about his process of review, Mr. Robson informed the Court, "I read though and as I read through I underlined, asterisked or something like that in the margin." (Hrg. 76:4-77:7.) Mr. Robson did *not* disclose that his process of review also included taking five pages of notes about Defendants' compelled testimony. Second, Mr. Robson initially testified that none of the "things" that he had added "markings" to on his copies of Defendants' compelled testimony, were things that he "didn't already know." (Hrg. 215:12-21.) Later, he admitted that he had not known about any of the emails that were sent to Mr. Allen or Mr. Conti until he read (and marked up) those portions of Defendants' compelled testimony. (Hrg. 220:22-221:16.) Third, Mr. Robson testified that nineteen months had passed from his review of Defendants' testimony until his decision to cooperate, when in fact, only five months had passed. (Hrg. 8:1-14, 17:3-19.) While the Court concluded that Mr. Robson's misrecollection of the date was an honest mistake, Mr. Robson's willingness to offer the above evidence when suggested by the Government calls into serious doubt his reliability.

Even if the Government could sustain its burden through Mr. Robson's assurance that he was unaffected by his exposure to Defendants' compelled testimony, which it cannot, his track record of unreliability precludes him from being the basis on which the Court can conclude that Defendants' constitutional rights have been protected.

### A.   The Evidence Does Not Support Mr. Robson's Claim That He Was Unaffected by His Review of Mr. Allen's Compelled Testimony.

Although Mr. Allen has no burden on the present motion, Mr. Allen contends, and demonstrates below, that Mr. Robson was impermissibly "affected," in at least three ways, by his review of Mr. Allen's compelled testimony.  First, Mr. Robson was influenced to cooperate by his review of Mr. Allen's testimony, which revealed that Mr. Allen would not corroborate his story.  Second, as a result of reviewing Mr. Allen's compelled testimony, Mr. Robson learned of facts previously unknown to him and he used these facts to secure a cooperation agreement and during his testimony at Mr. Allen's trial.  Third, because he reviewed Mr. Allen's compelled testimony, Mr. Robson was able to manufacture "information" implicating Mr. Allen—but which Mr. Robson knew Mr. Allen would find difficult to contradict.

#### 1.   As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr. Robson Learned That Mr. Allen Would Not Corroborate His Story.

The Second Circuit interprets *Kastigar*'s "total prohibition" on use, or derivative use, of a defendant's compelled statements as violated whenever a witness's exposure—or the "information" learned during that exposure—had any "influence" in the witness's decision to cooperate.  *Kurzer*, 534 F.2d at 517.  To this end, the Second Circuit has explicitly cautioned district courts against accepting, at face value, a witness's claim that he was not motivated to cooperate as a result of his exposure:

> We note that we do not hold that should [the cooperating witnesses] testify, as the Government has indicated he will, that the [compelled testimony was] irrelevant to his decision to cooperate, this would end the matter.  The district court must

> determine [the cooperating witness's] credibility, not only in terms of his inclination to tell the truth, but also with regard to whether he is truly able to isolate the factors which convinced him to cooperate.  Human motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences.

*Id*.  Here, it is impossible to conclude that Mr. Robson, facing serious criminal charges for his conduct at Rabobank, was entirely "unaffected" by the knowledge that his direct supervisor did not corroborate his story.

During his FSA interview, Mr. Robson's primary defense was that Mr. Allen had instructed him to discuss "liquidity" with the traders in Asia and Mr. Robson had taken that to mean he could accept LIBOR suggestions from those individuals.  (DX608B, at 100; *see e.g.* 98 ("it's part of the instruction of Tony Allen that we should all be discussing . . liquidity so that we can set an appropriate LIBOR to reflect our liquidity position to the market"); 99 (same); 112 (same).)  Mr. Robson had explained to the FSA that both Mr. Thompson and Mr. Yagami were JPY cash traders, which was why their input was "very valid" to his LIBOR submission.  (*Id*. at 27 (Yagami, Motomura and Thompson were all trading "yen cash."), 29, 67, 103.)

By the time the grand jury handed down the April 2014 Indictment, Mr. Robson knew that defense would no longer work.  His boss, Mr. Allen, had denied that he had ever "instructed Paul Robson to refer" to traders like Paul Thompson for information that could be used to submit LIBOR.  (DX900A, at 67, 122-123 (showing circles around Mr. Allen's answer, "I believe he would have known, yes" when FSA investigators asked if Mr. Robson would have known that Mr. Thompson was a derivatives trader and not a cash trader).)  After reviewing Mr. Allen's compelled testimony, Mr. Robson would also have been aware that another cornerstone of his defense—that he was not "aware of the definition of LIBOR" while he was a LIBOR submitter—had been contradicted by Mr. Allen, who told the FSA (and presumably would tell the jury) that Mr. Robson "knew how to set LIBORs."  (Hrg. 106:3-107:19; *see also* DX900A, at

49-51 (showing heavy markings by Mr. Robson on Mr. Allen's testimony about the understanding of the LIBOR definition by Rabobank's LIBOR-setters).)

Mr. Robson was likely telling the truth when he told Agent Weeks in July 2014 that he wanted to cooperate because "he was extremely stressed out" and had realized "that he wasn't going to be able to run away from this matter."  (Hrg. 147:3-8.)  What Mr. Robson *didn't* say, but what his mark-up of Mr. Allen's testimony makes clear, is that the reason Mr. Robson knew "he wasn't going to be able to run away from this matter" is because he had read Mr. Allen's compelled testimony and knew that Mr. Allen would not back up his defense.  On these facts, and in light of fundamental human nature, it is impossible for the Government to demonstrate that Mr. Robson's decision to cooperate was "wholly unaffected" by his exposure to Mr. Allen's compelled testimony.  For this reason, Mr. Allen's motion should be granted and the Indictment dismissed.

> 2.      *As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr. Robson Became Aware of Facts Previously Unknown to Him.*

In *United States v. Hubbell*, the Supreme Court "particularly emphasized" how critical it is to "protect" a defendant against future prosecutions that are "based on knowledge and sources of information obtained from [his] compelled testimony." 530 U.S. 27, 39 (2000) (internal citations omitted).  It is for this reason that a defendant's convictions must be set aside whenever a Government witness uses a defendant's compelled statements to "focus [his] thoughts, organize [his] testimony, or alter [his] prior or contemporaneous statements."  *North I*, 910 F.2d at 856, 860.

Here, Mr. Robson used the information he learned from Mr. Allen's compelled testimony to secure a cooperation agreement and to enhance the Government's presentation at trial.  The Government would not offer Mr. Robson a cooperation agreement until it assessed,

and found, Mr. Robson's story to be credible.  If his story happened to "check out" against the documentary record, Mr. Robson's chances of obtaining a cooperation agreement improved.  This would be especially true in instances where Mr. Robson's claims were corroborated by documents that Mr. Robson was not himself a party to, since he would have no reason to know such information, unless he was telling the "truth" about Rabobank's cash desk.

When Mr. Robson met with the Government for the first time on July 17, 2014, he told them a key piece of information that he had never before mentioned: that "Mr. Allen had acted as an example" on the cash desk because "he had received and acknowledged requests from swap traders to move the rate higher or lower."  (Hrg. 47:8-13.)  Mr. Robson described a "LIBOR roundtable" in which "everyone" got together to "discuss their positions" and to decide "where the group most benefitted" in terms of LIBOR's directions.  (DX608C, at 5.)  Specifically, Mr. Robson was able to attest to the fact that Christian Schluep had "submitted some requests regarding USD LIBOR" in "writing" to Mr. Allen.  (DX608C, at 7.)

Because Mr. Robson had *never* been copied on an email in which any swap trader, including Christian Schluep, made a request to Mr. Allen, the information conveyed by Mr. Robson was not based on his personal experience.  He learned that Mr. Schluep made LIBOR requests to Mr. Allen "in writing," because he reviewed Mr. Allen's compelled testimony.  (DX900A, at 123-135, 153-54 (regarding GX101C, GX101E, GX101G).)  This fact is not disputed.  When the Court asked Mr. Robson whether he had previously known about the "conversations" regarding LIBOR that he had "not been a party to," Mr. Robson conceded that he "did not know about [those conversations] until reading [Defendants' compelled testimony]."  (Hrg. 220:15-221:8.)  On this basis alone, Mr. Allen's motion should be granted, especially considering that Mr. Robson was asked to testify about these very same "conversations" to the

17

jury.  (Tr. 404:20-405:25 (regarding GX101AM), DX900A, at 99-106 (Mr. Allen's compelled testimony regarding GX101AM); Tr. 631:20-633:20 (regarding GX126/GX145), DX900A, at 115-121 (Mr. Allen's compelled testimony regarding GX126/GX145).)

In addition, it is impossible for the Government to prove that Mr. Robson would have told the Government, on July 17, 2014, about a "LIBOR roundtable," had he not seen Mr. Allen's compelled testimony and learned that Mr. Allen had received written requests from swap traders.  Secure in the knowledge that Mr. Allen had, in fact, received requests for LIBOR rates from swaps traders, Mr. Robson felt comfortable embellishing that fact into a daily ritual in which "the shout would go up on the desk 'right, LIBOR times'…[and] all of the interested parties would gather and discuss their positions."  (Tr. 324: 2-24; *compare with* Tr. 192:7-13, 259:7-21 (Mr. Stewart's testimony that requests were not daily and usually got a response "along the lines" of "ok, noted").)

Mr. Robson's use of Mr. Allen's compelled testimony was effective:  he obtained a cooperation agreement approximately two weeks after his first meeting with the Government. However, Mr. Robson continued to convey information that he had learned from Mr. Allen's compelled testimony throughout his cooperation, including during his testimony at trial.  For example, he testified to the jury that "there were conflicts, there were arguments on the desk" over LIBOR submissions and described one altercation, between Damon Robbins and Lee Stewart, after Mr. Robbins "had forgotten or had chosen to ignore Mr. Stewart's request" for a certain LIBOR.  (Tr. 398:12-401:4.)  Mr. Robson told the jury that "it got very heated and at that point, Mr. Allen stepped in and calmed the situation down."  *Id.*  This testimony was not based on Mr. Robson's "personal" experience either—he did not mention this "fight" to the FSA, he is

not included on the contemporaneous documents that reference the argument, *see* GX101S, and

he admits that he was "at the gym" at 11am "most days," when LIBOR was set.  (Tr. 512:11-13.)

In fact, Mr. Robson learned of the "argument" when he read Mr. Allen's

compelled testimony.[4]  (DX900A, at 141-144, 147 (with Mr. Allen's testimony circled).)  It is

not a coincidence that Mr. Robson's description of the "altercation" includes everything Mr.

Allen said about it, but no more:  Mr. Robson did not describe a *single* additional detail because

he wasn't there and he doesn't know what happened.  (*Compare id.* (Mr. Allen's testimony that

he did not know the cause of the dispute, but it got heated and he had to intervene) *with* DX608G

(Mr. Robson "cannot recall the actual context of the row" but it "almost came to blows before

Tony Allen stepped in.").)

Likewise, Mr. Robson testified at trial about information that, pre-exposure, he

had admitted he did not know.[5]  In 2013, the FSA asked him what "factors" went into the

determination of his bonus, and he explained that he "really [did not] know," because Mr. Allen

was "the guy" who "made the decisions" about how to divide bonuses.  (DX608B, 51-52.)

---

[4] Mr. Robson also used the information he learned from Mr. Allen's compelled testimony regarding the "fight" between Mr. Stewart and Mr. Robbins to obtain his cooperation agreement. *See* DX608C, at 19.

[5] Although Mr. Robson did not testify at trial about Mr. Allen's communication with Gavin Black of Deutsche Bank, due to a defense objection, *see* Tr. 5:17-21, Mr. Robson learned of those conversations by reading Mr. Allen's compelled testimony.  (*See* Hrg. 94:24-95:7 (*comparing* DX608B, at 187:6134-38 (Mr. Robson's testimony to the FSA that he did not know whether anyone else on the cash desk spoke directly with other panel banks about LIBOR) *with* DX900A, at 72:2708-73:2750 (compelled testimony from Mr. Allen regarding communications with Gavin Black of Deutsche Bank about LIBOR).)  Mr. Robson relayed what he had learned to the Government, *see* DX608I, at 2, and the Government informed the Court that it intended to offer Mr. Robson's testimony about Mr. Allen's conversations with Deutsche Bank at trial. (Hrg. 94:7-21.)  Because "impermissible use" of a defendant's compelled statements extends well beyond use at trial, and may include "interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy," the Court should grant Mr. Allen's motion. *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988).

When Mr. Robson read Mr. Allen's compelled testimony, however, he circled the portions in

which Mr. Allen described how bonuses were determined, *see* DX900A, at 30-31, and by the

trial, his recall had dramatically improved: he confirmed to the jury that his bonus depended on

the bank's performance and the resulting "bonus pool," just as Mr. Allen had told the FSA.  (Tr.

407:3-12.)

       *Kastigar* is violated whenever a witness "supplements" or "modifies" his previous

testimony in light of his exposure.  *North I*, 910 F.2d at 861.  The differences between Mr.

Robson's pre-exposure and post-exposure statements are significant and they can be traced

directly to Mr. Allen's compelled testimony.  (*See e.g.* Hrg. 95:8-98:13 (Mr. Robson's testimony

regarding the purpose of his own trading positions changed after reading Mr. Allen's testimony

on that same subject), 106:3-107:19 (Mr. Robson's testimony regarding his understanding of the

LIBOR definition changed after reading Mr. Allen's testimony on that same subject).)

       Mr. Robson's bald assertion that his testimony at trial was based on exclusively

on his "personal experiences" does not satisfy the Government's *Kastigar* burden.  Even if his

claim were true, the Court could not find in the Government's favor because it would

nevertheless be unable to determine whether or not Mr. Robson's recollection of his "personal

experiences" would have been different, had he not reviewed, in late 2013, Defendants'

compelled testimony.  And since the record, including Mr. Robson's own admission, render it

undeniable that Mr. Allen's compelled testimony was used by Mr. Robson during his

cooperation and his testimony to the jury, Mr. Allen's motion should be granted.

         3.     *As a Result of Reviewing Mr. Allen's Compelled Testimony, Mr.*
                 *Robson Created "Facts" to Implicate Mr. Allen.*

       The "testimony" of witnesses is "evidence" and so "when the Government puts on

witnesses who. . . modify that evidence with compelled testimony, the Government uses [the

compelled] testimony to indict and convict" and the defendant is entitled to have his conviction set aside.  *North I*, 910 F.2d. at 860.

Here, Mr. Robson used Mr. Allen's compelled testimony to construct "facts" that he knew would implicate Mr. Allen.  The prime example of this was Mr. Robson's testimony about a conversation he had with Mr. Allen after a "conflicts-of-interest" compliance training.  In 2013, the FSA asked Mr. Robson about his compliance training at Rabobank.  Mr. Robson said, "I can't recall any specific compliance training. . . I can recall a couple of times we had money laundering, things like that, but I can't specifically recall any other occasions."  (*See* DX608B, at 89-90.)  Mr. Robson was then asked whether he had ever "voiced any concerns" to Mr. Allen "about people within Rabobank trying to manipulate LIBOR submissions." (*Id*.)  Mr. Robson told the FSA, "No, I didn't." (*Id*.)

Mr. Robson's copy of Mr. Allen's compelled testimony demonstrates that Mr. Robson found it significant that he and Mr. Allen had the same recollection about the lack of training from Rabobank Compliance: Mr. Robson underlined Mr. Allen's sworn statement to the FSA, "I don't remember any training from Compliance," and circled Mr. Allen's testimony, which was consistent with his own, that Rabobank had offered "money laundering" training. (DX900A, at 90-91.)  Finally, he circled the portion of the transcript where Mr. Allen stated, "I don't remember conflicts of interest, no."  *Id*.

Then, in June 2015, after Mr. Allen had been arraigned and the Court had scheduled a trial date, Mr. Robson "disclosed" to the Government that he and Mr. Allen had attended a "compliance presentation" in the "fourth-floor boardroom" of Rabobank's London office regarding "conflicts-of-interest."  (DX608G, DX608K.)  He told the prosecutors the same story he later told the jury: after the conflicts-of-interest training ended, when he and Mr. Allen

21

were walking back from the boardroom to the trading floor, Mr. Robson remarked, "If I understood what I just heard in that meeting, that means what we are doing with Lee [Stewart] must be along these lines as well, yeah?" (Tr. 340:25-341:19.)  Mr. Robson told the jury that Mr. Allen responded, "No, no, no. It's different.  Lee's part of the team. It's fine."  *Id*.

This testimony was, as Mr. Allen confirmed when he took the stand, complete fiction.  (Tr. 1175:23-1176:6.)  For purposes of this motion, however, it is meaningful because it demonstrates how Mr. Robson used Mr. Allen's compelled testimony in subtle ways, such as the creation of a narrative based on an event that Mr. Robson knew Mr. Allen had testified that he could not recall, and therefore, could not easily refute.  This is a prohibited evidentiary use under *Kastigar* that entitles Mr. Allen to have his conviction set aside.

### B.    The Evidence Does Not Support Mr. Robson's Claim That He Was Unaffected by His Review of Mr. Conti's Compelled Testimony.

Mr. Robson's review of Mr. Conti's compelled testimony also affected his testimony—and his decision to cooperate—in at least three ways.  First, he learned that Mr. Conti could offer the Government information that would increase Mr. Robson's chance of conviction.  Second, he learned that Mr. Conti had shared information with investigators that he had not revealed.  Both of these discoveries influenced his decision to cooperate as well as his statements to the Government.  And third, he learned of facts previously unknown to him that he used to shape his testimony and secure a cooperation agreement.

#### 1.    Mr. Robson Learned from Mr. Conti's Compelled Testimony That Mr. Conti Would Not Corroborate His Story.

As recounted above, Mr. Robson maintained during his own FSA interview that, when he received trader requests related to LIBOR, he "would have thought, in fact, that [they were] talking about these things from a liquidity perspective." (DX608B, at 71:2318-2319.)

When asked by the FSA whether Mr. Yagami and Mr. Thompson "ever asked [him] to adjust [his LIBOR submissions] to benefit fixings that they had," Mr. Robson told the FSA that, "[a]t the time [he] wouldn't have thought about it like that." (DX608B at 71:2317-2318.)  He gave this testimony despite knowing, as Mr. Allen told the FSA, that Mr. Thompson was strictly a derivatives trader and as such had no insight into Rabobank's liquidity position. (DX900 at 122:4630-123:4639.)

When Mr. Robson saw that Mr. Conti, another LIBOR submitter sitting just two desks away, told the Government that he knew traders made requests to "suit positions they had," he realized that his own claim of ignorance would look suspicious by comparison.  (*See* Tr. 314:18-24; DX901A-1, at 45:1476-1477.)  He also knew that, unless he secured a cooperation agreement before Mr. Conti did, he risked facing these contradictions at trial.  Common sense counsels that this is why he underlined this portion of Mr. Conti's testimony, and that these concerns at least partly motivated his decision to cooperate.  Because the Government has no means to prove otherwise, Mr. Conti's motion should be granted.

2.   *Mr. Robson Learned from Mr. Conti's Compelled Testimony That Mr. Conti Had Shared Information with the FSA That Mr. Robson Had Not Revealed.*

Several topics that Mr. Robson testified about at trial were wholly absent from his FSA testimony. Especially conspicuous is that his FSA testimony contained no account of Lee Stewart's verbal requests to Mr. Conti, or about *any* requests made verbally at the money market trading desk.  Mr. Conti, on the other hand, not only told the FSA about Mr. Stewart's verbal requests, he made it clear that others at the desk could hear these requests. (DX901-1, at 44:1423-1461 (Mr. Stewart made requests "[g]enerally, verbally" because he was "[a] handful of feet away"); 46:1502 – 47:1520 (Mr. Allen "would have been aware" of Stewart's requests

"because Lee would have been orally speaking to [Conti]" from across the desk).) And he specifically testified that the Yen desk, including Mr. Robson, were "all in earshot" of his conversations with Mr. Stewart and others on the desk.  (DX901-3, at 6:202 – 7:229.)

When Mr. Robson reviewed Mr. Conti's compelled testimony, he circled Mr. Conti's statement that Mr. Stewart made verbal requests "something like once a month, once every six weeks or something like that," as well as Mr. Conti's statement that the Yen desk was in earshot of Mr. Conti's conversations.  (DX901A-2, at 7:214-219; DX901A-3, at 7:225-229.) Mr. Robson knew after reading these statements that Mr. Conti had told FSA investigators information that Mr. Robson had withheld about requests made in his presence. By that time, he likely also knew that Mr. Conti had already made a proffer to U.S. investigators, and he had every reason to believe that Mr. Conti provided the same information to them. (*See* GX219.) Undoubtedly concerned that Mr. Conti might cooperate against him, Mr. Robson arranged his own proffer and at last recalled these conversations for the prosecutors. (*See* DX608C at 6; Tr. 327:4-12.)  And to prove his unique value as a witness, he added a flourish of his own—the daily LIBOR "roundtable" that even Mr. Stewart, also a cooperating witness, neglected to mention during his testimony. (DX608C at 5; *see generally* Tr. (Stewart Direct) 166:1 – 258:10.)

Because Mr. Robson did not mention either Mr. Stewart's requests or the "roundtable" before reviewing Mr. Conti's testimony, the Government cannot show that his later statements about these topics were not influenced by that review. Therefore, the Court should infer that Mr. Robson's testimony—and his decision to offer it—were affected by Mr. Conti's compelled testimony.

3.    *Mr. Robson Learned New Facts from Mr. Conti's Compelled Testimony and Incorporated Them into His Own*

24

Mr. Robson learned new information from Mr. Conti's compelled testimony that shaped his statements to the Government and his testimony at trial. Specifically, he learned that Mr. Schluep had sent written requests to Mr. Conti, that Mr. Conti had considered his own positions when setting LIBOR, and that Paul Thompson expressed preferences to Mr. Conti regarding USD LIBOR submissions.

As described above, Mr. Robson told the Government during his July 2014 proffer, and testified at trial, that Mr. Schluep made written requests to Mr. Conti and Mr. Allen. (*See* DX608C at 7; Tr. 387:16 – 389:6.)  He learned about some such requests from Mr. Allen's compelled testimony; others he knew about only from Mr. Conti's. (*See* DX901-2, at 6:180 – 7:212; DX901-2, at 8:248 – 9:297; DX901-2, 10:305-338; DX901A-2, 13:415-423; DX901-2, 18:575-583; DX901-2, 18:589 – 19:604.)  As Mr. Robson admitted under oath, he had never seen any of these requests before reviewing the defendants' compelled testimony. (Hrg. 220:15-221:8.)  Therefore, his statement to the Government on July 2014 that Mr. Schluep made written requests to Mr. Conti has no plausible source but Mr. Conti's compelled testimony. (*See* DX608C at 7.)

Mr. Conti's compelled testimony was also the basis for Mr. Robson's statement to the Government that Schluep's "requests… were prioritized below… Stewart's trading positions." (*Id*.)  The FSA investigator specifically asked Mr. Conti, regarding Mr. Schluep and Mr. Stewart, "was there a hierarchy of whose preferences would be accommodated?" (*Id*. at 20:636 – 645.)  Twice during his compelled interview, the FSA questioned Mr. Conti about communications reflecting conflicts between Mr. Schluep's and Mr. Stewart's trading positions that were apparently resolved in Mr. Stewart's favor. (DX901-2, 13:415 – 16:523 (Schluep: "Whatever the ambassador wants"), 18:589 – 20:664 (Schluep: "If the ambass doesn't hv any

preferences, can I have low 1s and 3s the next few days pls matey").)  The FSA investigator

noted that in one instance, Mr. Conti replied to Mr. Schluep that "[Stewart's] exact words [are],

'I don't give a f*ck.'" (*Id*. at 20:660-662.)  Mr. Robson drew an "X" next to this portion of the

transcript. (DX901A-2, 20:660-662.)  A few months later, he told the Government that Mr. Conti

privileged Mr. Stewart's requests above Mr. Schluep's, knowing that the Government had

documents corroborating what he had learned from Mr. Conti's compelled testimony. (DX608C

at 7.)

      Mr. Robson also read for the first time in Mr. Conti's FSA transcript a written

communication from Mr. Thompson to Mr. Conti regarding Rabobank's USD LIBOR

submission. In it, Mr. Thompson asked Mr. Conti "what [he was] roughly thinking about 1 and 3

month LIBORs." (DX901-,2 at 21:684-693.) Mr. Conti responded with his estimates and told

Mr. Thompson, "I'm higher in 1's because we're long in the fixing today and the next few days."

(DX901-2, at 21:695-696.)  Mr. Thompson responded, "That's fine with me, mate – So am I."

(DX901-2, at 23:758.) In his transcript of Mr. Conti's compelled testimony, Mr. Robson circled

the FSA's first question about this communication—"What do you mean that you're higher in 1s

because you're long the fixing today?"—and drew an "X" next to Mr. Conti's response.

(DX901A-2, at 21:700 – 22:704.)

      The Government cannot show that Mr. Robson knew, before reading Mr. Conti's

compelled testimony, that Mr. Conti ever took his own positions into account when submitting

USD LIBOR.  Mr. Robson did not tell the FSA that Mr. Conti's submissions favored his own

positions; he first made this claim to the Government at his proffer in July 2014, after reviewing

and annotating Mr. Conti's compelled testimony. (DX608C, at 7.)  Even assuming that Mr.

Robson could have known this independently of Mr. Conti's compelled testimony, what he

learned from that testimony was still significant. Having read about the exchange with Mr.

Thompson, Mr. Robson knew that the Government could corroborate his claim that Mr. Conti

accommodated his own positions. (*See id.*) This would lend him credibility at his proffer and

serve to bolster his otherwise-uncorroborated "roundtable" story. (*See id.*)

Mr. Robson testified at trial that Paul Thompson made requests to Mr. Conti over

the phone for USD LIBOR submissions that favored Mr. Thompson's trading positions. (Tr.

360:12-13.) But at the *Kastigar* hearing, Mr. Robson admitted that he did not hear what

transpired between Mr. Conti and Mr. Thompson over the phone.[6] (Hrg. 207:24 – 208:21.) Nor

does the record show that Mr. Robson was ever party to a single written communication

reflecting a request from Mr. Thompson to Mr. Conti. There is only one plausible source for Mr.

Robson's "knowledge" of Mr. Thompson's requests to Mr. Conti: Mr. Conti's compelled

testimony. And because Mr. Robson offered testimony implicating Mr. Conti that he admits he

could not have known prior to reviewing Mr. Conti's compelled testimony, the court should

grant Mr. Conti's motion.

## II.   THE GOVERNMENT HAS FAILED TO PROVE THAT ITS PROSECUTION OF DEFENDANTS WAS BASED ENTIRELY ON LEGITIMATE SOURCES WHOLLY INDEPENDENT OF DEFENDANTS' COMPELLED TESTIMONY.

The Supreme Court's mandate that a defendant's compelled testimony may not be

used against him "in any respect" is meant to ensure that "the compelled testimony can in no

way lead to the infliction of criminal penalties." *Kastigar*, 406 U.S. at 461. The Government,

---

[6] Mr. Robson also learned from Mr. Conti's compelled testimony that Mr. Schluep sometimes made requests to Mr. Conti over the phone. (DX901-2 9:286-292.) Mr. Robson placed an "X" next to this portion of Mr. Conti's compelled testimony. (DX901A-2 9:286-292.) It is possible that Mr. Robson simply misremembered Mr. Conti's testimony when he reported that the calls were from Mr. Thompson. Whichever the case, Mr. Robson's testimony was tainted.

however, takes the position that it was free to "use" Mr. Allen's and Mr. Conti's compelled testimony when it made its decision to seek a criminal indictment against them, because, according to the Government, *Kastigar* does not reach "exercises of prosecutorial discretion." (*See* Gov't Opp'n to Defs.' Mot. to Cpl. ("Gov. MTC Opp."), Dec. 29, 2015, ECF No. 204, at 4-6 (*relying on United States v. Rivieccio*, 919 F.2d 812 (2d Cir. 1990).)

   While the Government is correct that *Kastigar* is not concerned with "tangential use" such as the evaluation of a defendant's "demeanor" or a prosecutor's "thought process" while questioning a witness, *see Rivieccio*, 919 F.2d at 815-16, the Government's decision to prosecute is a determination of a different kind and degree.  In the Second Circuit, that decision must meet the *Kastigar* test.[7]  *See, e.g., Mariani*, 851 F.2d at 600 (including the Government's decision "to initiate prosecution" among potential impermissible uses of compelled testimony); *Kurzer*, 534 F.2d at 515 (*Kastigar* prohibits use of compelled testimony to "set in motion the train of events which ultimately result[ ] in [defendant's] own indictment"); *Bianco*, 534 F.2d at 510 (*Kastigar* analysis of defendant's claim that the "impetus" for his prosecution derived from his compelled statements); *United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995) (*Kastigar* is concerned with "the government's decision to pursue its line of investigation").  Here, it is obvious that Mr. Robson's testimony "played an important part," *Kristel*, 762 F.Supp. at 1109, in

---

[7] While *United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011) holds that a decision to prosecute does not fall under *Kastigar*, the Second Circuit follows a different rule.  If the Second Circuit believed that decisions to indict did not fall under *Kastigar*, its evaluation, in *Mariani*, of the Eighth Circuit's list of impermissible uses—"assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy"—would have been different.  In explaining where it parted ways with the Eighth Circuit, the Second Circuit did *not* exclude "deciding to initiate prosecution" but instead clarified that that "tangential[] influence[]" over a prosecutor's "thought process[]" while preparing the indictment and preparing for trial would not constitute impermissible use.  *Mariani*, 851 F.2d at 600.  "Deciding" to indict and "preparing the indictment" are two very different things.

the Government's decision to indict Mr. Allen and Mr. Conti; if Mr. Robson's testimony added

nothing to the Government's prosecution, it would have indicted Defendants in April 2014.

The Government refutes this contention on the basis that "the prosecutors in this

case were already well aware of Messrs. Allen's and Conti's involvement in the scheme long

before the government's first interview with Mr. Robson." (*See* Gov. MTC Opp., at 6-7.)  That,

however, is precisely the point.  On April 24, 2014, when the Government presented evidence to

the grand jury, it had in its possession every improper email, instant message, and phone call that

involved Mr. Allen or Mr. Conti.  Indeed, every communication presented at Defendants' trial

was in the Government's possession before April 2014.  (GX191.)  The Government states that it

had "interviewed at least ten other individuals from Rabobank who provided information

establishing [Defendants'] participation in the scheme" but what the Government does not

mention is that every one of those interviews took place *prior* to its April 24, 2014 presentation

to the grand jury.  (*See* GX178-185.)  If the Government's decision to indict Defendants was

based only on their emails and interviews with other Rabobank employees, Mr. Allen and Mr.

Conti would have been indicted in April of 2014.  They were not.

Instead, on August 18, 2014, one month after its interview with Mr. Robson, the

Government informed the Court that "in light of information that ha[d] come to light" as a result

of Mr. Robson's and Mr. Yagami's cooperation, the Government was "considering" filing a

"superseding indictment  . . . involv[ing] other individuals."[8]  (DX608T, at 25:15-23.)  The only

"information" that could have "come to light" after April 24, 2014 was information provided by

Mr. Robson:  the Government's own records show that it did not obtain any new

---

[8] Although Mr. Young mentioned "information" provided by Mr. Yagami, the Government's
interviews with Mr. Yagami were conducted on August 1, 2013 and on March 5, 2014, well
before its presentation to the grand jury on April 24, 2014.  After interviewing Mr. Yagami in
March 2014, the Government did not interview him again for another year, until April 16, 2015.

communications involving the Defendants nor did it conduct any other interviews with Rabobank employees after that date, save for Mr. Robson's interview on July 17 and 18, 2014.

Moreover, with respect to Mr. Allen, the "information" provided by Mr. Robson was unique. The Government admits that Mr. Robson was the *only* witness it interviewed who said that Mr. Allen had "instructed" Rabobank's LIBOR-setters to accommodate trader requests. (Hrg. 253:10-14.) This "information" served as the foundation of the Indictment against Mr. Allen, in which the Government alleged that Mr. Allen had "directed Rabobank traders to advise Rabobank's LIBOR setters of any financial interest they had in LIBOR on a particular day" and ordered Rabobank's LIBOR-setters to "make LIBOR submissions that favored the traders' positions." (Superseding Ind. at ¶ 29(a).) The Government could not have made its indictment decision before Mr. Robson's cooperation, because its Indictment is based on information it did not then possess. The Government's claim that its decision to indict Mr. Allen was "wholly independent" of statements made by Mr. Robson is contradicted by the timing of events, the Government's own representations to the Court, and the very text of the Indictment itself.

Likewise, Mr. Robson was the Government's only basis for at least two of its allegations against Mr. Conti. Mr. Robson's testimony alone supported the Government's claim that Mr. Conti led a daily "roundtable" to coordinate the interests of traders regarding LIBOR. (Tr. 324:16-20; *see also* GX186 at 10:21 – 11:2; DX608C, at 5.). Mr. Robson's testimony was also the sole source for the claim that Mr. Conti received requests for favorable LIBOR submissions over the phone from Mr. Thompson. (Tr. 360:6-20.) Because the Government did not have any of this information before Mr. Robson began cooperating, it cannot establish that its decision to indict Mr. Conti was "wholly independent" of Mr. Robson's tainted testimony.

Because Mr. Robson's cooperation played an important role in the Government's decision to indict Defendants, the Indictment must be dismissed.

### III.      THE GRAND JURY INDICTED DEFENDANTS ON THE BASIS OF TAINTED EVIDENCE PROVIDED BY PAUL ROBSON AND SUMMARIZED TO THE GRAND JURY BY THE CASE AGENT.

In *United States v. Hinton*, the Second Circuit confirmed that "the burden imposed by *Kastigar* requires not merely a showing by the Government that the immunized testimony was not the indictment's 'legal cause'" but instead demands that the Government "establish that the legitimate evidence upon which the indictment was founded was gleaned from a source wholly independent of the compelled testimony." 543 F.2d 1002, 1008 (2d Cir. 1976) (internal citations omitted). In *United States v. Pelletier*, the Circuit expressly held that the Government cannot satisfy that burden "simply by showing the availability of 'wholly independent' evidence from which it *might* have procured indictment or conviction had it not used the immunized testimony." 898 F.2d 297, 303 (2d Cir. 1990) (citing *Nemes*, 555 F.2d at 54 n.3 ("if the indictment had been obtained by direct or derivative use of immunized testimony, it would have been subject to dismissal").) Instead, the Government is required to make its showing with respect to the *actual* evidence it presented to the grand jury. Where the Government is unable to do that and the indictment rests almost exclusively on tainted evidence, the Indictment must be dismissed. *United States v. Rivieccio*, 919 F.2d 812, 816 n.4 (2d Cir. 1990); *see North I*, 910 F.2d. at 869 (where compelled testimony "is used before a grand jury" the "grand jury process itself is violated and corrupted, and the indictment becomes indistinguishable from the constitutional and statutory transgression.").)

The Government has not met its burden, because tainted information from Mr. Robson was imparted liberally to the grand jury.

### A.    The Grand Jury Indicted Mr. Allen on the Basis of Tainted Information from Mr. Robson.

The grand jury indicted Mr. Allen on the basis of tainted information from Paul

Robson, which was summarized by Special Agent Weeks.  At the very outset of his grand jury

testimony, Agent Weeks was asked to describe Mr. Allen's "role" in the "scheme to

manipulate." (GX186, at 5:12-20.)  Agent Weeks characterized Mr. Allen as the "boss" who had

"instructed, specifically instructed, LIBOR submitters in London to consider the positions and

the requests of Rabobank traders and adjust their submissions for LIBOR." *Id.*  The grand jury

was told that Mr. Allen's "instructions" were "explicit," *id.*, at 10:8, that those instructions

pertained to "both yen and dollar," *id.*, at 7:8-11, and that Mr. Robson felt that "his job was in

jeopardy" if he didn't comply with Mr. Allen's "guidance." *Id.* at 10:6-15.  Indeed, the

Government made clear that the grand jury should consider Mr. Allen responsible for all of the

unsavory Rabobank emails presented, not just those that he was copied on, because "even though

Mr. Allen doesn't show up in the communication, he's still involved as a supervisor" who issued

the "guidance." (GX186, at 28:21-29:23. )

*All* of this "evidence" is based exclusively on tainted information Mr. Robson

gave to the Government.[9]  Agent Weeks admitted that Mr. Robson was the *only* witness

interviewed during the Rabobank investigation who said that Mr. Allen "directed" Rabobank's

submitters to take trading positions into account when setting LIBOR. (Hrg. 253:10-14.)

Indeed, even Mr. Robson, *prior* to reading Mr. Allen's compelled testimony, did not make such a

---

[9] Agent Weeks also informed the grand jury that "Mr. Robson identified a couple of occasions where Stewart, either because he was not consulted related to his interests or he perceived that his requests [were] not accommodated, reacted very angrily toward the person who set the U.S. dollar LIBOR rates that day." (GX186, at 12:1-15.)  Agent Weeks was clearly referring to the information Mr. Robson provided the Government about the "fight" between Mr. Stewart and Mr. Robbins, information that Mr. Robson learned exclusively from Mr. Allen's compelled testimony.  *See supra* at 19.

claim.  On January 17, 2013, FSA investigators asked Mr. Robson directly, "Were you told to make submissions to benefit other traders' [positions]?"  (Hrg. 28:20-13 (regarding DX608B, at 105).)  He denied that he had been given any such instruction, replying, "I was told to set submissions to the best of my ability within a range of where LIBOR could be."  *Id.*

Because Mr. Allen was indicted by the grand jury on a theory of his involvement that was based exclusively on Mr. Robson's post-exposure, altered testimony, the Indictment against Mr. Allen is invalid and must be dismissed.

**B.    The Grand Jury Indicted Mr. Conti on the Basis of Tainted Information from Mr. Robson.**

When Agent Weeks presented the Government's case against Mr. Conti to the grand jury on October 7, 2014, four parts of his testimony were shaped by his exposure to Mr. Conti's compelled testimony by way of Mr. Robson: his testimony that Mr. Conti made LIBOR submissions for his own benefit; his description of the "round-table discussion" about LIBOR submissions; and his statements about Mr. Stewart's verbal requests to Mr. Conti.

When Agent Weeks testified that Mr. Conti "adjusted his U.S. dollar LIBOR rates… for his own benefit," he only possessed a single document from which that might be inferred—the brief exchange between Mr. Conti and Mr. Thompson referenced above. (GX186, at 6:21-23; DX901-2 at 21:695-696.)  He opted instead to base his testimony upon Mr. Robson's proffer, telling the grand jury that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions."  (*Id.* at 12:20-24.)  Agent Weeks agreed at the *Kastigar* hearing that "[that] testimony was derived solely from Mr. Robson."[10] (Hrg. 243:25 – 244:13.)  The Government therefore cannot show that Agent

---

[10] Agent Weeks also testified on redirect about his statement to the grand jury that "[his] investigation has revealed that Mr. Conti adjusted his U.S. dollar LIBOR rates both for his own benefit and for the benefit of other traders," saying that "[t]his statement came not exclusively

Weeks would have given this testimony had Mr. Robson not provided information derived from his exposure to Mr. Conti's compelled testimony.

As detailed above, Mr. Robson's testimony regarding a daily LIBOR "roundtable" on the Rabobank London money market desk was influenced by his review of Mr. Conti's compelled testimony about Mr. Stewart's verbal requests. (*See supra* at 25-28.)  Agent Weeks presented the same story to the grand jury, based solely on Mr. Robson's testimony. (GX186, at 10:21 – 11:2.)  Because the Government cannot show that Mr. Robson's account was not influenced by his exposure to Mr. Conti's compelled testimony, it also cannot show that Agent Weeks' testimony was not tainted by that influence.

When Agent Weeks testified to the grand jury about Mr. Stewart's verbal requests to Mr. Conti, he could have relied on any number of sources, including Mr. Conti's own interview. (*See* GX219 at 7 ("Stewart frequently requested that his trading positions be accommodated when Conti set Rabo's USD LIBOR contributions").)  Instead, the Government chose to ground its case in Mr. Robson's testimony.  (GX186 at 11:22-26.)  But because Mr. Robson did not so much as mention Mr. Stewart in his pre-exposure testimony to the FSA, the Government cannot prove that Mr. Robson's recollection of these requests was not influenced or refreshed by his review of Mr. Conti's compelled testimony.  (*See generally* DX608B.) Therefore, it cannot satisfy its "affirmative duty to prove that the evidence… is derived from a legitimate source *wholly independent* of the compelled testimony." *Kastigar*, 406 U.S. at 460-61 (emphasis added).

---

from witnesses but also from documents." (Hrg. 249:4-8.)  However, he did not testify that the relevant portion in particular—regarding Mr. Conti's own positions—was derived from documents as well as testimony.  (*Id*.)  And he did not reference any document independently supporting this statement in his testimony to the grand jury.

**IV.      THE GOVERNMENT FAILED TO SATISFY ITS BURDEN OF PROVING THAT IT WAS NOT EXPOSED TO DEFENDANTS' COMPELLED STATEMENTS THROUGH ITS COMMUNICATIONS WITH BRITISH AUTHORITIES.**

Once a defendant demonstrates that he has previously been compelled to testify about a matter relevant to the charges against him, the "burden of disproving use" of those compelled statements belongs to the Government, and "cannot, under *Kastigar*, be shifted onto the defendant, nor can the defendant be required to assume the burden of going forward with evidence that puts in issue the question of use." *North II*, 920 F.2d at 943. Here, the potential for taint extends beyond Mr. Robson because the Government's investigation of Rabobank, Mr. Allen and Mr. Conti "greatly benefited from a diligent and wide-ranging cooperative effort" that included the Serious Fraud Office and the FSA. (Ex. C (DOJ Press Release).)

To address this issue, the Government submits "Declarations" from the prosecutors and staff assigned to its Rabobank investigation. (*See* GX211-218.) Without exception, these Declarations include only "conclusory denials of use or derivative use," and are therefore inadequate to prove that the Government was not exposed to, and did not use, Mr. Allen's or Mr. Conti's compelled testimony during Defendants' prosecution. *Tantalo*, 680 F.2d at 908; *United States v. Hampton*, 775 F.2d 1479, 1487 (11th Cir. 1985) (dismissing indictment where government made only "conclusory denials of use or derivative use.").

For example, Ms. Sipperly's Declaration asserts that she has not "learned the substance of any testimony taken by" the FSA. (GX215 ¶ 3.) At the same time, however, Ms. Sipperly admits that she "met and spoke with representatives of the Serious Fraud Office on several occasions" to discuss "interviews, charging events, guilty pleas, and extradition requests," including a discussion of the evidence that would support the extradition of "Paul Robson and others." (*Id.* at ¶ 5.) The "others" Ms. Sipperly alludes to include Mr. Allen and

Mr. Conti.  (*See* Ex. D (Notes of Sept. 16, 2014 meeting between Government and SFO) at 2.)
Considering that Ms. Sipperly has not read Mr. Allen's or Mr. Conti's compelled testimony, it is
impossible for her to credibly vouch that she was not exposed to any information derived from
their testimony during her communications with U.K. authorities, including her discussion of
"the evidence that would support the extradition" of Mr. Allen and Mr. Conti.  This same point
applies equally to the Declaration of Michael Koenig, who participated in the same September
16, 2014 meeting with the SFO but also claims that he has not learned the "substance" of any
compelled testimony, save for that of Takayuki Yagami.  (GX217 at ¶ 3.)

   The trial team's assertion that they were "not exposed," directly or indirectly, to
Defendants' compelled testimony is based on the assumption that the U.K. authorities did not
share information from compelled interviews after the Government asked them not to do so.
Mr. Allen's and Mr. Conti's Fifth Amendment rights, however, should not have to depend upon
the assumption that some unknown number of U.K. government agents could, and did in fact,
limit their discussions with the prosecutors to only those facts learned from non-compelled
sources.  Even if such a feat were possible in the midst of "a wide-ranging cooperative effort," it
simply does not go far enough to ensure that information derived from Defendants' compelled
statements was not disclosed to the Government.  *Nemes*, 555 F.2d at 55 (a prosecutor's lack of
access to the defendant's compelled testimony "cannot be relied upon to afford the witness the
full protection the Constitution guarantees" and "does not preclude the possibility that someone
who has seen the compelled testimony was thereby led to evidence that was furnished to federal
investigators"); *North I*, 910 F.2d at 868 ("reliance on warnings" not to share information "was
not sufficient" to show that compelled testimony was not used); *North II*, 920 F.2d. at 942 ("It

simply does not follow that insulating prosecutors from exposure automatically proves that immunized testimony was not used against the defendant.")

The Government was required to detail its communications with U.K. authorities to establish that there was no taint, but the Government chose not to.  The Government, therefore, has not satisfied its obligation to prove that it made no use, or derivative use, of Defendants' compelled statements, and the Indictment should be dismissed.

## CONCLUSION

Accordingly, this Court should order the dismissal of the Superseding Indictment against Mr. Allen and Mr. Conti, or, in the alternative, order a new trial excluding Mr. Robson's testimony and all evidence derived from Mr. Robson's testimony.

Dated:   New York, New York
         January 15, 2016


**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TOR EKELAND, P.C.**

By: /s/ Tor Ekeland
(electronic signature w/permission)
Tor Ekeland
Aaron Williamson
195 Plymouth Street, 5th Floor
Brooklyn, New York 11201-1133
Phone: (718) 737-7264

*Attorneys for Defendant Anthony Conti*