G3AFALL1                         Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 272 (JSR)

5    ANTHONY ALLEN AND ANTHONY
     CONTI,
6
              Defendants.
7
     ------------------------------x
8
                                          New York, N.Y.
9                                         March 10, 2016
                                          4:15 p.m.
10

11   Before:

12                    HON. JED S. RAKOFF,

13                                        District Judge

14
                            APPEARANCES
15
     UNITED STATES DEPT. OF JUSTICE
16        Criminal Division
     BRIAN YOUNG
17   CAROL SIPPERLY
     MICHAEL KOENIG
18        Assistant United States Attorney

19   WILKIE FARR & GALLAGHER LLP
          Attorneys for Defendant Allen
20   MICHAEL SCHACHTER, ESQ.
     CASEY DONNELLY, ESQ.
21
     TOR EKELAND, PC
22        Attorneys for Defendant Conti
     TOR EKELAND, ESQ.
23   AARON WILLIAMSON, ESQ.

24

25

G3AFALL1                          Sentence

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  March 10, 2016.  This is United

4     States v. Anthony Allen, docket number 14 CR 272, defendant

5     number 5.  Will everyone please be seated and will the parties

6     please identify themselves for the record.

7          MR. YOUNG:  Good afternoon, your Honor.  Brian Young,

8     Carol Sipperly, and Michael Koenig for the United States.  With

9     us at counsel table is Christopher Neary, our paralegal.

10          MR. SCHECHTER:  Michael Shechter and Casey Donnelly

11     for Mr. Allen, who is present in court.

12          MR. EKELAND:  Good afternoon, your Honor, Aaron

13     Williamson and Tor Ekeland on behalf of Anthony Conti, who is

14     also present.

15          THE COURT:  Good afternoon.  We're here for sentence.

16     I want to say before we start the difficult work ahead of us

17     that I am very grateful to all counsel in this case for their

18     really superb work throughout this case, but not least in the

19     presentation of their memoranda for sentencing and other

20     submissions for sentencing, all of which were extremely helpful

21     to the Court.

22          I think for purposes of loss calculation, which we'll

23     get to in a moment and other guideline calculations, I'll hear

24     from counsel for both defendants, but then we're going to

25     bifurcate and deal first with the sentence for Mr. Allen and

1     then the sentence for Mr. Conti, because these are two separate

2     individuals and they need to be separately considered.  But

3     there was common themes on the loss calculation and on the

4     guideline calculation where there were objections made, so I'll

5     hear from both counsel just on that portion of the colloquy.

6           I am required by federal law to calculate a guideline

7     range for each defendant and I am required to do that before we

8     do anything else and so I will carry out that obligation.  But

9     I want to make clear at the outset and it will come as no

10    surprise to any of the counsel in this case that the guideline

11    calculation will have little or no effect on my sentences.  The

12    guidelines in this Court's view are inherently flawed,

13    irrational, unreasonable and nowhere is that more shown than in

14    this very case.

15          There's a debate which we're about to hear fleshed

16    out, though it's already in the papers, over the loss

17    calculation, and if the loss were as the defendants believed,

18    namely, zero, then the sentencing guideline range would be zero

19    to seven months.  And if the loss calculation was as the

20    probation officer, who also did a splendid job, were to be

21    adopted, then the guideline range jumps, because loss is the

22    single biggest factor, approximately 50 percent of the

23    calculation, jumps up to many years.  I think for Mr. Allen it

24    jumps to 87 to 104 months.  And if, as the government asserts

25    the real effective loss was even much larger, not perhaps in a

 1    technical sense but in a sense that the Court is urged to

 2    consider, then we jump right up to life in prison.  And all of

 3    this is in a situation in which both sides, both the defendants

 4    and the government, are agreed that on the particular facts of

 5    this case it's rather difficult to calculate loss.  Not

 6    impossible I don't think, but certainly far from an easy task.

 7              So there we have the mighty sentencing guidelines

 8    proclaiming in effect that the sentence of these two defendants

 9    could under a certainly not impossible calculation of the

10    guidelines be anywhere from zero months in jail to lifetime

11    imprisonment and that all in a situation where loss is, as the

12    parties agree, difficult to calculate.

13              To my mind that speaks to the utter poverty of the

14    guidelines; their inherent irrationality, their complete

15    insignificance in achieving justice and I will calculate as I'm

16    required to do the guidelines, but I give you that temperate

17    statement in advance so that you know that my sentence will not

18    be materially affected by the guidelines.

19              All right.  So, let's talk first about the calculation

20    of the loss which the presentence report, adopting essentially

21    the government's expert position, puts at $1,149,671.76, thus

22    creating the illusion of precision in an area where all sides

23    agree precision is impossible.

24              So let me hear from defense counsel, since you believe

25    that's not a reasonable calculation.

G3AFALL1                        Sentence

1              MR. SCHECHTER:  Thank you, your Honor.  And to be

2      clear, although your Honor referred to the FBI accountant as an

3      expert, I think the government does not put forward this

4      individual as an expert.  In fact, it is the government's

5      position that this is simply mathematical computations that any

6      witness could, any lay witness could perform and they have not

7      submitted any kind of expert analysis at least as that term is

8      known by the Federal Rules of Evidence.

9              Your Honor, the intended loss under the new revision

10     to the guidelines effective in November limits the calculation

11     of intended loss to the amount of pecuniary harm the government

12     is able to prove by a preponderance of the evidence the

13     defendant purposely sought to inflict.  It is limited to his

14     subjective intent.  It is the amount, it is to be calculated

15     the amount that the government proves the defendant had a

16     conscious object to cause.  The Sentencing Commission

17     specifically considered the question as to where intended loss

18     should be limited to the amount that the defendant purposely

19     intended or whether it should also include amounts that may

20     have been intended by other participants in jointly undertaken

21     activity.  Although that was the position that was urged by the

22     Justice Department, that position was rejected by the

23     Sentencing Commission.  So it is limited, this exercise is

24     limited to determining what is the amount, is there an amount

25     that can be calculated as the specific amount of loss that

Mr. Allen purposely sought to inflict, and in this

circumstance, and I should say it even is clear under the

Sentencing Commission's pronouncement that he's not responsible

for losses that he might have possibly or potentially

contemplated, the Sentencing Commission says that's to be

excluded as well from the calculation of intended loss.

It is stipulated among the parties that Mr. Allen had

no knowledge of any of the particular swaps that were the

subjects of whatever requests had been made in this case.  He

doesn't know the size of the swap, wouldn't know who the

counter party was, and would not know what amount, if any, was

to be caused.

In addition, Mr. Allen himself received only 16

requests.  He responded to only four and the government found

that one of those four was followed by a submission which,

according to their analysis, was inconsistent with the request

that was received.  So it's just three of the four to which he

responded they believe that, even the government believes the

submission was consistent with the request.

In calculating intended loss, the government we submit

ignores the sentencing guidelines and looks instead at 201

requests and analyzes -- does some analysis to determine what

is the possible loss which may have resulted to counter parties

from those 201 requests.

THE COURT:  So why -- I know they group this under

1   intended loss, but why isn't this a reasonable approximation of

2   actual loss where actual loss does include reasonably

3   foreseeable pecuniary harm?

4           MR. SCHECHTER:  That's true.  Still, your Honor, it

5   is, it is methodology that they have gone about to calculate

6   some amount of -- first of all, the government I don't think

7   does take the position that this is an approximation of actual

8   loss.

9           THE COURT:  No, but I've got an independent duty to do

10  the best I can to figure out what the loss is and if actual

11  loss is a better measure than intended loss I should adopt

12  that.  No one claims in this case but just to show the problem

13  if actual gain were a better measure or a fallback measure

14  because you couldn't calculate loss then I would adopt that.

15  So looking at it as actual loss, reasonably estimate.  It's not

16  a perfect analysis, but why isn't this actual loss?

17          MR. SCHECHTER:  I think the government stipulates they

18  have no ability to calculate actual loss.

19          THE COURT:  I'm taking the methodology they use and

20  putting a different, if you will, gloss on it and why isn't it

21  a reasonable way to determine actual loss?

22          MR. SCHECHTER:  I guess I will first note that of

23  course the government bears the burden of proof here and I

24  think the government submits that they can't meet that burden.

25  Putting that aside I'll respond to the Court's question.  The

1    methodology is completely flawed.  They have no -- they could

2    have, I suppose, gone to the counter parties and said, okay,

3    here's the trading information, what loss did you suffer on

4    that particular day.  It would have been -- I don't know that

5    that would have been difficult to do, and they could have then

6    submitted some approximation of the actual loss.  They chose

7    not to --

8            THE COURT:  That's right, but I guess what prompts

9    this question from the Court is the guidelines say actual loss

10   means the reasonably foreseeable pecuniary harm that resulted

11   from the offense, so in some ways, in just another example of

12   "guideline-ese," they're mixing up intended loss and actual

13   loss and applying the language that you think would be part of

14   intended loss to actual loss and eschewing it from the

15   definition of intended loss.  But, hey, they'll do what they

16   want.

17           MR. SCHECHTER:  Yes, well -- I think there's a bunch

18   of loss.  First and foremost the government has no ability and

19   didn't even attempt in the course of this trial to say that the

20   LIBOR submissions were inaccurate or would have been different

21   had there not been a request.  And so we don't know and the

22   government, we have no, sitting here, we have no knowledge, the

23   government has offered no evidence that the LIBOR submission on

24   any given day would have been different had there not been a

25   request.  In fact, they include in this list of 200 requests,

114 that their own analysis, where their own analysis showed

that the submission was inconsistent with the request that was

received and yet, in order to, I submit to get the number as

high as possible, they include requests in their calculation

for which they don't even believe there's evidence that the

submission, that there was any attention paid to the

submission.

THE COURT:  So going back to intended loss, your

client and his co-defendant attempted to rig the LIBOR rate in

such a way that it would be otherwise than it would have been

and that was for the purpose of gaining benefits at their end

which would then be ipso facto detriments at the other end.  So

if we were able to calculate from using that approach, wouldn't

it be a lot more than a million dollars?

MR. SCHECHTER:  Well, your Honor, I think part of the

problem is that, and it's an issue with the sentencing

guidelines as your Honor pointed out.  This is just, there is

just not a way that one can -- the sentencing guidelines are

not that helpful, particularly under the unique circumstances

of this case.  I will quarrel with one --

THE COURT:  I totally agree with that.

MR. SCHECHTER:  I will quarrel with one statement made

by your Honor.  Your Honor said that for their end.  And to be

clear, this is, as we said in our submissions, this is a very

unique set of facts.  Your Honor has tremendous amounts of

G3AFALL1                        Sentence

1    experience, has seen many, many criminal cases, defended them,

2    prosecuted them.  I submit that this, there is nothing like

3    this particular case when your Honor said to help their end, in

4    fact, it's also, there is no dispute that this was not for

5    their end, that there was no personal gain --

6        THE COURT:  No, no, I didn't mean a personal gain, but

7    to help their customers, to help their bank.  They weren't

8    doing it as sleepwalkers.  They had a reason for doing it.

9        MR. SCHECHTER:  It is relatively rare that there is a

10   criminal offense brought before the Court where there is no

11   personal gain, there is no motive for the offense.  It happens.

12   I think there's -- but it separates this case from certainly a

13   vast majority of fraud cases that your Honor sees.  I'll

14   address that at a different time with the Court's permission.

15       THE COURT:  Yes.

16       MR. SCHECHTER:  But on the subject of the application

17   of the guidelines, if one is simply to apply the terms of the

18   guidelines, there is no calculable intended loss.  There is no

19   evidence that Mr. Allen -- certainly the jury found, in all

20   likelihood that there was a point in time, perhaps the jury's

21   verdicts could be based on one of the four e-mails that he

22   responded to that he chose one estimate of borrowing costs over

23   another with, mindful of what was going to be helpful to his

24   employer.  That doesn't allow us to come to a calculation of

25   what loss, if any, he intended.  And so I think just from a

G3AFALL1                    Sentence

1    pure application of 2B1.1 there is no loss that the government,

2    no intended loss that the government is able to establish.

3    There's many flaws in the methodology.  I can take the Court

4    through them if that would be --

5           THE COURT:  Well, I assume you are alluding to your

6    papers and I've read your papers carefully so why don't we put

7    that on hold at least for the moment.

8           Let me hear from co-counsel before we go to the

9    government.

10          MR. WILLIAMSON:  Your Honor, as co-counsel points out

11   the intended loss numbers are based on -- the majority of the

12   requests taken into account by the government's analysis were

13   requests to the government's witness, Paul Robson, and there's

14   been no evidence that my client was aware of those specific

15   requests or possibly could have intended, specifically intended

16   any harm caused by them.  I would also point out that the

17   government, the government's analysis assumed that the

18   defendants intended to move LIBOR by one basis point every time

19   they received a request.  I don't believe there's evidence in

20   the record for that.  Their assumption that it's one -- their

21   argument that one basis point is a reasonable number because

22   there were sometimes requests to move the number by more than

23   that, but every communication reflecting such a request is,

24   again, a request to Mr. Robson and again there's no evidence

25   that my client was aware of requests that specifically asked

G3AFALL1                          Sentence

1    for movement of a certain number of basis points and so I would

2    submit that one basis point is not necessarily a reasonable or

3    a conservative estimate.  And that's all I have.

4              THE COURT:  All right.

5              (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3ASALL2

1           MR. SCHACHTER:  May I make one other point, one flaw

2   of the methodology I wish to emphasize.  The government's

3   analysis also concludes that, in reaching this one eighth of a

4   basis point, we are going to assume that every single time

5   there was a request that LIBOR was affected by one eighth of a

6   basis point because the submission was affected by one basis

7   point.

8           It ignores a submission by KPMG, which we have

9   attached to our papers, which concluded that more than

10  50 percent of the time, Rabobank's submission was kicked out of

11  the eight middle grades.  Therefore, whether the impact,

12  whether the request was impacted by one basis point or two

13  basis points or half a basis point, in more than half of those

14  instances, it wouldn't have had -- certainly there is no basis

15  to conclude it would have had a one eighth of a basis point

16  effect.

17          There is many flaws in the methodology, that is my

18  point.

19          THE COURT:  Let me hear from the government.

20          MR. YOUNG:  Judge, I think it was in 2008, Lee Stewart

21  got into a fight with Damon Robbins on the trading floor about

22  Rabobank's submission that day.

23          While it may be difficult to quantify loss in this

24  case, I think it is clear that Lee Stewart was upset because he

25  knew that it was money at stake, and the purpose of the scheme

G3ASALL2

1   was to make money at the expense of a counterpart.

2            THE COURT:  I agree with that, but the technical

3   problem we have -- frankly, that fact looms in my mind far more

4   importantly than any of the stuff we are going through right

5   now -- but the guidelines say I have to calculate loss.

6            MR. YOUNG:  Here is the best way we can think of to do

7   it.  We thought, we took written submissions, written

8   requests -- I think there were 200 something of them -- on

9   those days we assumed -- that doesn't include verbal requests,

10  which is how they generally communicated -- on those days we

11  assumed that the requester wanted to move Rabobank's submission

12  by at least one basis point, by one basis point.  We know that

13  often they asked for more.

14            If they were successful in moving Rabobank's

15  submission by one basis point, that would cause at least a one

16  eighth change in the fix.  So our baseline assumption is every

17  time somebody asks the Rabobank's submitter to change the

18  Rabobank's submission on their behalf, though intended to cause

19  a one eighth basis point change in the overall LIBOR effects on

20  those specific dates, we found out what Rabobank's positions

21  were vis-a-vis on the counterparties, assumed the movement

22  adverse to the counterparty by one eighth of a basis point, and

23  that is how we got 1.139 million or whatever we came up with.

24  That is the best way that we can think about doing it.

25            But I would submit --

G3ASALL2

1          THE COURT:  Built into that are all sorts of

2     assumptions that are really just -- you call them reasonable

3     estimates, someone might call them specifications.

4          MR. YOUNG:  We have to do the best that we can.  Under

5     this circumstance, it turns out that the defendants have

6     committed a crime that just makes it very difficult to quantify

7     the loss that they caused.

8          THE COURT:  All the more reason why the guidelines

9     don't really fit this situation very well, assuming they fit

10    any situation well.  My own view is this.  I think it is a very

11    close call.

12          I think, in the end, under all the facts and

13    circumstances, the government's approach -- flawed though it

14    is, more speculative it is in numerous respects -- is not so

15    unreasonable that it can't be adopted by the court.  I want to

16    stress again how irrelevant all of this is to my sentence.  My

17    sentence would be the same, the same, if instead of the loss of

18    1.14967, 1.76, or it was zero.  Zero, that's really not the

19    right way to put it.  It was incalculable.  No one knew what it

20    was.  It does not affect my sentence.

21          I do think when all is said and done, the government

22    came up with something that was not unreasonable, and so I will

23    adopt that.  The calculation, now you will notice again how

24    absurd the result is.  This adds 14 points to the guideline

25    range.  The guideline range for the defendants is approximately

G3ASALL2

1    twice that amount.  We are talking about 50 percent of the

2    guideline calculation is based on what is, at best,

3    questionable approach to calculation, though not an

4    unreasonable one, I so find.

5             Let's go on to the two-point increase involving ten or

6    more victims.  Let me hear from defense counsel on that.

7             MR. SCHACHTER:  Your Honor, our argument is the same

8    as laid out in our papers.  They did not prove any actual loss

9    that was sustained by any victim that was caused by Mr. Allen.

10   In fact, I believe that probation found that there was no

11   pecuniary loss to any victim, and on that basis, there is no

12   basis for the two-level enhancement.

13            THE COURT:  Your view is that, for example, is as some

14   of the witnesses in the trial who said if we had known this was

15   going on, we never would have invested, they are not, for these

16   purposes, a victim, even though they are in some sense a

17   victim?

18            MR. SCHACHTER:  Yes.  Because the guidelines define

19   victims to be someone who sustains a monetary harm.  None of

20   those witnesses were able to say they sustained a monetary

21   harm.

22            THE COURT:  I wanted to be clear on that point, that

23   what I understood in your submission, anything you wanted to

24   add.

25            MR. WILLIAMSON:  One point, your Honor.

G3ASALL2

1          The government's actual loss calculation was based on

2     the assumption that when Paul Robson, again, quote, was

3     requested to make a particular submission, and after having a

4     been asked where he thought LIBOR would sit that day, that when

5     he quoted to the requester a number that a broker had told him

6     earlier in the day, that that necessarily would have been the

7     number that he would have submitted, absent a request.

8          I consider that also speculative, your Honor.  I think

9     that sort of speculation is less supportable in an actual loss

10    calculation.

11          THE COURT:  Let me hear from the government.

12          MR. YOUNG:  Judge, I think this is a similar analysis

13    to what we just talked about.  However, in these three

14    instances, what we did was look at three chats where

15    Mr. Robson, or whoever the submitter was, indicated a number

16    that he was thinking of before the request, changed the number

17    after the request.

18          So those instances, we could go back and see how much

19    the LIBOR fix changed that date.  That is what we did.  We did

20    the counterfactual LIBOR effects.  We affected ten different

21    financial institutions.  I mean, I guess it is technically true

22    that Mr. Robson didn't say, I intend to submit X on this day,

23    but he did say brokers are telling me X, and then he submitted

24    X plus five.

25          THE COURT:  One could draw the inference.

G3ASALL2

1          MR. YOUNG:  Judge, we had submit on the papers beyond

2     that.

3          THE COURT:  I do think -- although I think, again,

4     there are problems with the analysis -- but I think it is a

5     little stronger than the loss calculation, so I will do the

6     two-point increase.

7          I don't need to hear further argument on the other

8     points.  I think there was an abuse of a position of trust, and

9     I know the arguments that are made against that.  I agree with

10    the government's position there.

11         I also agree, in Mr. Allen's case, that he

12    orchestrated a scheme that involved five or more participants,

13    etc., so there is the four-point adjustment for role.

14         In the case of Mr. Allen, now we will just focus on

15    Mr. Allen for a few minutes, and then come to Mr. Conti later.

16         The court determines that the offense level is 29, the

17    criminal history category is Roman numeral I, and the guideline

18    range is therefore 87 to 108 months.

19         Now that we have gotten that stuff out of the way,

20    let's talk about the real issues.  Let me hear first from

21    Mr. Allen's counsel, then from the government, on what sentence

22    I should impose, taking account of the statute that I do think

23    makes a lot of sense, Section 3553(a) of Title 18.

24         MR. SCHACHTER:  Your Honor, the 165 letters that were

25    submitted to the court --

G3ASALL2

1          THE COURT:  Which the court found very valuable, and

2    in some cases pointed, and I am very grateful to you for having

3    submitted those.

4          MR. SCHACHTER:  Your Honor, we submit that they show

5    the court that Mr. Allen is a very, very good and kind person

6    with two small children who need him.  His daughter Fay, who is

7    five years old, will need serious surgery in the near term and,

8    your Honor, needs her father with her.

9          Mr. Allen's loving partner of 25 years, Tracy, who was

10   present in the United States with Mr. Allen throughout the

11   trial, and is here today as well, loves him, depends on him.

12   You may have noted Mr. Allen's aging parents, who also were

13   present throughout the course of the trial.  They love him.

14         THE COURT:  Of course this is a problem in a great

15   many cases.  The argument you're making has weight, but it

16   cannot be the whole story, because for two reasons.  One is

17   that, in a very large number of cases where crimes are

18   committed, the victims include the perpetrators having family.

19   You could even make the argument -- not without some force --

20   that by committing a crime that is punishable by imprisonment,

21   the perpetrator knowingly or unknowingly sets out to victimize

22   the people he purports to love best.

23         That doesn't mean that I shouldn't take account of the

24   harm to them.  That is what I will do.  But I want to suggest

25   that the argument is sort of double-edged in some ways.

G3ASALL2

1          MR. SCHACHTER:  Well, your Honor I guess I'll respond

2     in two ways.  One of, of course, 3553(a) starts with examining

3     the characteristics of the man who has been convicted that is

4     before your Honor for sentencing.

5          THE COURT:  Yes.  That is a good point.

6          The very first item in -- let me just pull it out --

7     Section 3553(a)(1), the court, first and foremost, is to look

8     at, quote, the nature and circumstances of the offense and the

9     history and characteristics of the defendant.

10          The fact that those are grouped together as the

11     primary thing that the court is told to look at shows that it

12     is a two-edged sword.

13          MR. SCHACHTER:  Certainly, your Honor.  I will

14     address, of course, the nature of the offense as well.

15          But the man that is before, it is important to

16     understand who he is, and we think that that the letters that

17     are submitted by friends and family, that speaks volumes about

18     the character of Mr. Allen.  Because the court is not merely

19     judging the offense conduct -- that's obviously a very

20     important component, and I will address that -- but also the

21     question is what kind of penalty is appropriate for this man.

22          To determine that, we submit that your Honor needs to

23     understand -- and we have tried to paint a picture of the

24     man --

25          THE COURT:  Unless the government thinks otherwise, I

G3ASALL2

1    think you have established, the defense has established, that

2    Mr. Allen is, in most respects, a good person.  He is clearly a

3    good family man.  He is someone who doesn't engage in

4    ostentation or excesses.  He has many commendable qualities,

5    all of which I think are important to sentencing, and all of

6    which I will take account of.

7         The government focuses on a different aspect.  They

8    point out that, you know, the people who wrote these letters,

9    of course, were not present and they didn't see the evidence.

10   The evidence, in the court's view, to be frank, was very

11   strong.  While otherwise leading a blameless life, Mr. Allen

12   chose to commit -- and over a period of time, not just a

13   one-time deal -- a serious crime.

14        The government also argues that he lied about it on

15   the stand, but I noticed they didn't ask for an obstruction of

16   justice calculation in that respect, and I am not going to make

17   such a finding, but the jury could, and that is inherit in the

18   verdict.

19        Let me just pause, though, and see if the government

20   agrees about what I have just said about the character of

21   Mr. Allen.

22        MR. YOUNG:  We agree as far as Mr. Allen's home life

23   and the way he interacts with his neighbors.  We would submit

24   that there are aspects of this crime which present a different

25   side of his character.

1          THE COURT:  Back to you, Mr. Schachter.

2          MR. SCHACHTER:  Well, I think that one thing that your

3    Honor has said is very important, and that is that other

4    than -- I don't recall your Honor's exact words -- but other

5    than the conduct which was considered by the jury, we submit

6    that the record shows that Mr. Allen has led a model life of

7    integrity and kindness and caring, and we think that his family

8    circumstances are certainly considerations that the court

9    should consider.

10         THE COURT:  I agree.  The word "model" may be a little

11   strong.  I think I used the word blameless.  But I agree that

12   those are all things I need to factor in.

13         MR. SCHACHTER:  Putting aside -- I'll take that

14   next -- the specific LIBOR-related conduct, there are also

15   letters which demonstrates Mr. Allen's conduct in the

16   workplace.  His former coworkers wrote on his behalf, and they

17   spoke to his integrity in the workplace as well.  We obviously

18   need to speak about the LIBOR-related conduct, but his

19   coworkers say he was, was, a person of integrity in the

20   workplace.  He was no different to his colleagues than he was

21   to his family and friends, that they all looked to him as being

22   a person of virtue and integrity.

23         In assessing the characteristics of the defendant, we

24   submit, your Honor, that is very important, as well as the fact

25   that Mr. Allen has never had a brush with the law.  There is no

G3ASALL2

1    dispute to that, and as the ABA Task Force noted, that is a

2    factor which should be considered in determining whether a jail

3    sentence is warranted, as well as its length.  It is different.

4    I think, your Honor, many times -- not always -- but many times

5    when --

6             THE COURT:  The last I checked, the ABA task force

7    doesn't make the law of the hand, much as they hope to.

8             MR. SCHACHTER:  Or should.  Or should.

9             Jail is a very serious penalty, and we need to

10   consider whether, as a society, under what circumstance that is

11   a penalty which needs to be imposed.  And I think that --

12            THE COURT:  I am not sure how far that cuts.  I

13   basically agree with that point, but I would note, just so that

14   it is out there, for better or worse, we are a highly punitive

15   society.  We throw people in jail for offenses that are trivial

16   compared to anything that was committed in this case.

17            We have 2.2 million people in prison or jail right

18   now, the so-called mass incarceration.  That is by far the

19   highest percentage and the highest absolute number of any

20   country in the world, civilized or uncivilized.

21            If all were to look at it with a cold, cynical point

22   of view, one would have to say that the American society has

23   chosen jail as its preferred approach to crime.

24            MR. SCHACHTER:   I think that is right, and I think

25   that many question whether or not that is a reasonable approach

G3ASALL2

1      that accomplishes anything at all.  That is a subject for

2      discussion another time.

3            I think that I have found, as a prosecutor, your

4      Honor, that generally what causes somebody to be prosecuted and

5      incarcerated is not always, but very frequently it has been a

6      life of corner-cutting, a life of mild cheating, that has

7      brought this person within the government's focus.  Not always,

8      but frequently.  Here, there is no such evidence.  The evidence

9      is to the contrary.  These letters tell a contrary story, and I

10     think that that matters.

11           We also note, as we did in our papers, that Mr. Allen

12     waived extradition.  He voluntarily came here immediately to

13     answer these charges when he could have fought the government

14     in a lengthy extradition battle.  Who knows how that would have

15     turned out, but it deserves consideration by your Honor in what

16     we submit is a complicated, a very difficult sentence.

17           Now, I would like to turn to the offense.  I submit,

18     your Honor, that there are important things about this

19     particular offense that make it different than almost any other

20     fraud offense that has come before the court or that the court

21     has experienced.  I am going to try to take the court through

22     the many ways in which this offense is significantly different.

23           The first, most glaring, and I think the factor that

24     is most worthy of the court's weighty consideration, is that

25     this offense was not committed for personal gain.  It resulted

G3ASALL2

```
 1    in no personal gain.  The only conceivable motive was to help

 2    one's employer.  That doesn't excuse illegal conduct.

 3          THE COURT:  Well, what makes you think that is so

 4    unlawful?  When we get to crime in the suites, as it is

 5    sometimes referred to, often there is no direct gain.  But by

 6    doing a "good job," meaning one that leads to greater profits

 7    or greater enhancement of advantages or whatever, depending on

 8    the case, for the company, the defendant also advances his own

 9    future in the company, sometimes directly through bonuses, but

10    sometimes indirectly, just through achieving an enhanced

11    position.  I am not so sure that is so unusual.

12          MR. SCHACHTER:  I submit that a vast majority of the

13    fraud, while certainly there are the kinds of cases, I am going

14    to distinguish those from Mr Allen's circumstance, but I submit

15    that a vast majority of the fraud cases that your Honor sees

16    that are prosecuted are motivated by greed.  It is somebody who

17    has set out to defraud somebody else to put money in their

18    pocket.  That is what they are out to do.  It is venal.

19          THE COURT:  This is not a debate we need to have,

20    because whether it is common or uncommon, I understand the

21    distinction you're making.

22          But, for example, all the people who were involved in

23    the mortgage fraud cases, that most of whom were not

24    prosecuted, but all of whom were doing deeds that led to the

25    prosecution of their companies, were seeking to advance the
```

G3ASALL2

 1    economic position of the company.  They weren't putting money

 2    directly in their pocket by doing that, they were helping their

 3    company with its profitability in ways that, at least so far as

 4    the company was concerned, were later determined to be

 5    fraudulent.

 6         I think it is a different motivation, if you will,

 7    that is what we are really talking about here.  There are

 8    people who go out and commit economic crimes so that they can

 9    get rich and because they are greedy, but there are a

10    meaningful number of people who commit economic crimes because

11    it advances their position in terms of the company or financial

12    institution or whatever that they are a part of.  This may be

13    the latter type, but I think both cases exist in some numbers.

14         MR. SCHACHTER:  As your Honor noted, individuals, in

15    the example that the court provided, were not prosecuted

16    criminally.  There are civil regulatory agencies that may

17    pursue individuals in those matters.  The use of the criminal

18    hammer is for the most egregious cases, because the government

19    has a range of weapons.  Not all are appropriate for every

20    circumstance.  As a general matter, because the criminal hammer

21    can result in somebody's incarceration, I think it should be

22    reserved for the most venal.

23         In assessing venality, I think it is fair to look to

24    the motivation and is this someone who was greedy and who was

25    acting to harm others or to put their money in their own

1   pockets or was this a different motivation.  I think it is a

2   relevant factor.  I submit it is a relevant factor.  I think it

3   is a rare circumstance where it is not motivated by personal

4   gain that --

5          THE COURT:  Just so we can move on, I agree with you,

6   it is a relevant factor.  We can debate how rare or unrare that

7   kind of situation is, but the point from your purposes is

8   simply that this was not a crime, in your view, that was

9   committed for personal gain.

10         MR. SCHACHTER:  Yes.  Just to address the government's

11  response that they submitted on that, that they have said in

12  their papers, that, well, maybe it was done to benefit the

13  overall, the bank's bonus pool.  I wish to say there is no

14  evidence of that whatsoever.  Mr. Robson did not say that he

15  was motivated to honor Mr. Yagami's request because he was

16  considering the bank's bonus pool.  There is no e-mails, no

17  recorded conversations in which anybody is saying, well, look,

18  it is really important that we do what the swap traders want

19  because we need to improve the bank's overall bonus pool.  And

20  any of these particular swaps, the impact that a single-panel

21  bank could have had on any particular swap, it would be so

22  small as to not have any possible impact on a bonus pool.

23         I just wish to address the government's argument in

24  that papers.  That would be pure speculation and nothing but.

25  There is no basis to suggest that the defendants would have

G3ASALL2

1    been doing anything or motivated by anything other than to

2    assist their employer in what, I submit, is a, perhaps,

3    misguided -- the court would certainly say very misguided --

4    effort to do their job.

5              (Continued on next page)

G3AFALL3                        Sentence

1            MR. SCHECHTER:  But it's to benefit, it's to help

2       their employer not, to line their own pockets.  I think that's

3       a relevant factor and I know I've taken -- the Court has heard

4       me on that.

5            So I ask the question.  Why, if there is no personal

6       gain, why did cash traders ever -- what's the motive?  With no

7       apparent pecuniary motive, why did cash traders ever take into

8       account the swap trader's requests?  Why were the swap traders

9       making these requests?  What's important and what I think is

10      unique about this case is the nature of the offense.  This did

11      not just happen at Rabobank.  The government's deferred

12      prosecution agreements with financial institutions have

13      revealed that identical if not far more significant conduct

14      that was before this Court was engaged in by more than 125

15      people at ten different financial institutions.  That's all

16      laid out.  There is no dispute between the government and we

17      that the exact same thing happened everywhere and that's just

18      125 that the government sought to list in their deferred

19      prosecution agreements and CFTC resolutions and all that.  So

20      it's clearly far more than that number.

21           Why did that happen?  Why did the Deputy Governor of

22      the Bank of England call Barclays and tell them to put their

23      rates lower than they otherwise would because they did not want

24      the market to be worried that Barclays was having trouble

25      borrowing money?  In other words, the Deputy Governor of the

1   Bank of England says to Barclay submit a false LIBOR rate, they

2   direct them to submit a false LIBOR rate.  And why did this

3   happen?  Why was it so widespread?  And I submit, your Honor,

4   that there was something different about the nature of this

5   offense than any other fraud offense.  I submit, your Honor,

6   that the lines here, the enormous widespread nature of this

7   practice, so as to really become -- it's an industry practice,

8   is explained because the lines here were blurrier, that when

9   the Deputy Governor of the Bank of England calls Barclay and

10  says lower your rates, there's something about it that is not

11  obvious that it's wrongful, or we can conclude that hundreds of

12  people, certainly more than 125 people went to work every day

13  in the city of London and they thought to themselves today I'm

14  intentionally committing fraud.  This is what I do, this is my

15  job.

16          THE COURT:  I don't know why you think this is so

17  unusual.  Again, I take the analogy of the mortgage bank

18  security bubble.  So everyone who was, for example, soliciting

19  someone who they knew really did not qualify for a mortgage to

20  put false statements down on their mortgage application so that

21  the mortgage could be obtained, which could then be part of a

22  pool that could be sold as securities to people who were misled

23  into believing that the risk was a lot less than it was,

24  everyone who did that knew at a minimum that what was being put

25  down in that mortgage application was not true; the person

1    submitting it knew it was not true and the person soliciting

2    knew it was not true.  And there were all sorts of pressures,

3    economic and otherwise, that were pushing hundreds of people to

4    do that.  But it wasn't because they were personally pocketing

5    money when they obtained that signature on that application.

6         MR. SCHECHTER:  Your Honor, but that's another example

7    where no one has been criminally prosecuted.

8         THE COURT:  Firstly, that's a little bit of an

9    overstatement but second of all, I'm not sure that matters.

10   The question you were raising was why do people do this and

11   what I'm suggesting to you that common experience and recent

12   experience suggests that the kinds of situations you're

13   describing are not so unusual.  And one doesn't have to just

14   dwell with the -- you can think of the S and L crisis where

15   there were considerable overstatements of the risk of things

16   that savings and loan associations were engaged in and it was

17   very widespread.  In fact, it was so widespread that there the

18   Department of Justice in an era when it had a different view of

19   who should be prosecuted, successfully prosecuted 800 people,

20   virtually none of whom were lining their pockets directly in

21   the sense that you've been referring to.

22        So I'm not persuaded yet that this is such an unusual

23   or unique situation.

24        MR. SCHECHTER:  Well, your Honor, my point is, what

25   I'm attempting to do, and obviously I'm not doing a very good

1   job --

2           THE COURT:  You always do a good job, Mr. Schechter.

3   Don't worry about that.

4           MR. SCHECHTER:  What I'm attempting to do, your Honor,

5   is suggest to the Court that not all offenses are the same and

6   that there's something about the nature of this offense as

7   indicated by its widespread nature and other factors as well,

8   which perhaps I'll have better luck with the Court in

9   suggesting that there is something about the nature of this

10  offense which is different than most criminal offenses.

11  Perhaps I failed with the widespread nature.

12          Let me point out this.  This occurred out in the open.

13  There was no effort to conceal it.  The unanimous testimony of

14  all the witnesses in this case as well as is laid out in all

15  the government's corporate prosecutions, no one tried to

16  conceal this.  This happened out in the open.  The head of

17  treasury at Rabobank sat directly across from Mr. Allen.  There

18  was nothing, there was no efforts to conceal, there was no

19  efforts to -- there was no clandestine meetings at which the

20  plan was hatched --

21          THE COURT:  I think while there's some element of

22  truth to what you're saying here, I think the testimony at

23  trial shows this was not known, for example, to the people on

24  the other side who were relying on LIBOR as an objective

25  measure.

1        MR. SCHECHTER:  Certainly true.  But my point is this:

2   That in -- my suggestion is that the lines were blurrier here

3   because if people thought to themselves, if all 125 of these

4   people; Mr. Allen, Mr. Conti, thought they were doing something

5   wrong, that it would be an odd thing to do to have every day,

6   as Mr. Robson said, there would be a shout, okay, "Who needs

7   this for LIBOR?"  It's an odd thing to do if people are

8   knowingly, intentionally committing a --

9        THE COURT:  I think it would help, to have a further

10   debate, you are bound as I am bound by the jury's verdict.  The

11   jury found that this was an intentional fraud.  I personally

12   think the evidence of that was strong.  I don't disagree with

13   the jury in any respect.  But you are bound by it even if you

14   did disagree with it.

15        MR. SCHECHTER:  My point is not to suggest -- I'm not

16   here to quarrel with the jury's verdict.  That's not my point.

17   My point is that not all criminal offenses are the same and not

18   all criminal offenses warrant the same penalty and I think

19   there is a difference when the evidence shows that somebody is

20   going 70 through a stoplight as somebody is walking across the

21   street and what I'm suggesting is that there are facts and

22   circumstances about this offense, your Honor, which suggests

23   that the lines were blurrier, that the nature of the offense is

24   different than some.

25        For example, your Honor, we have studied carefully

1   your Honor's opinion in the case of Rajat Gupta.  When Rajat

2   Gupta leaves the Goldman Sachs board room and calls Raj

3   Rajaratnam to tip him about Warren Buffet's investment, there

4   is no question that he knows he is engaged in a criminal act.

5   There is no question that he is engaged in what your Honor

6   described as an egregious breach of trust.  No question.  He

7   can't have any doubt.

8           There are facts about this which suggests that this

9   offense is less venal, and there's indicators -- which I am

10  probably unsuccessfully trying to lay out for the Court.  It is

11  enormously widespread.  It is done out in the open.  No one

12  cares who hears.  It is internally audited at Rabobank.  It is

13  brought to their attention that Mr. Yagami is making requests

14  to Mr. Robson of what LIBOR submissions should be put in.

15  Internal audit sees it, doesn't care, does nothing.  There are

16  reports to the British Bankers Association that this is

17  happening.  There are regular reports.  The British Bankers

18  Association is aware, the Financial Supervisory Authority in

19  the UK is aware of it.  Mr. Allen, we heard the tape, callid

20  the Federal Reserve investigators and says that LIBOR rates are

21  being influenced by swap trader requests and the Fed also does

22  nothing about it.

23          My point is not that they're not guilty.  I'm not here

24  to quarrel -- there may some another day --

25          THE COURT:  I understand you're not waiving any of

1    your appellate rights.

2            MR. SCHECHTER:  But that's not my point.  My point is

3    I am submitting to your Honor, as your Honor compares it to

4    other offenses, there are odd things about this offense which

5    suggests that the lines are blurrier and it is an offense that

6    should be considered different from most fraud offenses which

7    come before the Court and I think are relevant for

8    consideration of sentencing.

9            THE COURT:  All right.

10           MR. SCHECHTER:  Mr. Allen doesn't pay cash bribes.  He

11   doesn't destroy evidence.  There's nothing being done by

12   anybody to conceal the conduct.  I think that is a window to

13   the state of mind of the people that are engaged in this

14   practice.  Mr. Robson never said he did anything to hide it.  I

15   think it is a window to the state of mind of the people that

16   are engaged in this conduct.  It is worthy of the Court's

17   consideration of the venality, of the seriousness of the

18   offense.  And I don't mean to suggest when I say that, that

19   it's not serious.  That's not my point.  My point is, that as

20   your Honor compares all of the defendants that your Honor has

21   sentenced I think these are relevant factors to compare and

22   contrast and it will be my request that your Honor consider a

23   non-custodial sentence.  I'm trying to lay out the factors

24   which would support the imposition of such a sentence.

25           Another factor.  Lee Stewart, the government's witness

who the government clearly believes is a truth teller, they

entered into a cooperation agreement, they called him to the

witness stand and presented his testimony before the jury.  He

said that it wasn't considered inappropriate.  His

understanding was that it wasn't considered inappropriate at

Rabobank to engage in this conduct.  He was asked:  "Between

2005 and 2009 you never thought about or you never really

considered whether sharing your LIBOR preferences with cash

traders was appropriate or inappropriate?  That didn't cross

your mind?

"A.  At Rabobank it wasn't considered inappropriate to do that.

"Q.  When you left the bank in 2009, you had no inkling that

LIBOR submissions at Rabobank were an issue or a problem?

"A.  No."

        This is the government's witness.  They believed that

man was telling the truth as he stood on the witness stand and

he says I didn't -- he didn't see it.  It did not cross his

mind that this was inappropriate conduct.

        Again, my point is not that no offense was committed.

My point is, that as your Honor compares Mr. Allen to the many

defendants that your Honor has sentenced, that is worthy of the

Court's consideration that the government's own witness didn't

see it.  My point is that the lines were blurrier.

        There are not many frauds, none that I can think of

where there have been individual prosecutions -- I'm trying to

1    distinguish the mortgage-backed securities example that your

2    Honor has provided -- there are not -- I cannot think of frauds

3    where the conduct occurs across an entire industry at every

4    financial institution out in the open with the knowledge of

5    regulators, being discussed with regulators.  It's just

6    different.  That's my point.

7            There are other things that I think are different

8    about this offense than others.  And I will note, by the way,

9    your Honor, I'm sure your Honor will be aware that there were a

10   number of brokers who were charged with LIBOR manipulation in

11   the United Kingdom and they were acquitted.

12           THE COURT:  Yes, but of course Mr. Hayes was

13   convicted.  Every case was different and I don't think we can

14   draw the -- I think there's one important aspect of the Hayes

15   sentence that I want to ask the government about, but I'll flag

16   it right now because you were the one who raised it.  You

17   stated and as near as I was able to check it out it appears to

18   be correct, that under British law, while his sentence was

19   nominally eleven years, originally 14 and then reduced to 11,

20   in fact he will only serve 5-1/2 years in prison and he will be

21   released to the community for the other 5-1/2 years.

22           I was really taken aback when I learned that because

23   it reminds me a little bit of the system that the U.S. did away

24   with, the parole system where a judge could say, oh, I'm

25   sentencing you to 15 years but in reality in most cases,

1    particularly in white collar cases, it would be five years

2    because under the law then he could be paroled after one-third

3    of his sentence.

4            British law as far as I can determine, it goes even

5    further.  They mandate that you be released after one-half of

6    your sentence unless you've committed some other offense or

7    something like that.  So the reality was that Mr. Hayes, who I

8    think everyone agrees was in various respects more culpable

9    than either defendant here, received a sentence in fact of

10   5-1/2 years.

11           MR. SCHECHTER:  That's correct, your Honor.

12           THE COURT:  I'll hear from the government on that in a

13   minute.  We need to hear from the government, so I'll ask you

14   to bring it to a conclusion.

15           MR. SCHECHTER:  I will attempt to do so.  My only

16   point in mentioning the broker's acquittal, watchers of that

17   trial reported that the view was the LIBOR system was broken

18   well in advance of the conduct and that was the reason for the

19   acquittal.  Again, my point is just that the lines here are

20   blurrier.

21           A couple of other facts that I think make this one

22   different than the vast majority of the cases your Honor sees

23   is -- I'm not trying to excuse it, I'm merely trying to

24   distinguish it among other defendants convicted of fraud

25   offenses.  The deceived parties were sophisticated swap

participants, most of whom were in financial institutions

engaged in exactly the same conduct.  The government is unable

to in this unusual case identify any loss suffered by any

counter party and we think that makes it different and supports

a non-custodial sentence.  That's not it.  We think that

Mr. Allen's involvement in the offense is more limited and that

is also worthy of the Court's consideration.

Mr. Allen, the government recounts in its papers, his

job was to, was the supervision of the bank's liquidity.  The

LIBOR submissions is not part of what he supervised.  It is not

what he did on a regular basis.  It is not the heart of what he

did each and every day.  That's because LIBOR submitting we all

learned is a simple task.  It takes a couple of minutes.  It

does not require any interaction with a supervisor and that was

the testimony of Mr. Yagami, Mr. Stewart and Mr. Robson, all of

whom testified that Mr. Allen did not supervise their LIBOR

submissions, he didn't supervise Mr. Stewart at all.

He would submit U.S. dollar LIBOR on extremely rare

occasions.  The testimony was a couple of times a year.  He

would submit LIBOR only when Mr. Conti and Mr. Robbins were out

of the office.  It would make sense that it would only be on

those occasions that anybody would be directing their request

to Mr. Allen as opposed to somebody else.

And that's it.  We have the recorded calls and there

is no recorded calls beyond these 14 -- these 16 e-mails to

G3AFALL3                          Sentence

1    which Mr. Allen responds only four times.  That's the extent of

2    the conduct.  There is no recorded call making a request.  My

3    point is only that Mr. Allen's -- worthy of consideration by

4    the Court, is his limited involvement in this offense.

5              THE COURT:  All right.  I'm going to need to cut you

6    off.  We've gone over an hour.

7              MR. SCHECHTER:  Your Honor, I have one more point

8    which I really think is very important.

9              THE COURT:  Go ahead.

10             MR. SCHECHTER:  And that is that your Honor I think

11   needs to consider the disparities between, Mr. Allen stands

12   before the Court and Mr. Conti's response submission laid out

13   in chapter and verse identical and much worse conduct committed

14   by others at other financial institutions, and I think it is

15   fair consideration for the Court in fashioning a sentence to

16   consider this disparity.  Why is it -- and we're six years into

17   the government's investigation -- why is it that -- is it fair

18   that Mr. Allen and Mr. Conti are the only ones in the United

19   States to go to prison for this conduct when the government is

20   aware of these more than 125 others?  Is his conduct worse than

21   the senior executive at Barclays who headed the FX and money

22   market committee who said in a conversation with Mr. Ewan that

23   Barclays was dirty clean?  Is it worse than RBS's global head

24   of money market that talked about keeping LIBOR down because of

25   big fixes in London?  Is it worse than UBS's head of short-term

G3AFALL3                                Sentence

interest rate trading who agreed it was UBS's, quote, natural

right to reflect our interest in the LIBOR fixing process?

          And one of the factors is to avoid unwarranted

sentencing disparities.  And this is a gross disparity, your

Honor, and I think that looking at all of these people who

engaged in identical conduct, and who will never be brought

before the Court, will never risk incarceration, I think that

is a very significant factor for your Honor to consider in

fashioning Mr. Allen's sentence.

          Your Honor mentioned Mr. Hayes, and as your Honor

noted, there is no comparison between Mr. Hayes' conduct and

the conduct here.  Mr. Hayes paid cash bribes to brokers in

order to disseminate false market information and he obstructed

justice.  He told a witness to leave the United States in order

to avoid being interviewed by the Justice Department.  There is

no comparison, theres nothing like that in the conduct

before your Honor.  There is no comparison and I wish to

emphasize that if your Honor does impose a custodial sentence,

that the Bureau of Prisons will place Mr. Allen and Mr. Conti

in harsher conditions, much harsher conditions, your Honor.  We

attached several reports of the conditions that exist in

private prisons which the Bureau of Prisons will subject them

to and that consequence of your Honor's sentence is worthy of

consideration.  The fact that placing them in prison will be

different and worse and harder than any other, than other

1    defendants, other U.S. citizen defendants that your Honor will

2    sentence.  That is simply because they're foreign nationals.

3    They will be ineligible for a minimum security or a low

4    security designation.  Instead they will be sent to these

5    institutions, these privately run institutions where there is

6    no education, there are none of the rehabilitative

7    opportunities that exist in the prisons simply because they're

8    foreign nationals and that's not fair and it's harsh.

9            THE COURT:  All right.  Thank you very much.  Let me

10   hear from the government.

11           MR. YOUNG:  Your Honor, I think the lines were clear.

12   The lines were not blurry.  When Mr. Allen got up and testified

13   he didn't say I thought it was okay to influence this rate to

14   suit our trader positions.  He said I understand that you can't

15   do that.  And that's what Mr. Robson said, that's what

16   Mr. Stewart said that's what Mr. Yagami said.  I would submit

17   that it's obvious.  I mean, if you are manipulating a rate it's

18   a zero sum game when it's a swap.  Somebody else on the other

19   end of the swap is going to lose out.

20           The biggest problem with the crime, Judge, I looked at

21   what the Court said in sentencing Mr. Gupta and the Court there

22   observed:  "The effect of the crime is to place in jeopardy the

23   integrity of the marketplace which is one of the most valuable

24   assets this country possesses; in an even broader sense to

25   suggest cynicism about how the financial markets work and how

G3AFALL3                          Sentence

business is conducted.  Once you have a situation where people

say well, it's all rigged, it's all fixed, it's all a bunch of

people with inside information getting rich at the expense of

the rest of us, you create cynicism that is terribly hard to

overcome."  And that's the problem with this case.  By rigging

this market the defendants not only undermined the integrity of

the market, but they harmed public confidence in those markets.

And that is a very real and non-theoretical problem.  Because

if people don't have confidence in the markets they're not

going to invest their money.  That is the single biggest

problem with this case, your Honor.

          It is certainly the case that there are other people

out there manipulating the LIBOR rate.  I mean, there were

other prosecutions, there were deferred prosecution agreements.

And what that shows, your Honor, is that there are a lot of

people who if given that opportunity, if given the opportunity

to rig a benchmark in their favor, they're going to do it.  And

while a deferred prosecution agreement and a corporate fine can

have very helpful consequences in deterring that conduct the

fact this conduct is so pervasive and that many institutions

that have entered into TPAs for rigging LIBOR had people

continue on and rig the FX file.  I think what that teaches us

is that no deterrence short of incarceration is going to deter

people from taking advantage of those situations.

          THE COURT:  So in light of that, what do you say to

1    the argument that why hasn't the government gone after a lot

2    more individuals?

3            MR. YOUNG:  Well, I would say a couple of things.

4    Mr. Shechter's argument assumes that we're done investigating

5    and this is the end of the story as far as LIBOR is concerned.

6    And while I can't make any representations about what may or

7    may not happen tomorrow, what I can tell you is that this is

8    not the end of the story.  If we come across another case of

9    LIBOR manipulation, we think it's a good case we believe beyond

10   a reasonable doubt that it will be proven, that's a case that

11   we can bring.  So I think it's probably more fair to say that

12   the defendants are on the earlier end of the individual

13   prosecutions than some other folks.

14           I would also note, Judge, we have charged, the

15   Department of Justice has charged a number of people in this

16   case.  We charged Tom Hayes as well.  He was prosecuted in the

17   United Kingdom.  There was a guy named Mr. Darren who is

18   residing in Switzerland and a number of the ICAP brokers who

19   were acquitted.  But what's also important is that the United

20   Kingdom has charged 24 individuals.  So when we make

21   prosecuting decisions we have to decide is this a good use of

22   taxpayer dollars, is there another sovereign that's going after

23   these same people, does it make sense for two sovereigns to

24   chase after the same folks?

25           THE COURT:  I believe there's still a fugitive in this

G3AFALL3                        Sentence

 1    very case.  Do I have that right or not?

 2              MR. YOUNG:  You do have that right.  There are two

 3    other people.  Mr. Thompson is in Australia.  We've also

 4    charged Mr. Motomura.  It's simply not the case that we decided

 5    to charge Mr. Allen and Mr. Conti for some personal animus.  We

 6    went after the conspiracy the best way we knew how to do it.

 7              And, Judge, there was a guilty plea of a Deutsche Bank

 8    trader not long ago in this very courthouse.

 9              At the trial it was certainly true that both

10    defendants had family members that came.  They came all the way

11    across the ocean, they sat in on the trial and the Court had a

12    window of their friends and their family in the letters that

13    were written.  And I remember we thought to ourselves if these

14    defendants have family members that are willing to support them

15    in such a difficult and trying circumstances, they must have

16    done something right and that is certainly probative of 3553.

17    But here's the problem.  The problem is that people who are in

18    a position to rig the FX file or to rig a LIBOR benchmark by

19    and large are similarly situated to these defendants when it

20    comes to having family members, when it comes to having people

21    who care about them.  And what I would urge the Court to

22    remember -- while there may be no dispute that these defendants

23    are well liked in their communities and they have beautiful

24    families that support them, it should be noted that their

25    offense was not an aberration in the sense that they got up

G3AFALL3                          Sentence

almost every morning and participated in a scheme that went on

a number of different years.  And that's an important

distinction we think to draw.  And so --

            THE COURT:  It's also a distinction with the Gupta

case, for example, where it was a single, one-time violation.

            MR. YOUNG:  It is.  This wasn't somebody who had a

lifetime of trading that made a bad trade.  This is the way

they did business.  And I think another helpful part of the

Gupta decision is that the Court said the offense, the way

these people, the defendant committed the offense that's

probative of their character, too.  And the problem with this

case is that you have two defendants that decided that they

wanted to engage in conduct which they knew full well would

underline the credibility of the LIBOR benchmark and cause

people to question the integrity of the markets.  They knew

that that would happen and they decided to go forward with that

scheme anyway.  They subordinated the most important numbers in

the financial universe to simply gain an edge on their counter

parties.

            (Continued next page)

G3ASALL4

1          MR. YOUNG:  Judge, what we have is sad situation.

2     What we are asking the court to do will no doubt have terrible

3     consequences on the defendant's family.  I am glad we don't

4     hold the gavel today, but we think for the purposes of

5     deterrence, a custodial sentence is warranted and it is

6     necessary.

7          THE COURT:  I wanted to ask you, just to make sure

8     that there is no disagreement because it may be relevant, that

9     is, do you disagree that under the British sentencing system,

10    Mr. Hayes' effective prison sentence was five and a half years?

11         MR. YOUNG:  I don't want to hold myself out as an

12    expert.  I don't know if it is five and a half.  I would agree,

13    everything I know about their system says that a defendant, if

14    they have good behavior, will serve significantly less time

15    than the time to which they are sentenced.

16         THE COURT:  What I am relying on here is a publication

17    of the government of the United Kingdom, complete with a

18    beautiful logo of the crown.  It appears at

19    *www.gov.uk/typesofprisonsentence*, and it says:  If a sentence

20    is for 12 months or more, the first half of the sentence is in

21    prison and the second half is in the community.

22         I have no reason to think that is other than what the

23    law is in the U.K.

24         MR. YOUNG:  I don't either.  I don't either.

25         Judge, I guess I don't want to impose too much more

G3ASALL4

```
1    time on the court.  I would like to address one more last point
2    on the question of why not more prosecutions.  There is a
3    number of reasons, but one of the answers is, these are really
4    difficult cases.  They are hard cases to take forward.  They
5    are hard cases to detect.
6                We have a number of authorities, Gupta included, which
7    say when you have a crime that is difficult to prosecute and a
8    crime that is difficult to detect, that requires a relatively
9    stiff punishment, to change the calculus of the would-be
10   offender.
11               Judge, unless the court has any questions you would
12   like me to address, we would submit on the papers, and thank
13   you for all the energy you spent on the case.
14               THE COURT:  Thank you.
15               Let me hear from the defendant, if he wishes to be
16   heard.
17               THE DEFENDANT:  Your Honor, over the last three years,
18   was involved in the investigation of the trial against me.  I
19   have constantly asked myself what I should have done
20   differently.  Over the past two years, I have read and re-read
21   over and over again the e-mails I sent and received.
22               I so wish that when requested, the stock trades were
23   communicated to me, I would have just said, no, stop.  I wish
24   that after receiving a request, I would have gone to compliance
25   or done something more to stop it.  I live with that regret
```

G3ASALL4

1     every day of my life.  I wish I was more tuned in, that my

2     sense of judgment was different.

3          If only I had done something more, my family might be

4     spared in all this plague, the weight that I will carry with me

5     forever.  To think that these failings may lead me to be

6     separated from my daughters is unbearable.  The idea that they

7     may not experience the same type of childhood that I did, where

8     they are safe and secure with a father who is present and

9     loving, the grief is just overwhelming.

10         Your Honor, the last three years have taken a huge

11    toll on myself and my family.  It has been truly punishing

12    time.  I have suffered from anxiety and depression and sought

13    counseling to help me cope with the situation that I find

14    myself in.  I do not feel I am the same person that I once was,

15    but I am consumed with worry about my family's future and what

16    it may hold.

17         I never stop thinking about the punishing effect it

18    has had on my partner, my children, my elderly parents, and on

19    their health.  My partner Tracy and I have been together for

20    25 years and enjoy a strong, loving relationship built on

21    trust, respect, and honesty.  Tracy has been extremely

22    supportive during this period.  This has been incredibly hard

23    on her, and the potential of a life apart from each other and

24    the thought of bringing up our children on her own.

25         I am so concerned with the effect this has had and

continues to have on my two young daughters.  I can see how

they have suffered already.  They are no longer the

happy-go-lucky, bubbly girls they were.  It has affected their

sleep, their school work.  And I constantly ask, when will I be

going?  When will I come back?

I have been a full-time father for the last seven

years, staying at home and rearing my children.  I have formed

an incredible bond with my daughters.  They mean everything to

me.  They are still so young and emotionally vulnerable, and to

be separated from them by thousands of miles in another

country, their ability to have regular physical contact, or to

not be there for them in their formative years is a devastating

prospect for them and for me.

I plead with you to please take these effects into

consideration and show leniency when you're assigning my

sentence.

I thank you.

THE COURT:  Thank you very much.

I want to first make reference to the law that does

govern this sentence, because although I have had some flippant

remarks to make about the guidelines, and the law permits me to

do that, I am bound by and also very appreciative of congress'

wisdom in imposing Section 3553(a) of Title 18 entitled The

Imposition of Sentence.

The first factor that the court must consider under

G3ASALL4

that section, as I have mentioned earlier, is "the nature and circumstances of the offense and the history and characteristics of the defendant."

Now, as to the history and characteristics of the defendant, as I previously mentioned, I am persuaded that there is a great deal of good in Mr. Allen, and that in this, his day of sentence, the court needs to take account of that.  I don't view that as something that is extraneous to a sentence.  It is an important part of a sentence, when the whole human being in front of the court needs to be judged.

But I also agree with the government that this was a clear-cut and rather blatant fraud.  Yes, it was a fraud that others had involved themselves in as well, and that is not irrelevant, but the proof beyond a reasonable doubt at that trial that showed that Mr. Allen knowingly, unlawfully, willfully, intentionally engaged in a quite serious fraud.  It was a fraud in the bigger picture, as the government points out, that involved the rigging or the attempted rigging of what is one of the most important benchmarks in the financial markets.  The benchmark to which billions, if not trillions, of dollars in mortgage loans, consumer debt, derivative contracts, and other financial instruments are tied.  I don't want to overstate it.  This was just one small part of that huge market, but the undermining of the reliability and objectivity of LIBOR is a very serious offense, and that cannot be

G3ASALL4

overlooked.

The second portion of Section 3553(a) says that the sentence needs to be sufficient but not greater than necessary to carry out four different factors.  The first is to reflect the seriousness of the offense and also promote respect for the law and provide just punishment.  I have already indicated that I consider this a very serious offense.

The second is to afford adequate deterrence to criminal conduct.  Now, I don't think anyone believes that there is much need here for specific deterrence.  It is very unlikely that Mr. Allen would commit this offense again.  But, of course, what that provision is mainly addressed to is general deterrence.  General deterrence is one of the most difficult aspects of sentencing for any judge to calculate, because the truth of the matter is that no one really knows how much a given sentence will act as a general deterrent.  It would be wonderful if we could say, oh, well, a ten-year sentence deters twice as much crime out of a particular kind as a five-year sentence.  No one can say that.

The studies that go back several decades all suggest that there are too many factors involved and that no one can really make an overall assessment from, if you will, a criminal logical standpoint of how a given sentence is likely to affect deterrence.  That generally, therefore, cuts in favor of a lesser sentence or no sentence, because if you can't make a

G3ASALL4

determination of how much deterrence there is going to be, how can you use that as a factor to impose something as serious as a criminal term.

However, there is a body of literature, much of it going back several decades to the works of Gilbert Geis, who was one of the major figures in this area for many decades, now unhappily deceased, that suggest what common sense would also suggest, which is that some prison time does have a deterrent effect that a complete absence of prison time does not.  Just thinking about it in common sense terms, if there were never any prison term for any crime, there is no doubt that crime would run rampant.

It is a particularly strong deterrent, Mr. Geis' studies suggest, in the white-collar area because people who commit white-collar crimes, particularly of the sort that Mr. Allen committed -- as to say is distinct from professional con men or things like that -- are people to whom prison and the very thought of prison is so antithetical to the way their lives have developed, that even the possibility of going to prison is more likely to have a deterrent effect in their cases than, say, in the case of some drug addict or person who is from a more crime-ridden background.

At the same time, I am aware of nothing that suggests that that effect, that deterrent, effect on white-collar criminals of prison sentences cannot be achieved through

G3ASALL4

relatively short sentences.  I think there are no studies that

suggest the opposite, that huge, big sentences will serve a

general deterrent effect in white-collar cases that is not

substantially served by short sentences.

I have imposed, on occasion, long sentences in

white-collar cases.  I sentenced an attorney named Mark Dreier

to 20 years, but had nothing to do with the belief that that

was going to achieve a greater deterrence than if I had

sentenced him to two years.  It had everything to do with the

fact that, unlike Mr. Allen, he was a despicable human being

who had spent much of his adult life involved in fraudulent

activity.  But on the issue of deterrence, it seems to me the

beginning of wisdom in the white-collar area, that some prison

time has an important deterrent effect, but a lot of prison

time doesn't add very much.

A related aspect of this is a statement that appeared

in the government's memorandum in this case involving Mr. Allen

that I thought was very well-spoken.  It is at page five.  It

says, "The LIBOR and foreign exchange manipulation scandals

have exposed a culture of cheating on the trading desk of many

of the world's largest financial institutions that can be

checked only by the incarceration of wrongdoers."

I think that is right.  I am mystified that in some of

the recent history of the past, that approach was apparently

not taken, and only the institutions were gone after.  But also

G3ASALL4

the Deputy Attorney General has indicated that that's the

policy of the past, not the policy of the present.

        In any event, here we have a case where the

individuals have been charged, and one cannot ignore, I think,

to my mind, the almost common sense observation that punishing

individuals with some prison time is infinitely more likely to

have a deterrent effect on widespread misconduct than

extracting monies from corporate parents, usually at the cost

of their innocent shareholders.

        The third factor under Section 2 of Section 3553(a) is

to protect the public from further crimes of the defendant.  I

see nothing to indicate there will be any further crimes by

Mr. Allen.

        The fourth is to provide the defendant with needed

educational or vocational training, medical care, or other

correctional treatment.  This is irrelevant, other than in the

sense that Mr. Schachter brought to the court's attention that

Mr. Allen may not qualify under Bureau of Prison policies for

the kind of institution that someone in his position would

normally be sent.  I don't think, when all is said and done,

that is a major factor one way or the other, but it is a factor

that bears a little bit in Mr. Allen's favor, or in the notion

that the sentence should be lower than it might otherwise be.

        The third factor under Section 3553(a) is the kind of

sentences available.  I don't think we need to say anymore

1      about that.

2             The fourth factor is the kinds of sentencing range

3      established by the sentencing commission.  Well, I have already

4      expressed my tepid views on that subject.

5             The fifth factor is any policy statement of the

6      sentencing commission.  I don't know that there is any that

7      bears on this particular situation.

8             The sixth is the need to avoid unwarranted sentence

9      disparities.  Now, this is always a very difficult thing to

10     assess, because every case is different.  When a case is not

11     before the same judge, you only have indirect knowledge, at

12     best, of the facts.  Nevertheless, I think everyone here agrees

13     that Mr. Hayes' misconduct was more severe and culpable than

14     that of either Mr. Allen or Mr. Conti, and that is why I was

15     struck by the fact that his sentence was five and a half years.

16            In my mind that, so far as disparities are concerned,

17     suggests that Mr. Allen's sentence has to be substantially

18     below that, but that is just one factor.

19            Then the seventh factor, the last factor, is the need

20     to provide restitution.  I don't believe that is involved in

21     this case.  Let me just be sure of that, insofar as the

22     government is concerned.

23            MR. YOUNG:  It is not involved in this case.

24            THE COURT:  Very good.

25            There are a lot of other factors that are implicit in

G3ASALL4

those seven factors that I just mentioned.  I have already said
about the family.  My heart goes out to the family of Mr. Allen
and Mr. Conti.  It is one of the many terrible things about
prison terms, that the victims are often the families of the
incarcerated.  I mentioned before the mass incarceration for
which this country suffers, to its shame, to its total shame,
but of those 2.2 million people in prison right now, an amount
that has stayed more or less steady or increased over the last
25 years, even as crime rates have gone steadily down, 40
percent of them are young black males.  The effect on their
families, on their entire communities, is tragic.  This is
something that the court must consider in this case, the effect
on Mr. Allen's family, and when we get to the next sentence, to
Mr. Conti's family, because it would be barbaric to say that
because we are ruining the lives of black families, we should
also ruin the lives of white families.  Obviously the right
lesson is to reduce the sentences in the other cases.

When I weigh all these things together, I come to the
conclusion that there must be prison time here.  The offense is
too serious.  You can't go around as, in my view, both
Mr. Allen and Mr. Conti were doing, and helping rig one of the
most important markets in the world and not pay the price.  And
deterrence, in the limited sense I have mentioned, is also
important, but I think a great many other factors cut in favor
of a modest sentence.

G3ASALL4

1              The sentence of the court is that the defendant is

2      sentenced to 24 months on each of the 19 counts to run

3      concurrently.  24 months.  I see no need for supervised release

4      and the probation office does not recommend supervised release

5      to follow prison.  I am also persuaded by the defense

6      submissions that no fine is appropriate in this case.  There

7      is, however, a special assessment of $100 on each of the counts

8      that must be paid for a total of $1,900 mandatory special

9      assessment.

10              I don't know that any forfeiture is involved, is it?

11              MR. YOUNG:  We are not seeking forfeiture.

12              THE COURT:  Very good.

13              The sentence is pretty much straight across the board,

14      two years, 24 months.

15              Now, before I advise the defendant of his right of

16      appeal, is there anything either counsel needs to raise for the

17      court?

18              MR. YOUNG:  Not from the government, your Honor.

19              MR. SCHACHTER:  Your Honor, I don't know if this is

20      the appropriate time.  We would ask for a recommendation from

21      the court.  Would the court like to hear that now?

22              THE COURT:  Sure.

23              MR. SCHACHTER:  We ask that court include in the

24      judgment and recommendation, our hope is to avoid one of these

25      privately contracted facilities, and so we ask that the court

G3ASALL4

1   recommend that the defendant be designated to FCI Allenwood,

2   which is pretty close to Newark.  And while travel and

3   visitation will be very difficult given that his family resides

4   in the U.K., it will be made easier through that

5   recommendation.

6           THE COURT:  Just let me stop.  I am perfectly happy to

7   make that recommendation and will.  I am sure you have told

8   your client that, of course, I can only recommend, I cannot

9   order that.  The Bureau of Prisons makes the determination.

10          MR. SCHACHTER:  Yes, your Honor.

11          We would also ask that the court recommends that

12  Mr. Allen not be designated to one of the Bureau of Prisons'

13  privately contracted facilities.  We ask for that

14  recommendation.  We don't know that it will be of assistance,

15  your Honor, but --

16          THE COURT:  I am happy to make that recommendation.  I

17  think there is a lot of literature that suggests that the

18  private prisons and their ownership have become one of the

19  leading lobbies for the continuation of mass incarceration in

20  this country, but maybe that is unfair, they are not here to

21  protest.  But I will make that other recommendation.

22          MR. SCHACHTER:  Thank you, your Honor.

23          THE COURT:  Mr. Allen, you have a right to appeal this

24  sentence.  Do you understand that?

25          THE DEFENDANT:  Yes, I do.

G3ASALL4

1            THE COURT:  If you can't afford counsel for any

2      appeal, the court will appoint one for you free of charge.  You

3      understand that?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Let's turn to Mr. Conti.

6            MR. WILLIAMSON:  Thank you, your Honor.

7            Though he may not believe it himself, Mr. Schachter

8      addressed, I think, all of the many of the issues that apply to

9      both defendants, and so I'll keep my comments limited to

10     Mr. Conti's individual culpability.

11           As the government has acknowledged in their sentencing

12     submission, Mr. Conti was not the leader of the conspiracy.

13     Mr. Conti received no formal education in banking or finance.

14     He comes from a working class family.  He entered banking

15     immediately out of secondary school, and everything he learned

16     about his responsibilities, both as a money market trader and

17     as a LIBOR submitter, he learned on the job.

18           As the government's witnesses testified at trial,

19     accommodating trader requests was common practice at Rabobank.

20           THE COURT:  I think, by the way -- forgive me for

21     interrupting -- I think I never formally indicated that I had

22     adopted the presentence report calculation of the guidelines in

23     Mr. Conti's case, as I did Mr. Allen's case.

24           MR. WILLIAMSON:  Thank you, your Honor.

25           THE COURT:  Go ahead.

1          MR. WILLIAMSON:  As the government's witnesses

2   testified, accommodating trader requests was common practice at

3   Rabobank as early as the year 2000, at least five years before

4   Mr. Conti was given any responsibility over LIBOR submissions.

5   They also testified that they engaged in this practice for some

6   time without believing it was wrong.  Mr. Yagami made requests,

7   he said, throughout 2005 and '6, and he did not come to believe

8   it was manipulation until later.  Mr. Stewart, as Mr. Schachter

9   said, said that by the time he left the bank, he didn't realize

10  that the practice was a problem.

11         Now, the jury determined that Mr. Conti engaged in

12  this conduct knowing it was wrong.  We respect that verdict.

13  But as Mr. Schachter eloquently argued, these facts suggest

14  that Mr. Conti's conduct was not the result of brazen disregard

15  for the law that the government argues that it was, but the

16  cultural factors were to obscure the seriousness of the

17  conduct.

18         I would point out, your Honor, that Mr. Conti's

19  conduct, as demonstrated by the evidence at trial, was not as

20  culpable as Mr. Robson's.

21         THE COURT:  I think the government agrees with you on

22  that.

23         MR. WILLIAMSON:  Thank you, your Honor.

24         Nor did Mr. Conti, like Mr. Stewart, have a direct

25  proprietary interest in the LIBOR submission that's were made.

G3ASALL4

As I understand, Mr. Stewart had a proprietary contract with LIBOR bank and made money directly of those submissions.

Again, Mr. Conti was, according to Mr. Robson's testimony, instructed in how to submit LIBOR rates by superiors.  I would urge the court to consider all of this in calculating Mr. Conti's relative culpability in order to avoid unwarranted sentencing disparities between Mr. Conti and the other defendants in this matter.

THE COURT:  Thank you very much.  Let me hear from the government.

MR. YOUNG:  Your Honor, I'll rest on the papers and on my points that I made with respect to Mr. Allen, except to make two observations.

(Continued on next page)

G3AFALL5                          Sentence

1          MR. YOUNG:  I think the distinction between Mr. Conti

2     and Mr. Allen is, number one, Mr. Allen was in a subordinate

3     role.  I think also, we would submit that Mr. Allen was not

4     entirely candid when he was testifying.  That is a

5     distinguishing factor with Mr. Conti, so with those

6     distinctions, Judge, we rest on the papers and my arguments

7     that pertain to Mr. Allen.

8          THE COURT:  Let me hear from Mr. Conti if he wishes to

9     be heard.

10         THE DEFENDANT:  Your Honor, I will be very brief.

11    First, I want to thank you for your courtesy and decency

12    throughout the trial and this process.  I've never faced

13    criminal charges before and certainly have never been put on

14    trial.  You made the process somewhat less frightening and

15    intimidating and my family and I are grateful for that.

16         Secondly, I've always tried to conduct my life

17    personally and professionally with integrity and concern for

18    others, but I accept the verdict and the fact that you must

19    issue a judgment.  There are certain sad realities that I must

20    come to terms with.  I know that the career in banking that I

21    spent my entire adult life building is over and I may go to

22    prison in a country not my own far from home.  But what I worry

23    about most, your Honor, is the effect that any separation is

24    going to have on my wife, Lisa, and my two daughters and my

25    son.

G3AFALL5                         Sentence

1        Since I was first placed under investigation years ago

2   their lives have been completely turned upside down.  I am

3   scared for their future.  That they have gone through so much

4   turmoil pains me more than anyone can know.  Your Honor, all I

5   want to now do is protected my family from harm and to get to a

6   point where we can just be a family again without all this

7   hanging over our heads, without pain, without grief.  I will be

8   extremely grateful for your consideration in allowing that day

9   to come as soon as possible.

10        Thank you very much, your Honor.

11        THE COURT:  Thank you very much.

12        So all the comments that I made of a general nature

13   with respect to the sentencing of Mr. Allen apply in

14   Mr. Conti's case.  The big difference is that under any

15   realistic view of the situation he's less culpable.  In

16   addition, as does Mr. Allen in a different way, he has a very

17   sympathetic background and family situation, so forth, all of

18   which I have taken account of.

19        So the sentence of the Court, which I will explain

20   more specifically in a moment, is he is sentenced to a year and

21   a day on each of the 19 counts concurrently.  No supervised

22   release, no fine.  I should say in his case it's nine counts,

23   so -- is that right?  There were fewer counts with respect to

24   Mr. --

25        MR. YOUNG:  We're counting eight, Judge.

1              THE COURT:  Okay.  Whatever it is.  Let's see.  I'm

2     counting nine, but I'm counting counts 1, 4, 7, 8, 10, 13, 14,

3     15, 16.  And if my fingers are correct, that's nine.  Well --

4              MR. YOUNG:  I think that's right.

5              THE COURT:  Okay.  So concurrently on each of the

6     counts, whether it's eight or nine, but I'm pretty sure it's

7     nine, and therefore a mandatory special assessment of $900.  If

8     it turns out there are eight counts it's $800.  We'll check

9     that before we issue a judgment but I think it's nine.  But no

10    fine, no restitution, no forfeiture.

11             Now, the reason a year and a day is important is that

12    if your sentence is a year or less you don't qualify for good

13    time.  Mr. Allen, for example, will qualify for good time and

14    that means his sentence can be reduced at the discretion of the

15    Bureau of Prisons by as much as 15 percent of his sentence and

16    I wanted Mr. Conti to have that same benefit.  So while

17    otherwise I would have imposed a sentence of a year, half of

18    the sentence I imposed on Mr. Allen, instead I'll make it a

19    year and a day so that you will qualify for that good time

20    reduction in the discretion of the Bureau of Prisons.

21             Now, before I advise Mr. Conti of his right of appeal,

22    anything else counsel wanted to raise?

23             MR. WILLIAMSON:  Yes, your Honor.  We would make the

24    same request of a recommendation of a designation to Allenwood.

25             THE COURT:  I will make the exact same recommendation.

G3AFALL5                        Sentence

1    Mr. Conti, you have a right to appeal the sentence.  Do you

2    understand that?

3              THE DEFENDANT:  Yes, I do, your Honor.

4              THE COURT:  If you can't afford counsel for the appeal

5    the Court will appoint one for you free of charge.  Do you

6    understand that?

7              THE DEFENDANT:  I do.

8              THE COURT:  Very good.  All right.  Anything else

9    counsel needs to raise?

10             MR. YOUNG:  Judge, we would ask for a modification of

11   conditions of release.

12             THE COURT:  What modification do you wish?

13             MR. YOUNG:  What we would ask the Court to do is to

14   restrict, allow the defendants to self surrender, but that they

15   have to stay in the Southern District of New York or some other

16   agreeable venue until they can self surrender to their

17   facility.

18             THE COURT:  I'm disinclined to impose that.  These

19   defendants have not shown yet any propensity to flee.  They

20   would ruin their careers forever if they did that.  They would

21   probably ruin their family life because they could be found if

22   they simply fled back to England.  They probably do need to set

23   a prompt surrender date.  Now, of course, this may be affected

24   by any appeal.  We'll worry about that if and when that occurs.

25   But why don't we say that the defendants are, barring any

G3AFALL5                          Sentence

1    subsequent order, to surrender to the designated institution by

2    May 2 at 2:00 p.m. All right.  Anything else we need to take

3    up?

4               MR. SCHECHTER:  As your Honor alluded to, we do seek

5    bail pending Mr. Allen's appeal.

6               THE COURT:  The bail will be granted on the same

7    conditions previously set, subject, of course to revision at

8    any time if either side has reason to believe they are a bail

9    risk.  And I understand that the statute says about whether

10   there's a substantial issue for appeal and all like that.

11   Although I think technically it doesn't really kick in until

12   the moment of surrender, but while of course like all judges

13   think there's no issue on appeal nevertheless I think the

14   Kastigar issue is not without some appellate interest, so I'm

15   not going to order their immediate surrender.

16              MR. SCHECHTER:  So, I guess, and I apologize, your

17   Honor --

18              THE COURT:  The government is not seeking their

19   immediate surrender.

20              MR. SCHECHTER:  But in terms of, our request would be

21   that he continue on the conditions set for his release during

22   the pendency of appeal until the Court of Appeals rules and I'm

23   not sure --

24              THE COURT:  So I will grant that order with the

25   proviso that the government has the right at any time to come

G3AFALL5                          Sentence

1    before the Court and say there's new information or reasons to

2    change that.  That could even be after you file your appeal

3    brief and maybe he'll say, Judge, they didn't even raise a

4    colorable issue.  I retain jurisdiction to change that, but for

5    now that will be the order of the Court for both defendants.

6                MR. SCHECHTER:  Thank you, your Honor.

7                MR. WILLIAMSON:  Thank you, your Honor.

8                THE COURT:  Anything else?  Thanks very much.

9                (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25